No. 25-7652

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

**UNITED STATES OF AMERICA,**

*Plaintiff-Appellee,*

v.

**EDUARDO RUBEN LOPEZ**,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the District of Nevada
No. 2:23-cr-00055-CDS-DJA
Hon. Cristina D. Silva, Presiding

**OPENING BRIEF**

STINSON LLP
Dan W. Goldfine
1850 N. Central Ave., Suite 2100
Phoenix, Arizona 85004-4584
(602) 330-3612

DICKINSON WRIGHT PLLC
Bennett Evan Cooper
1850 N. Central Ave., Suite 1400
Phoenix, Arizona 85004
(602) 285-5000

DICKINSON WRIGHT PLLC
Michael M. Beckwith
615 National Ave., Suite 220
Mountain View, California 94043
(408) 791-6200

Attorneys for Defendant-Appellant
Eduardo Ruben Lopez

# TABLE OF CONTENTS

*Page*

Table of Contents..................................................................................2

Table of Authorities .............................................................................6

Introduction ........................................................................................13

Statement of Jurisdiction....................................................................14

Statutes and Rules ..............................................................................15

Statement of Issues Presented.............................................................15

Statement of the Case .........................................................................17

    A.    The government tries Lopez for antitrust and associated wire-fraud offenses................................................17

    B.    At trial, the government tells its wage-fixing story through its star witness while suppressing the true nature of the leniency agreement..........................................18

    C.    Lubinsky's credibility was critical, and the government concealed from Lopez and misled the jury as to the leniency deal that bolstered his testimony............21

    D.    The government presents lay and expert opinion testimony from its FBI case agent without qualifying him as an expert or bifurcating the lay and expert testimony. ............................................................................23

    E.    The government plays for the jury, and then highlights, Lopez's postconspiracy "hookers" comment. ......................................................................24

    F.    The government introduces a privilege log to show what Lopez said to his attorney. ........................................26

G. The government tells the jury to "do your job" and convict. ............................................................... 27

H. The district court sentences Lopez by using "gain" as a proxy for "loss." ............................................. 27

I. The district court orders forfeiture of over $10.4 million based on the purchase price Lopez received for selling his company to Solace. ................................ 28

J. The district court orders Lopez's payment of over $2.4 million to Solace as restitution for its attorneys' fees. ......... 29

Summary of Argument ........................................................... 29

Argument ............................................................................ 33

I. This Court should reverse Lopez's convictions and remand for a new trial because of the government's serial prosecutorial misconduct. ........................................... 33

A. The government violated *Brady/Giglio* and *Napue* by suppressing and misrepresenting the leniency deal the government provided its star witness for his testimony. ........................................................ 35

1. The true substance of the government's deal with Lubinsky's employer was suppressed, and the government presented false evidence of the agreement. ................................................ 37

2. The undisclosed terms of the government's leniency deal were favorable and material. ................. 40

3. These violations require reversal. .............................. 43

B. The government improperly used SSA Singh to provide both inflammatory opinions and undisclosed expert testimony. ................................................. 44

3

C. The district court erred as a matter of law in admitting the recording and transcript of Lopez's "hookers" comment............................................................. 49

D. The government's use of Lopez's inadmissible privilege log violated Lopez's Fifth and Sixth Amendment rights. ............................................................. 53

1. The privilege log was inadmissible hearsay. ............... 53

2. Use of the privilege log infringed on privileged attorney-client communications. ................................. 54

E. The government introduced reversible error when it ended its closing by exhorting the jury to "do your duty." ................................................................... 57

II. The district court erred as a matter of law in sentencing Lopez and imposing improper forfeiture and restitution sanctions on him. ...................................................................... 60

A. In sentencing Lopez for wire fraud, the district court improperly used Lopez's gain as a proxy for loss in determining his sentencing range. ....................................... 60

1. There was no finding of intended loss. ........................ 61

2. There was no finding of actual loss. ............................ 62

B. The district court's forfeiture order lacked a legal basis and constituted an unconstitutionally excessive fine. ............................................................................... 64

1. The district court's order was not supported by 18 U.S.C. § 981(a)(2)(A). ............................................... 64

2. A forfeiture order of over $10.4 million constitutes an excessive fine. ....................................... 67

C. The district court applied the wrong legal standard in awarding Solace restitution for attorneys' fees. ................... 69

Conclusion ............................................................................. 72

Statement of Related Cases ................................................. 73

Certificate of Compliance ..................................................... 74

Addendum

## TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*Austin v. United States,*
509 U.S. 602 (1993) ..............................................................68

*Biggs v. Chicago Bd. of Educ.,*
2022 WL 1591577 (N.D. Ill. May 19, 2022), *aff'd*, 82 F.4th
554 (7th Cir. 2023) ..............................................................54

*Brady v. Maryland,*
373 U.S. 83 (1963) ......................................... 35, 36, 40, 41

*Catlin v. Broomfield,*
124 F.4th 702 (9th Cir. 2024) ............................................36

*Chambers v. Mississippi,*
410 U.S. 284 (1973) .............................................................54

*Clarke v. Am. Com. Nat'l Bank,*
974 F.2d 127 (9th Cir. 1992) ..............................................55

*Cmty. for Creative Non-Violence v. Reid,*
490 U.S. 730 (1989) .............................................................65

*Dow v. Virga,*
729 F.3d 1041 (9th Cir. 2013) .....................................35, 40

*Giglio v. United States,*
405 U.S. 150 (1972) .............................................................35

*Gonzalez v. Wong,*
667 F.3d 965 (9th Cir. 2011) ...........................36, 40, 41, 42

*Hampton v. Shinn,*
143 F.4th 1047 (9th Cir. 2025) .....................................36, 40

*Hayes v. Brown,*
  399 F.3d 972 (9th Cir. 2005)......................................................35, 42

*Horton v. Mayle,*
  408 F.3d 570 (9th Cir. 2005)..................................................41, 43, 48

*Hurd v. Terhune,*
  619 F.3d 1080 (9th Cir. 2010)...........................................................56

*Jackson v. Brown,*
  513 F.3d 1057 (9th Cir. 2008)...........................................................36

*King v. Burwell,*
  576 U.S. 473 (2015)..........................................................................65

*Kousisis v. United States,*
  145 S. Ct. 1382 (2025)......................................................................61

*Kyles v. Whitley,*
  514 U.S. 419 (1995)....................................................................40, 42

*Lagos v. United States,*
  584 U.S. 577 (2018)..........................................................................69

*Milke v. Ryan,*
  711 F.3d 998 (9th Cir. 2013)............................................................40

*Napue v. Illinois,*
  360 U.S. 264 (1959)..............................15, 23, 30, 33, 35, 36, 38, 40, 44

*Nordstrom v. Ryan,*
  762 F.3d 903 (9th Cir. 2014)............................................................54

*Old Chief v. United States,*
  519 U.S. 172 (1997).........................................................................50

*Slaughter-House Cases*, 83 U.S. 36 (1872) ...........................................37

*Strickler v. Greene,*
  527 U.S. 263 (1999).........................................................................40

*United States v. $100,348.00 in U.S. Currency,*
354 F.3d 1110 (9th Cir. 2004)...............................................................68

*United States v. Arturo Sanchez,*
659 F.3d 1252 (9th Cir. 2011).........................................................59, 60

*United States v. Bajakajian,*
524 U.S. 321 (1998)...............................................................................68

*United States v. Balsiger,*
910 F.3d 942 (7th Cir. 2018)..................................................................66

*United States v. Beecroft,*
825 F.3d 991 (9th Cir. 2016)..................................................................68

*United States v. Carpenter,*
941 F.3d 1 (1st Cir. 2019) ................................................................66, 67

*United States v. Crandall,*
525 F.3d 907 (9th Cir. 2008)..................................................................62

*United States v. Cruz,*
592 F. App'x 623 (9th Cir. 2015) ...........................................................59

*United States v. Davis,*
53 F.4th 833 (5th Cir. 2022) ............................................................66, 67

*United States v. Davis,*
706 F.3d 1081 (9th Cir. 2013)................................................................65

*United States v. Frederick,*
78 F.3d 1370 (9th Cir. 1996)..................................................................49

*United States v. Freeman,*
498 F.3d 893 (9th Cir. 2007)..................................................................44

*United States v. Fryberg,*
854 F.3d 1126 (9th Cir. 2017).................................................................53

*United States v. Gomez,*
725 F.3d 1121 (9th Cir. 2013).......................................................57, 58, 59

*United States v. Gonzales,*
520 U.S. 1 (1997) ................................................................. 37, 40

*United States v. Gracidas-Ulibarry,*
231 F.3d 1188 (9th Cir. 2000) .......................................... 61

*United States v. Haischer,*
780 F.3d 1277 (9th Cir. 2015) .......................................... 50

*United States v. Halseth,*
342 U.S. 277 (1952) ............................................................. 65

*United States v. Hankey,*
203 F.3d 1160 (9th Cir. 2000) .......................................... 51

*United States v. Hazelwood,*
979 F.3d 398 (6th Cir. 2020) ............................................ 51

*United States v. Heslop,*
694 F. App'x 485 (9th Cir. 2017) ..................................... 72

*United States v. Kohring,*
637 F.3d 895 (9th Cir. 2011) ............................................ 43

*United States v. Lloyd,*
807 F.3d 1128 (9th Cir. 2015) .......................................... 45

*United States v. Lo,*
839 F.3d 777 (9th Cir. 2016) ............................................ 67

*United States v. Moalin,*
973 F.3d 977 (9th Cir. 2020) ............................................ 35

*United States v. Omidi,*
125 F.4th 1283 (9th Cir. 2025) ........................................ 67

*United States v. Perez,*
962 F.3d 420 (9th Cir. 2020) ............................................ 45

*United States v. Price,*
566 F.3d 900 (9th Cir. 2009) ............................................ 38

*United States v. Ruehle,*
  583 F.3d 600 (9th Cir. 2009)...................................................53

*United States v. Ruiz,*
  167 F.4th 1024 (9th Cir. 2026) .........................................49

*United States v. Sanchez,*
  176 F.3d 1214 (9th Cir. 1999)...........................57, 58, 59

*United States v. Santos,*
  553 U.S. 507 (2008) ...........................................................65

*United States v. Schuler,*
  813 F.2d 978 (9th Cir. 1987)...........................................56, 57

*United States v. Simtob,*
  901 F.2d 799 (9th Cir. 1990)...........................................48

*United States v. Taylor,*
  78 F.4th 1132 (9th Cir. 2023) .........................................61

*United States v. Valencia-Lopez,*
  971 F.3d 891 (9th Cir. 2020)...........................................49

*United States v. Vallejo,*
  237 F.3d 1008 (9th Cir. 2001)...........................................51

*United States v. Vera,*
  770 F.3d 1232 (9th Cir. 2014)...........................................47

*United States v. Wallace,*
  848 F.2d 1464 (9th Cir. 1988)...........................................34, 60

*United States v. Wells,*
  879 F.3d 900 (9th Cir. 2018)...........................................49, 53

*United States v. Yepiz,*
  718 F. App'x 456 (9th Cir. 2017) .....................................40

*United States v. Zolp,*
  479 F.3d 715 (9th Cir. 2007)...........................................63

*Zapata v. Vasquez,*
788 F.3d 1106 (9th Cir. 2015) .......................................................... 59

**Constitutions, Statutes, Rules, and Sentencing Guidelines**

U.S. Const. amend. V ......................................................................... 31

U.S. Const. amend. VI ........................................................................ 31

U.S. Const. amend. VIII ..................................................................... 67

15 U.S.C. § 1 ...................................................................................... 17

15 U.S.C. § 7a-1(a) ............................................................................ 39

15 U.S.C. § 7a-1(b) ............................................................................ 39

18 U.S.C. § 981(a)(2).......................................................................... 64

18 U.S.C. § 981(a)(2)(A)................................................ 32, 64, 65, 66, 67

18 U.S.C. § 981(a)(2)(B)..................................................................... 66

18 U.S.C. § 1343.......................................................................... 17, 64

18 U.S.C. § 1956(c)(7) ....................................................................... 64

18 U.S.C. § 1961(1) ............................................................................ 64

18 U.S.C. § 3231................................................................................ 14

18 U.S.C. § 3571(b)(3)........................................................................ 68

18 U.S.C. § 3663A(b)(4) ......................................................... 29, 69, 70, 71

18 U.S.C. § 3663A(c)(1)(A)(ii) .................................................. 29, 33, 69

28 U.S.C. § 1291................................................................................ 15

Fed. R. App. P. 4(b)(1)(A)(i) .............................................................. 14

Fed. R. Crim. P. 16 ............................................................................ 44

Fed. R. Evid. 104............................................................................... 47

11

Fed. R. Evid. 403.............................................. 15, 25, 47, 49, 50, 51, 52, 53

Fed. R. Evid. 701................................................................................. 45

Fed. R. Evid. 702................................................................................. 45

Fed. R. Evid. 801(c)............................................................................. 54

Ninth Cir. R. 27-13(d)......................................................................... 28

U.S.S.G. § 2B1.1 ....................................................................... 27, 62, 63

U.S.S.G. § 2B1.1(b)(1)................................................................... 28, 62

U.S.S.G. § 2B1.1(b)(1)(A)..................................................................... 61

U.S.S.G. § 2B1.1(b)(1)(B)................................................................ 61, 63

U.S.S.G. § 2B1.1(b)(1)(C)(i) ................................................................ 62

U.S.S.G. § 2B1.1(b)(1)(C)(ii) ............................................................... 61

U.S.S.G. § 2R1.1 ........................................................................... 27, 28

U.S.S.G. § 3D1.4 ........................................................................... 27, 28

## INTRODUCTION

In what the U.S. Department of Justice's Antitrust Division viewed as a pioneering prosecution, defendant Eduardo Ruben Lopez was convicted of one count of wage fixing under the Sherman Act and five counts of wire fraud based on a failure to disclose he was under investigation for that wage fixing. The gravamen of the wage-fixing case was that Lopez and two competitors in the Las Vegas home-healthcare market allegedly agreed to keep the hourly rates they paid nurses within a certain range. The wire-fraud counts were premised on Lopez's selling his legitimate company without disclosing the existence of a federal investigation into the alleged wage fixing.

To win, the government ran roughshod over Lopez's rights. It suppressed critical impeachment evidence about the leniency deal affecting its key witness when that witness's credibility was a central issue, and then misrepresented the leniency terms to the jury. It used its FBI case agent as a conduit for undisclosed expert testimony, eliciting the opinion that Lopez made a "brazen admission of breaking the law" during an interview. It introduced an audiovisual recording of a postconspiracy lunch to show that Lopez said nurses were "like hookers." It asked the jury to infer from Lopez's privilege log the substance of attorney-client privileged communications. And it closed its rebuttal argument with a categorically improper direction to the jurors to "do your duty" by convicting Lopez.

13

At sentencing, the district court made at least three additional errors. First, the wire fraud produced zero loss, but the district court nevertheless circumvented the sentencing guidelines when it calculated Lopez's wire-fraud sentence by improperly using Lopez's "gain" (the funds he received for selling his company) as a proxy for "loss," without finding that "loss" was unascertainable or that there was any intended or actual loss. The court consequently found the sentencing range to be more than twice as long as it should have been. Second, it ordered the forfeiture of over $10.4 million Lopez received for selling his lawful business, without any statutory basis and in violation of the Eighth Amendment's protection against excessive fines. Third, it ordered Lopez to pay the buyer, Solace Healthcare Nevada, LLC ("Solace"), over $2.4 million in restitution for its attorneys' fees, applying the wrong legal standard and failing to make the requisite factual findings.

This Court should reverse Lopez's convictions, vacate his unlawful sentence and financial penalties, and remand for further proceedings.

### STATEMENT OF JURISDICTION

The district court had jurisdiction under 18 U.S.C. § 3231 because Lopez was charged with federal crimes. The court entered its final order of forfeiture on November 25, 2025, 1-ER-13–14, and its final judgment as to Lopez's sentence, fines, and restitution on December 3, 2025, 1-ER-2–12. Lopez timely filed his notice of appeal under FRAP 4(b)(1)(A)(i) on

December 5, 2025. 5-ER-706. This Court has jurisdiction under 28 U.S.C. § 1291. Lopez is currently in federal custody with the Bureau of Prisons.

## STATUTES AND RULES

Relevant statutes and U.S. Sentencing Guidelines provisions are included in this brief's Addendum.

## STATEMENT OF ISSUES PRESENTED

### Prosecutorial Misconduct

1. Did the government commit *Brady/Giglio* and *Napue* violations when it suppressed evidence of its secret leniency deal, which, in exchange for the key witness's cooperation and conspiracy testimony, reduced the restitution obligation of the witness's employer by over $5.3 million, and then misrepresented to the district court and the jury the true nature of the deal?

2. Did the district court commit reversible error when it allowed the government's FBI case agent to offer expert-opinion testimony about the nuances of antitrust conspiracies, including Lopez's "brazen admission of breaking the law," without disclosing or qualifying the agent as an expert?

3. Did the district court abuse its discretion under Rule 403 by allowing the government to play an audiovisual recording from a postconspiracy lunch to show that Lopez compared nurses to "hookers"?

4. Did the district court abuse its discretion by allowing the government to introduce hearsay entries in Lopez's privilege log to show

15

what Lopez told his attorney, impairing Lopez's Fifth and Sixth Amendment rights in the process?

5.     Did the government introduce reversible error when it exhorted the jury to "do your duty" to convict Lopez, without reminding the jury that it should do so only after concluding that the government had met its burden of proof?

## Punishment Rulings

6.     Did the district court err as a matter of law when it sentenced Lopez for wire fraud by using his "gain" from the sale of his company as a proxy for loss, when neither party suggested that loss was unascertainable, there was no evidence of intended loss, and Lopez presented uncontroverted evidence that the actual loss was zero?

7.     Did the district court err as a matter of law in ordering forfeiture of over $10.4 million Lopez received in selling his company, when such forfeiture lacked a statutory basis and violated the Eighth Amendment's protection against excessive fines?

8.     Did the district court err as a matter of law in ordering Lopez to pay restitution of over $2.4 million to Solace for its attorneys' fees, where the district court applied the wrong legal standard and failed to identify which, if any, fees were incurred in supporting the government's prosecution of Lopez?

STATEMENT OF THE CASE

**A. The government tries Lopez for antitrust and associated wire-fraud offenses.**

In 2025, Lopez was tried and convicted of one count of conspiracy to engage in wage fixing in violation of the Sherman Act, 15 U.S.C. § 1, and five counts of wire fraud in violation of 18 U.S.C. § 1343 for selling his legitimate company without disclosing the existence of a federal investigation into the alleged wage fixing.

Lopez allegedly conspired with two competitors in the Las Vegas market, NurseCore and Maxim Healthcare, to keep within certain ranges the hourly rates paid to nurses. Lopez allegedly entered the conspiracy in 2016 while an employee working for Spring View Home Health Care. ECF 1. Spring View terminated Lopez's employment in January 2017. ECF 622 at 123:11–14. He left Las Vegas for Reno to work in the healthcare industry there. About 18 months later, he returned to Las Vegas after founding his own home-healthcare agency, Community Home Health Care, LLC ("Community"). The indictment alleged Lopez continued to participate in the conspiracy after returning to Las Vegas in late 2018. ECF 1.

A superseding indictment added five counts of wire fraud, newly alleging that Lopez engaged in a scheme to defraud Solace, the company buying Community, by concealing during the due-diligence process the existence of an antitrust investigation. ECF 49.

17

After a two-week jury trial, Lopez was convicted and sentenced to 40 months' imprisonment on each count (concurrent); two years of supervised release on each count (concurrent); a $550,000 fine; and a restitution obligation of $2,496,101.00 to the buyer of his company, Solace, to compensate it for its attorneys' fees. 1-ER-2–12. Lopez also was ordered to forfeit $10,459,817.50, the amount he received when he sold Community. 1-ER-13–14.

**B.    At trial, the government tells its wage-fixing story through its star witness while suppressing the true nature of the leniency agreement.**

Maxim's employee of 19 years, Daniel Lubinsky, 7-ER-1120:15, was the government's principal witness for the wage-fixing allegations—the only conspiracy witness presented by the government. 7-ER-1214–1325; 8-ER-1326–1523; 9-ER-1437–1643. In its opening statement, the government promised it would rely on Lubinsky to "testify and provide an inside look into the conspiracy," and also the "coverup" that gave rise to the wire-fraud counts. 7-ER-1076:14–15, 1080:24.

Over three days, Lubinsky testified in great detail about numerous topics, including the background, formation, operation, and termination of the alleged wage-fixing agreement. Because the government was forced to rely on a smattering of emails, texts scattered over years, and recollected conversations, it looked to Lubinsky to provide a narrative of Lopez's state of mind, i.e., to testify as to what he "inferred" from Lopez's

18

comments, or even what Lopez "mean[t]." 7-ER-1261:4–8, 1262:8, 1294:20, 1297:6–9; 8-ER-1352:8–9; 9-ER-1629:20–22. The subjects of his testimony included

- the scope, structure, and operation of the Las Vegas home-healthcare market in general[1]
- Lubinsky's unwritten "general understanding" with Lopez and NurseCore's employee Megan Testa to keep within a certain range the wages of nurses providing home healthcare in the Las Vegas market,[2] and the unexpressed rationale for the alleged agreement[3]
- Lubinsky's personal relationship with Lopez, including his thoughts on their meetings, conversations, and email and text exchanges[4]
- Lubinsky's "infer[ences]" about what Lopez or Testa "meant" or "indicated" or what each was "saying" by various communications,[5] and Lopez's unexpressed reasons for doing or not doing various things[6]

---

[1] 7-ER-1231:24–1235:7, 1239:8, 1255:19, 1279:22–1280:12; 8-ER-1363:14–25, 1385:18–20.

[2] 7-ER-1270:23–1272:12.

[3] 7-ER-1250:24–1251:1, 1273:13–20; 8-ER-1346:3–21.

[4] 7-ER-1236:23–1238:23, 1243:22–47, 1249:22–54:5, 1261:24–1262:17, 1307:18; 8-ER-1385:21.

[5] 7-ER-1261:4; 8-ER-1350:8–9, 1375:13, 1382:20, 1387:12, 1388:25, 1389:12, 1399:20, 1425:18, 1433:4; 9-ER-1618:12, 1619:8, 1626:11–1627:8.

[6] 7-ER-1256:3, 1273:13–1279:11; 8-ER-1385:21.

- how Lubinsky and Lopez would "build trust" and "get on the same page with issues that were challenging in our industry," and how that "trust" allowed them to set nurses' wages without actually referring to an agreement[7]

- the effect of the alleged agreement on competition between Maxim, Lopez, and NurseCore[8]

- the relative mobility of home-healthcare nurses and the effect of the alleged wage fixing on it[9]

- Lopez's continued participation in the conspiracy while living in Reno, despite being fired from Spring View and leaving the Las Vegas market when he moved to Reno in early 2017[10]

- the termination of the "deal" on nurses' wages after Lopez raised his rates in 2019,[11] and

- when Lopez told Lubinsky during their last recorded call, "Hey, none of us were price fixing or doing anything like that," how Lubinsky "infer[red]" that Lopez meant "[t]hat he was trying to get us on the same page as far as—our story."[12]

---

[7] 7-ER-1247:16–24, 1253:23, 1274:1, 1293:5, 1306:21, 1307:23–1308:5; 8-ER-1355:10, 1372:20–23.

[8] 7-ER-1259:13; 8-ER-1346:19–1347:21, 1363:22, 1406:22–1407:3, 1413:14–18, 1415:6–11, 1421:18–25; 1455:5–9; 9-ER-1610:9–1611:21.

[9] 8-ER-1340:8–12, 1460:6–12.

[10] 8-ER-1362:17–25, 1372:24–1373:5, 1385:21–1387:17.

[11] 8-ER-1406:19–1407:25, 1413:14–18, 1421:18–25; 9-ER-1626:15–21.

[12] 8-ER-1454:23–254, 1456:4–7.

**C.** **Lubinsky's credibility was critical, and the government concealed from Lopez and misled the jury as to the leniency deal that bolstered his testimony.**

Given the scope and centrality of Lubinsky's testimony, it was clear from the beginning that his credibility was critical to the government's case, and the government's leniency agreement was material to that issue. *E.g.*, 7-ER-1076:12–17, 1086–87:23–25, 1088:17–89:6, 1095:4–15, 1096:1, 1104:18–20, 1105:1–4. Indeed, the government's opening used the leniency agreement to bolster his credibility. 7-ER-1076:18-23.

The government disclosed to Lopez, the jury, and the court only the nonprosecution aspect of the agreement. Lubinsky testified that the "leniency" he, "the entire company of Maxim, and its executives" would receive was "an agreement of nonprosecution," 8-ER-1458:16, and the government told the jury that Lubinsky "was not charged for his participation in the conspiracy … because he received immunity under a whistleblower program." 7-ER-1076:18–20.

The government emphasized to the jury that the nonprosecution of Maxim and Lubinsky was predicated on their full restitution to all of the victims, noting later that "[o]ver 800 nurses were affected." 7-ER-1085:1–12. The government announced, "Under the whistleblower program, a company and its employees won't be prosecuted if they tell the Government what they did before they get caught and *they pay the victims for the losses they caused*." 7-ER-1076:20–23 (emphasis added).

21

The government admitted as Trial Exhibit 174 a leniency agreement that said as much. 13-ER-2426–2431 It repeatedly relied on Exhibit 174 to bolster Lubinsky and justify its nonprosecution decision. It asked Lubinsky about his "cooperation agreement with the United States Government on behalf of your company," disclosing only the terms of Exhibit 174. 7-ER-1222:20–1225:9, 1226:22–1230:24. Lubinsky testified about his agreement to cooperate and testify at trial in exchange for nonprosecution. 7-ER-1227:7–24, 7-ER-1229:21–25. He specifically denied that there were "any other agreements that you have with the Government," or that the government made "any other promises." 7-ER-1230:18–24. In closing, the government emphasized the importance of restitution: "I want to be clear. It doesn't mean that [Lubinsky and Maxim] get a totally free pass … *they have to pay back the victims of their crime*, but it is true that they don't get prosecuted," 12-ER-2220:4–8 (emphasis added).

During preparation for sentencing, Lopez learned that certain terms of the leniency deal the government made were materially different from what had been disclosed to Lopez and the jury. As detailed in one of the government's sentencing submissions, Maxim was not required to pay restitution to all nurses injured by the conspiracy—only its own employees, who were less than a third of the total number of injured nurses. 5-ER-750. Maxim's restitution obligations under the leniency agreement were therefore over $5.3 million less than what had

22

been disclosed to Lopez and represented to the jury. 5-ER-750. After learning of the suppressed evidence and the false leniency agreement admitted at trial, Lopez unsuccessfully moved for a new trial under *Brady*/*Giglio* and *Napue*. 2-ER-158:3–6, 170:10–13.

**D.    The government presents lay and expert opinion testimony from its FBI case agent without qualifying him as an expert or bifurcating the lay and expert testimony.**

The government also extensively relied on its FBI case agent, Supervisory Special Agent ("SSA") Anand Singh, who testified over the course of two days. 9-ER-1679–1749; 10-ER-1777–857. Although not disclosed as an expert witness, SSA Singh repeatedly relied on specialized knowledge and training to provide expert opinions, including

(1) "in conspiracies, once one conspirator is notified of the investigation, they tend to communicate with the others, and then they all usually get together and create the same lie"; and

(2) "[c]oconspirators often communicate with each other once an investigation is known."

9-ER-1695:19–22, 1704:5–6. Both comments drew timely objections, including that Singh's testimony improperly ceded to his "law enforcement judgment." 9-ER-1735:17–1736:6.

Drawing on his "experience with the FBI," SSA Singh also provided expert testimony that conspiracy crimes are generally difficult to detect without use of the government's leniency policy. 9-ER-1690–91, 529-ER-

1695:19–22, 1704:5–6. In its order denying Lopez's motion for new trial, the district court conceded that these statements "walk the line" between lay and expert opinions. 1-ER-50:19.

But SSA Singh went further, testifying that Lopez's actions were, "by definition, wage fixing." 10-ER-1784:22–25. Lopez timely objected, 10-ER-1784:25, and the district court sustained the objection and struck the testimony. 10-ER-1785:1–3. But SSA Singh continued to provide such testimony, twice more opining that Lopez made a "brazen admission of breaking the law." 10-ER-1785:11–12, 1856:20–24. Following SSA Singh's testimony on Lopez's guilt, Lopez moved unsuccessfully for a mistrial. ECF 609. The district court gave a curative instruction, but it did so more than a week later, and it struck only the "portions of his testimony where he specifically stated, 'breaking the law.'" 11-ER-1975:16–21. Shortly thereafter, the government argued in closing that SSA Singh's law-enforcement-based expert opinions and Lopez's admission "to the crime" of violating the Sherman Act were bases for convicting him of wage fixing. 12-ER-2220:9–12, 2223:1–3.

### E. The government plays for the jury, and then highlights, Lopez's postconspiracy "hookers" comment.

Before trial, the government sought to admit a host of pre- and postconspiracy statements, lumped together as Motion in Limine No. 3, under a single theory that the statements were "inextricably intertwined" with the charged conspiracy. ECF 495 at 16. Among those

communications was a secret recording by Lubinsky—made months after the conspiracy had ended—of a lunch meeting in which Lopez is heard likening nurses to "hookers." *Id.* at 17. The government argued that the comment was "highly probative of Defendant's motive for entering the conspiracy." *Id.* The government gave a perfunctory Rule 403 recitation, arguing that though "describing nurses as like 'hookers' could elicit an emotional reaction from the jury," the statement was not any more inflammatory than the charged offenses themselves. *Id.* at 20–21. Lopez disagreed, challenging the evidence under Rule 404(b) and insisting that it would trigger "visceral bias" in the jury. ECF 521 at 39.

The district court summarily granted the government's broad motion to admit its pre- and postconspiracy statements, without engaging in any Rule 403 balancing as to the "hookers" comment—or, for that matter, any reasoning whatsoever. 6-ER-917. The day before the pretrial motions hearing, the court directed the parties to prepare to argue other motions in limine, but not the one concerning the "hookers" comment. ECF 541.

During trial, the government moved to admit a portion of the total audiovisual recording and accompanying transcript of Lopez's "hookers" comment, to which defense counsel again objected. 8-ER-1448:3–1449:6. The court "noted" the objection but opted to "stand by [its] previous ruling." 8-ER-1449:9–15.

25

Out of five audiovisual recordings from that lunch conversation, only the one with the "hookers" comment was offered by the government. 5-ER-846–47. The government played it for the jury and provided a transcript. 8-ER-1450. As soon as the jury heard Lopez's "hookers" comment, the government paused the recording to repeat that comment word-for-word. 8-ER-1450:21–1451:5. The government brought it up again at closing, describing Lopez as a person who "has so little respect for the nurses who work for him that when they're not around, he refers to them as hookers." 12-ER-2208:24–2209:3.

On the last day of their deliberations, the jury requested access to the "audiovisual recordings"—there was only that one—and the court acquiesced. 12-ER-2305:8–13. Less than two hours later, the jury convicted Lopez on all counts. 12-ER-2307.

### F. The government introduces a privilege log to show what Lopez said to his attorney.

The government also relied on SSA Singh to walk the jury through certain entries in Lopez's attorney's privilege log, publishing the excerpt shown here for the jury as Exhibit 204. As explained by SSA Singh, the

| No. | Bates Begin | Bates End | Document Type | Date | Author/From | To | | Cc | Bcc | | |
|-----|-------------|-----------|---------------|------|-------------|----|----|-----|-----|---|---|
| 58 | GOOG-EL002-001-00020481 | GOOG-EL002-001-00020481 | Email | 4/9/2021 7:17 | Edward Lopez <eddielopezniv@gmail.com> | @morganlewis.com | | | | | |
| 59 | GOOG-EL002-001-00020482 | GOOG-EL002-001-00020486 | Search Warrant | 3/9/2021 11:28 | U.S. District Court, Northern District of California | Edward Lopez | | | | | Attachment |

log showed that Lopez emailed someone at Morgan Lewis with an attached "search warrant" from the Northern District of California on

"the same date that the defendant received the search warrant as an attachment from Google." 9-ER-1731–32.

### G. The government tells the jury to "do your job" and convict.

In its rebuttal close the government's last words to the jury were "I have a job. Judge has a job. You have a job. With all due respect, you took an oath, do your job. He's guilty on every single count." 12-ER-2293:12–16. That unconditional statement was not accompanied by a recitation of the government's burden of proof.

### H. The district court sentences Lopez by using "gain" as a proxy for "loss."

At sentencing, the driving issue was the amount of loss Lopez caused in connection with the wire fraud counts. The government argued that Lopez intended the buyer of Community to lose the entire $12.5-million purchase price. ECF 726 at 20. Lopez argued that (1) he did not desire the buyer incur *any* loss, and (2) *no* actual loss was incurred because Community's value exceeded the sale price and continued to appreciate after the sale. 1-ER-22; ECF 725 at 4–8. The government did not controvert either point.

The amount of loss greatly affected Lopez's offense level: loss exceeding $9.5 million causes a 20-point increase to offense level 27, U.S.S.G. § 2B1.1, while, absent loss, the wage-fixing count would have garnered a final adjusted offense level of 15, U.S.S.G. §§ 2R1.1, 3D1.4.

27

The district court issued a written order in which, instead of finding actual or intended loss, the court used Lopez's gain as a proxy for the buyer's loss under U.S.S.G. § 2B1.1(b)(1). 1-ER–28. The court assessed the gain as over $10.4 million, the amount Lopez received in selling Community. *Id.* It found "the actual or intended loss is immeasurable" and "almost impossible to calculate." 1-ER-27. Then it sentenced Lopez to 40 months' imprisonment. 1-ER-4. If the court had properly determined that there was *no loss*, as the U.S. Probation Officer correctly did, PSR 35–36,[13] then the antitrust guidelines would have governed, and the recommended guidelines sentence likely would have been 18 to 24 months in custody. PSR ¶ 37; U.S.S.G. §§ 2R1.1, 3D1.4.

## I.    The district court orders forfeiture of over $10.4 million based on the purchase price Lopez received for selling his company to Solace.

In addition to his sentence of imprisonment, the district court ordered Lopez to pay the government an *in personam* criminal-forfeiture money judgment exceeding $10.4 million, reflecting all of the funds he obtained from the sale of his company, Community, to Solace. 1-ER-13. The court found that "the plain language of § 981 … mandatorily subjects to forfeiture … anything obtained directly or indirectly as a result of the unlawful activity, not limited to net gain or profits." 1-ER-33. The court

---

[13] "PSR" refers to the November 24, 2025, presentence investigation report. ECF 778. It is filed under seal pursuant to Circuit Rule 27-13(d).

28

ordered Lopez to forfeit what he received for his company even though it found that Community "was a legitimate business that Solace purchased for a legitimate purpose," simply because "the sale was tainted by Lopez's fraudulent omission of the antitrust investigation" during the due-diligence process. 1-ER-33 n.8.

## J. The district court orders Lopez's payment of over $2.4 million to Solace as restitution for its attorneys' fees.

The district court further awarded Solace over $2.4 million in attorneys' fees under 18 U.S.C. § 3663A(c)(1)(A)(ii). 1-ER-7–8. The district court determined these fees were recoverable because they were "directly tied to or [were] the proximate result of the wire fraud conviction in this case." 4-ER-679:16–20. The court did not limit the award to what the statute authorized, i.e., fees "incurred during participation in the [government's] investigation or prosecution of the offense or attendance at proceedings related to the offense." 18 U.S.C. § 3663A(b)(4). Nor did it make any findings as to how the fees were incurred.

## SUMMARY OF ARGUMENT

The grounds for reversing the district court and vacating Lopez's conviction and punishment fall into two categories: prosecutorial misconduct (five issues) and punishment errors (three issues).

### Prosecutorial Misconduct

The instances of prosecutorial misconduct warrant reversal of Lopez's conviction, whether considered individually or cumulatively.

A.     The government committed *Brady/Giglio* and *Napue* violations by concealing the leniency terms affecting the government's key witness, Dan Lubinsky, and his employer, Maxim. The government told Lopez, the court, and the jury that Lubinsky and Maxim received a nonprosecution agreement in exchange for cooperating and testifying, but Maxim would still have to pay restitution to all of the nurses injured by the wage-fixing conspiracy. The government put on false evidence in the form of an inaccurate leniency agreement, and caused Lubinsky to testify falsely about the deal between Maxim and the government, under which he was a "covered employee." The real deal was that Maxim's restitution obligation was reduced by over $5.3 million because it did not have to compensate "any person or entity injured" by the crime—only nurses it employed (a third of the total). The government's suppression and misrepresentations denied Lopez critical impeachment evidence where Lubinsky's credibility was a key issue.

B.     Violating Federal Rules of Evidence 701, 702, and 403, the government deliberately presented expert opinions from its FBI supervisory case agent Anand Singh, without disclosing him as an expert or establishing his qualifications to offer that testimony. The opinions covered not only the "common" behavior of an unidentified class of "co-conspirators" generally, but also his repeated opinion that Lopez made a "brazen admission of breaking the law"—the Sherman Act— despite SSA Singh's lack of apparent qualifications for distinguishing a

30

per se illegal criminal wage-fixing conspiracy from other, noncriminal conduct.

C.    Seeking to inflame the jury, the government introduced a highly prejudicial portion of an audiovisual recording—from a lunch that took place months after the alleged conspiracy ended—in order to broadcast Lopez's comment that nurses are "like hookers." Without conducting even a cursory Rule 403 balancing, as the court was required to do, it allowed in the recording. The comment had no probative value, but the government emphasized it to ensure it inflamed the jurors, who specifically asked to review that recording shortly before convicting Lopez.

D.    The government used a hearsay statement from Lopez's attorney's privilege log to cause the jury to infer that Lopez had discussed a criminal search warrant with his "antitrust" attorney and was therefore aware of an ongoing antitrust investigation. The privilege log was inadmissible, and its use to convey or imply the substance of attorney-client privileged communication violated Lopez's rights under the Fifth and Sixth Amendments.

E.    The government ended its rebuttal with an exhortation to the jury: "We proved our case. I have a job. Judge has a job. You have a job. With all due respect, you took an oath, do your job. He's guilty on every single count." A "do your duty" charge such as this is plain error under this Court's precedent: it includes a reference to the "jobs" of other

participants in the trial process, and it is not qualified by the "if … then" formulation that the jury may convict only after finding that the government carried its burden of proof. The government's reckless disregard of circuit law requires reversal.

## Punishment Errors

A.     The district court improperly calculated the "loss" amount for purposes of Lopez's wire-convictions, which substantially increased his sentencing exposure. Under the Sentencing Guidelines, "loss" is the "greater of actual loss or intended loss," and the court improperly used Lopez's gain from the sale of his business as a proxy for loss even though this was, under Supreme Court and Ninth Circuit precedent, a "zero loss" case. There was no "intended loss" because the government failed to offer any evidence that Lopez "consciously desired" that his buyer suffer losses—as opposed to enhancing the marketability of the business. There also was no "actual loss" because unconverted valuations and an independent audit showed that the business, Community, was always worth more than the buyer's purchase price, and its value continued to rise after the sale and the revelation of the antitrust investigation.

B.     The district court's order of forfeiture of over $10.4 million— what Lopez received from the sale of his business—lacked any statutory basis, and it violated the Eighth Amendment's protection against excessive fines. The district court misplaced reliance on a civil-forfeiture provision, 18 U.S.C. § 981(a)(2)(A), which applies to forfeiture in cases of

"unlawful activities," but other circuits have recognized that subsection applies only to "inherently unlawful" activities, not crimes related to lawful businesses. Here, the district court's finding that Community "was a legitimate business that Solace purchased for a legitimate purpose" precludes use of that forfeiture statute.

C. The district court improperly awarded Solace restitution of more than $2.4 million in attorneys' fees under 18 U.S.C. § 3663A(c)(1)(A)(ii). The court did not limit the fees to those incurred during participation in the government's investigation or prosecution of Lopez's offense, and it failed to make the required findings. Among other errors, the court awarded fees Solace incurred while defending *itself* from prosecution. This Court must vacate and remand.

## ARGUMENT

**I. This Court should reverse Lopez's convictions and remand for a new trial because of the government's serial prosecutorial misconduct.**

This Court should reverse Lopez's convictions and order a new trial on all counts because of a series of acts of misconduct by the government, including, among other things, the following:

- the government's *Brady/Giglio* and *Napue* violations in suppressing and misrepresenting its leniency deal with its key witness
- the government's use of a supervisory FBI agent to offer undisclosed and unqualified expert-opinion testimony and

33

inflammatory statements about Lopez's "brazen admission" of violating the Sherman Act

- the government's introduction of and emphasis on Lopez's postconspiracy comment comparing nurses to "hookers"

- the government's use of Lopez's privilege log to introduce what Lopez told his attorney and thereby to fill a critical evidentiary gap in its wire-fraud claim, and

- the government's improper "do your duty" closing argument moments before the jury retired for deliberations.

Each of those acts by itself warrants reversal, but this Court also should consider the cumulative effect of the prosecutorial misconduct in prejudicing Lopez and denying him a fair trial. Rejecting "balkanized, issue-by-issue harmless error review," this Court has recognized that even where "each of the … errors, looked at separately, may not rise to the level of reversible error, their cumulative effect may nevertheless be so prejudicial to the appellant[] that reversal is warranted." *United States v. Wallace*, 848 F.2d 1464, 1475–76 & n.21 (9th Cir. 1988) (error not objected to at trial may be aggregated with preserved errors in cumulative-error analysis). The Court has been "particularly troubled" by the effect of possible cumulative errors that go to the "credibility of the witnesses" where there is a "credibility contest" that involves the "co-conspirator witness." *Id.* at 1475–76.

**A.** **The government violated *Brady/Giglio* and *Napue* by suppressing and misrepresenting the leniency deal the government provided its star witness for his testimony.**

The Court should reverse Lopez's convictions and remand for a new trial because the government repeatedly misrepresented to the district court and the jury that Maxim—the lone cooperating co-conspirator's employer—would pay restitution under the leniency agreement (the "2021 Agreement"), Exhibit 174, to *all* nurses impacted by the conspiracy, when, as the government now concedes, Maxim's actual obligation was only to *nurses it employed*–less than a third of the total, saving Maxim over $5.3 million. 5-ER-750. By failing to disclose this material detail, the government breached its disclosure obligations under *Brady v. Maryland,* 373 U.S. 83 (1963), and *Giglio v. United States,* 405 U.S. 150 (1972). And by affirmatively misrepresenting the actual terms of the leniency agreement, both in argument and by the admission of the 2021 Agreement itself, the government also violated *Napue v. Illinois*, 360 U.S. 264 (1959). *Cf. Hayes v. Brown*, 399 F.3d 972, 978 (9th Cir. 2005) ("[T]he state violates a criminal defendant's right to due process of law when, although not soliciting false evidence, it allows false evidence to go uncorrected when it appears.").

This Court "review[s] de novo whether a *Brady* violation has occurred," *United States v. Moalin*, 973 F.3d 977, 1001–02 (9th Cir. 2020), and *Napue* claims also invite de novo review, *see Dow v. Virga*, 729 F.3d 1041, 1049 (9th Cir. 2013).

35

The *Brady/Giglio* and *Napue* violations are addressed collectively. *See Catlin v. Broomfield*, 124 F.4th 702, 745 (9th Cir. 2024) ("[W]hen *Napue* claims and *Brady* claims are both raised, materiality is analyzed collectively ...."). To establish a *Brady/Giglio* violation that warrants a new trial, a defendant must show (1) evidence was suppressed by the government, either willfully or inadvertently; (2) the suppressed evidence must be favorable to him; and (3) the suppressed evidence must be material to his guilt or innocence. *Gonzalez v. Wong*, 667 F.3d 965, 981 (9th Cir. 2011). For a *Napue* violation, a defendant must show (1) "testimony (or evidence) was actually false," (2) the "prosecution knew or should have known" that the testimony or evidence was actually false, and (3) the false evidence or testimony was "material." *Hampton v. Shinn*, 143 F.4th 1047, 1068 (9th Cir. 2025). As this Court recognized, a *Napue* violation can be based on the use of false testimony or false evidence. *Id*. "[I]f the *Napue* errors are not material standing alone, [this Court will] consider all of the *Napue* and *Brady* violations collectively and ask whether there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Jackson v. Brown*, 513 F.3d 1057, 1076 (9th Cir. 2008) (cleaned up).

### 1. The true substance of the government's deal with Lubinsky's employer was suppressed, and the government presented false evidence of the agreement.

Before and during trial, Lopez, the jury, and the court were told unambiguously that Maxim, Lubinsky's employer, had agreed to pay restitution to "any person or entity injured as a result of the anticompetitive activity being reported." Ex. 174 ¶ 2(g). The 2021 Agreement expressly (and falsely) said as much. Moreover, it disclaimed the existence of contrary promises or understandings. *Id.* ¶ 5. By its plain meaning, "any person or entity injured" by the conspiracy meant *all* impacted nurses, not just Maxim's own employees. *See Slaughter-House Cases*, 83 U.S. 36, 128–29 (1872) (interpreting "any person" to mean "all persons"); *United States v. Gonzales*, 520 U.S. 1, 5 (1997) ("Read naturally, the word 'any' has an expansive … meaning and so we must read ['any term of imprisonment'] as referring to all 'term[s] of imprisonment,' including those imposed by state courts.").

At trial, the government doubled down, repeatedly stating that Maxim and Lubinsky had an unlimited restitution obligation. Referring to Maxim and Lubinsky, the government in its opening statement falsely proclaimed that "a company and its employees won't be prosecuted if they … *pay the victims for the losses they caused*," 7-ER-1076:18–23 (emphasis added); its closing argument reiterated, "I want to be clear. It doesn't mean that [Lubinsky and Maxim] get a totally free pass … *they have to*

37

*pay back the victims of their crime*, but it is true that they don't get prosecuted," 12-ER-2220:4–8 (emphasis added). The government explained to the jury that the conspiracy injured over 800 nurses, and a full-time nurse lost $10,000 a year because of the conspiracy. 7-ER-1079:5–16 ("Those numbers add up quickly."). To further bolster Lubinsky, the government introduced Exhibit 174, the 2021 Agreement. By offering Exhibit 174, the government represented that restitution would be paid to all nurses.

Only after trial did the government disclose the truth about restitution obligations. On September 18, 2025, the government admitted in writing that Maxim is *only* "obligated to pay restitution to nurses it employed." 5-ER-750. This cannot be squared with the plain text of the 2021 Agreement or the government's statements at trial. The significance of this limitation is staggering: by avoiding restitution payments to non-Maxim nurses, Maxim stood to save over $5.3 million as part of the deal that required Lubinsky (as a "covered employee") to testify in a way consistent with the government's expectations. 5-ER-750. For *Brady/Giglio* purposes, the government's failure to disclose the true substance of Maxim's restitution obligations, whether intentional or inadvertent, was suppression. *See United States v. Price*, 566 F.3d 900, 907–08 (9th Cir. 2009) ("The term 'suppression' does not describe merely overt or purposeful acts on the part of the prosecutor; sins of omission are equally within *Brady*'s scope."). For *Napue* purposes, the government

knew or should have known that Exhibit 174 and its own representations as to its terms were false. The government was required to fully disclose and truthfully represent the terms of its leniency agreements. It did not.

When confronted with these violations, the government's only defense was that Lopez (and presumably the court and jury) *should have known* about the limited scope of Maxim's restitution obligation in light of the 2017 online "Frequently Asked Questions" ("FAQs") for its Corporate Leniency Policy. *See* https://www.justice.gov/atr/page/file/ 926521/dl?inline (archived). The FAQs were referenced collectively in a footnote on page one of the 2021 Agreement, while Maxim's restitution obligations were on page three.

FAQ No. 19 (of 34) states only that "[r]estitution is normally resolved through civil actions with private plaintiffs," and the Antitrust Criminal Penalty Enhancement and Reform Act (ACPERA) can limit a leniency applicant's liability in a civil action. ACPERA had no effect on Maxim's restitution obligations in this case. FAQ No. 19 acknowledges that APCERA applies only to leniency as to "civil damages claims in private state or federal antitrust actions." *Id.*; *see* 15 U.S.C. § 7a-1(a). No such case existed here. Even if it did, ACPERA is not self-executing: it requires findings by the district court as to the applicant's assistance to the civil plaintiffs. 15 U.S.C. § 7a-1(b). Because neither of those conditions for applying ACPERA were met here, the FAQ shed no light on the terms of Maxim and Lubinsky's leniency deal. Anyone reading the

39

2021 Agreement would have correctly interpreted Maxim's restitution obligations as covering *all* injured persons. *See Gonzales*, 520 U.S. at 5.

### 2. The undisclosed terms of the government's leniency deal were favorable and material.

Under *Brady/Giglio*, "[s]uppressed evidence is material if 'the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" *Gonzalez*, 667 F.3d at 981 (quoting *Kyles v. Whitley*, 514 U.S. 419, 435 (1995)). The materiality standard under *Napue* "is 'considerably less demanding' than its *Brady* counterpart," and the Court asks only "whether there is 'any reasonable likelihood that the false testimony could have affected the judgment of the jury.'" *Hampton*, 143 F.4th at 1068 (quotation omitted).; *see also Dow*, 729 F.3d at 1048 ("*Napue* requires [this Court] to determine only whether the error *could* have affected the judgment of the jury."). Thus, evidence meeting the *Brady/Giglio* materiality standard also meets the *Napue* standard.

For purposes of *Brady/Giglio*, evidence of undisclosed restitution deal was favorable to Lopez. Favorable evidence is "any evidence" that tends to call the government's case "into doubt," including "impeachment material that is relevant to either guilt or punishment." *Milke v. Ryan*, 711 F.3d 998, 1012 (9th Cir. 2013) (citing *Strickler v. Greene*, 527 U.S. 263, 280 (1999)). The undisclosed restitution deal is classic impeachment material. *See, e.g., United States v. Yepiz*, 718 F. App'x 456, 466–67 (9th

Cir. 2017) (undisclosed evidence of benefits provided to a government informant constituted *Brady* violation). Indeed, Jury Instruction 16 specifically instructed the jurors to consider whether the existence and terms of the deal Lubinsky's employer made with the government, which obligated Maxim to "encourage" its "covered employees" (including Lubinsky) to cooperate with the government in order for the company to secure leniency, Ex. 174 ¶ 2(c), influenced Lubinsky's make-or-break testimony. 1-ER-80.

The suppressed evidence of the true restitution deal, like the false Exhibit 174 that was presented to the jury, was material. Suppressed evidence can be material where "the withheld evidence could have provided additional or alternative means of impeachment." *Gonzalez*, 667 F.3d at 982, 984 (government cannot suppress evidence that would have "opened a new avenue of impeachment") (cleaned up). This Court has held that favorable leniency deals relating to a key witness are precisely the type of evidence that will satisfy the materiality element. *See Horton v. Mayle*, 408 F.3d 570, 581 (9th Cir. 2005) ("[W]here the prosecution fails to disclose evidence such as the existence of a leniency deal or promise that would be valuable in impeaching a witness whose testimony is central to the prosecution's case, it violates the due process rights of the accused and undermines confidence in the outcome of the trial.").

That the government repeatedly argued Lubinsky and Maxim had to pay restitution to all victims is telling. The suppressed evidence

41

regarding the $5.3 million Lubinsky's employer saved in restitution obligations would have provided critical impeachment ammunition as to Lubinsky, empowering Lopez's trial counsel to "change[] the way in which the jurors viewed [Lubinsky's] testimony" and calling into question Maxim's motives for "encouraging" Lubinsky (one of its "covered employees") to testify as a government witness. *Gonzalez*, 667 F.3d at 982. Given the government's repeated invocation at trial of Maxim's unqualified restitution obligation, there is a reasonable likelihood that the revelation of the false statements in the 2021 Agreement could have affected the jury's judgment. "It is of no consequence that the falsehood bore upon the witness' credibility rather than directly upon defendant's guilt." *Hayes*, 399 F.3d at 986 (quoting *Napue*, 360 U.S. at 269).

"[T]he damage the suppressed impeachment evidence could cause [is] 'best understood by taking the word of the prosecutor.'" *Id.* at 982 (quoting *Kyles*, 514 U.S. at 444). In opening and in closing remarks, the government highlighted Maxim's unqualified restitution obligations to bolster Lubinsky's credibility and validate its decision to grant leniency to Maxim and its employees. 7-ER-1079; 12-ER-2220. And where, as here, "[t]he prosecutor spent time during his summations discussing [the witness's] testimony and countering the attempted impeachment of him[,] … a court could view this as further support for the proposition that [the witness] was central to the prosecution's cases." *Gonzalez*, 667 F.3d at 982; *see* 12-ER-2276. The government's reliance on Lubinsky's

42

credibility "bolsters the conclusion that disclosure of the deal may have significantly damaged the prosecution's case." *Horton*, 408 F.3d at 580.

### 3. These violations require reversal.

"[T]he appropriate remedy for a *Brady/Giglio* violation will usually be a new trial." *United States v. Kohring*, 637 F.3d 895 (9th Cir. 2011). Given the importance of Lubinsky's testimony—and his credibility—this Court should follow its long-standing rule and reverse and remand.

The new trial should be on all counts because the government's cross-presentation of evidence makes it impossible to know which counts were affected by the violations. For example, Lubinsky also supported the wire-fraud counts, testifying that Lopez said he was visited by the FBI in October 2019, and Lopez was discussing possible defenses for a future prosecution. 8-ER-1451:15–1456:1. Moreover, SSA Singh supported both the antitrust count and the wire-fraud counts. 8-ER-1453:16–1454:23. He explained the antitrust leniency policy without impeachment as to the actual restitution obligations, 9-ER-1690:3–1692:16, and, as to the wire-fraud counts, he testified that Lopez was aware of the investigation, 9-ER-1710:17; 12-ER-2184:20–23. The suppressed impeachment evidence was thus central to evidence "the jury might have relied on in reaching its verdicts" on all counts. *Kohring*, 637 F.3d at 902 (ordering new trial on all counts). Because the government's presentation linked the strength of the wire-fraud counts to the strength of the wage-fixing count, the *Brady/Giglio* and *Napue* violations could

43

have affected the judgment as to all counts.[14] Reversal is the appropriate remedy here.

## B. The government improperly used SSA Singh to provide both inflammatory opinions and undisclosed expert testimony.

SSA Singh improperly commented on an ultimate issue when he opined that Lopez had made "a brazen admission of breaking the law"—the Sherman Act—during a 2019 knock-and-talk interview. 10-ER-1785:11–12, 1856–57. The government also elicited undisclosed expert testimony about the criminal characteristics of "co-conspirators." This Court reviews for abuse of discretion the district court's decision to admit expert testimony. *United States v. Freeman*, 498 F.3d 893, 900–01 (9th Cir. 2007). Under the harmless-error standard, the Court is "compelled to reverse the conviction 'unless it is more probable than not that the error did not materially affect the verdict.'" *Id.* (citation omitted).

Rule 16 requires the government to disclose and provide notice of any expert testimony and a summary of the opinions to be expressed. Fed. R. Crim. P. 16(a)(1)(G)(i). The government never disclosed SSA

---

[14] In opposing Lopez's motion for severance, the government argued the antitrust and wire-fraud charges all were connected: "[i]f Defendant had not engaged in the price-fixing conspiracy, he would not have hidden the existence of the conspiracy, and the government's investigation of that crime, from Solace [the buyer], and, therefore, he would not have committed the wire fraud." ECF 180 at 5.

Singh as an expert under Rule 702, so only lay opinion testimony would be admissible. *See* Fed. R. Evid. 701.

Under Rule 701, a lay witness may "offer opinions that are (a) 'rationally based on the witness's perception,' (b) 'helpful' to the jury, and (c) 'not based on scientific, technical, or *other specialized knowledge* within the scope of' expert testimony." *United States v. Perez*, 962 F.3d 420, 435 (9th Cir. 2020) (quotation omitted; emphasis added). The rule applies equally to law enforcement officers. *Id.* A police officer's "employment does not endow him with any freestanding license to offer opinions." *Id.* Law enforcement officers "*may not* testify based on speculation, rely on hearsay or interpret unambiguous, clear statements." *Id.* (quotation omitted). This Court has found improper expert testimony where a law enforcement officer testified that "[e]verybody that [the witness had] ever worked with will always stretch the truth and make … outright lies especially in certain techniques." *United States v. Lloyd,* 807 F.3d 1128, 1154 (9th Cir. 2015).

Here, SSA Singh did not offer opinion testimony solely based on his experience investigating Lopez. He went further, opining on the criminal characteristics of a general class of unidentified "co-conspirators" (not just the wage-fixing co-conspirators in this case). His testimony involved specialized police knowledge beyond the ken of a lay witness:

45

- "As is common in conspiracies, once one conspirator is notified of the investigation, they tend to communicate with the others, and then they all usually get together and create the same lie."
- "Coconspirators often communicate with each other once an investigation is known."

9-ER-1695:19–22, 1704:5–6.

Even more troubling, SSA Singh uttered his "brazen admission" comment twice, both at strategically significant times—first at the end of direct examination, and then again at the end of redirect. 10-ER-1785:11–12, 1856–57. Initially, SSA Singh opined that Lopez's stated actions were "by definition, wage fixing" in violation of the Sherman Act. 10-ER-1784:22–25. The testimony drew an objection and was stricken. 10-ER-1784–5. The government, undeterred, rephrased its question and SSA Singh opined that Lopez had made "a brazen admission of breaking the law." 10-ER-1785:11–12. Presenting this testimony to the jury was planned and intentional.

Then it happened again on redirect. Asked how he remembered Lopez's words, SSA Singh stressed, "As I mentioned earlier … it was a brazen admission of breaking the law." 10-ER-1856:23–24. And that ended the testimony; the government said it had no further questions. 10-ER-1857:1.

The gratuitous statement about "a brazen admission of breaking the law," made at strategically significant times by a besuited

46

supervisory FBI agent, was improper. It went to an ultimate factual issue, one that was for the government to prove and the jury to decide. The statement also violated Rule 403. Moreover, it lacked a proper foundation under Rule 104. SSA Singh never explained his experiential basis in antitrust law for determining what constituted "breaking the law," particularly in the context of an alleged criminal, per se illegal wage-fixing conspiracy under the Sherman Act, rather than a civil claim subject to the rule of reason.[15]

Beyond that, the jury was never given a dual-role instruction, which might possibly have mitigated some of the harm. *See United States v. Vera*, 770 F.3d 1232, 1246 (9th Cir. 2014) (finding plain error where court failed to give dual role instruction after law enforcement officer testified generally about gang structure and practices, and that the defendant was likely a leader of a street gang).

The district court's belated curative instruction—which advised the jurors to disregard "all portions of [Lopez's] testimony where he specifically stated, 'breaking the law,'" 11-ER-1975:16–21, did nothing to remedy the government's violations. Jurors are presumed to follow their

---

[15] SSA Singh's testimony was not limited to wage fixing, but also recounted information about other communications among Lopez, Lubinsky, and Testa as to conduct that either does not violate the Sherman Act or is at least subject to the rule of reason, e.g., information sharing about wages, no-poach agreements, and joint efforts to lobby the State of Nevada. 9-ER-1558, 1565, 1700.

47

instructions, but curative instructions must still be "[p]rompt and effective." *United States v. Simtob*, 901 F.2d 799, 806 (9th Cir. 1990). In this case, at least four factors kept the district court's curative instruction from preventing substantial prejudice:

1.    *Testimony by a law-enforcement officer on an ultimate issue.* SSA Singh's improper testimony was about an ultimate factual issue, not a collateral factual point. Because SSA Singh is a law enforcement officer, his testimony carries additional weight.

2.    *Temporal remoteness.* The instruction came *over a week* after SSA Singh's testimony, and the prejudice of the purported "brazen admission" of "breaking the law" had already taken root.

3.    *Vagueness of the instruction.* The instruction specifically struck only part of SSA Singh's improper testimony—that Lopez was "breaking the law." 11-ER-1975:20–21. It did not explicitly strike the "brazen admission" part. By striking only part of the improper statement, the district court allowed the jury to fill in the gap with what it had already heard, i.e., a seasoned FBI agent determined that Lopez admitted to breaking the law. *See Horton*, 408 F.3d at 579 ("[T]he defendant's own confession is probably the most probative and damaging evidence that can be admitted against him." (cleaned up)).

4.    *Invocation of the stricken testimony in closing.* The government nullified any curative effect by highlighting SSA Singh's stricken testimony in closing. The government harkened back to that

48

testimony and argued that Lopez "admitted to the crime." 12-ER-2222:1–3. Invoking stricken testimony (arguing an admission of "the crime" or "breaking the law") in closing is itself a "particularly serious" form of prosecutorial misconduct. *See United States v. Frederick*, 78 F.3d 1370, 1378-79 (9th Cir. 1996) (improper to cite agent's earlier testimony once stricken).

For those reasons, and because SSA Singh's "brazen admission" comment "went to the heart of the most important issue in the case" under the Sherman Act, *United States v. Valencia-Lopez*, 971 F.3d 891, 902 (9th Cir. 2020), reversal is warranted.

## C. The district court erred as a matter of law in admitting the recording and transcript of Lopez's "hookers" comment.

The district court committed reversible error under Rule 403 by admitting the recording and transcript of Lopez's postconspiracy lunch so that the government could highlight Lopez's comment about nurses: "They're not. Because they're going to leave. They're like hookers." 8-ER-1451. Normally, this Court reviews for abuse of discretion the district court's failure to exclude evidence under Rule 403. *United States v. Ruiz*, 167 F.4th 1024, 1031 (9th Cir. 2026). But where, as here, "the district court fails to engage in necessary Rule 403 balancing, [this Court] review[s] *de novo*." *United States v. Wells*, 879 F.3d 900, 914 (9th Cir. 2018).

49

The comparison of nurses to prostitutes—particularly in a case involving the Las Vegas market—is precisely the type of inflammatory, misogynistic comment that Rule 403 forbids—one that invites the jury to convict on grounds of repugnance and moral outrage rather than proof of the charged antitrust offense.

Rule 403 favors exclusion of relevant evidence when its probative value is substantially outweighed by the danger of unfair prejudice. In the criminal context, "unfair prejudice" means the capacity of evidence to "lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." *Old Chief v. United States*, 519 U.S. 172, 180 (1997). Evidence is unfairly prejudicial "if it makes a conviction more likely because it provokes an emotional response in the jury or otherwise tends to affect adversely the jury's attitude toward the defendant wholly apart from its judgment as to his guilt or innocence of the crime charged." *United States v. Haischer*, 780 F.3d 1277, 1282 (9th Cir. 2015) (citation modified).

The government's use of Lopez's comparison of nurses to "hookers" epitomizes unfair prejudice: it uses a derogatory word to describe a predominantly female workforce, while bearing no relationship to the elements of a wage-fixing conspiracy (an agreement, intent to restrain trade, anticompetitive impact).[16] The phrase is viscerally offensive,

---

[16] No limiting or curative instruction was given by the district court and, as Lopez argued in opposing the government's motion in limine, no

producing a "reverberating clang" that "drown[s] out all weaker sounds" of the less emotionally fraught evidence of the actual charged conduct. *United States v. Hazelwood*, 979 F.3d 398, 411 (6th Cir. 2020) (quotation omitted).

*Hazelwood* underscores this point. There, the government introduced a secret recording of the defendant using racist and misogynistic slurs in a private conversation, arguing it was relevant to rebut the defendant's claims that he would never jeopardize the company's reputation. 979 F.3d at 411. The Sixth Circuit reversed the conviction, holding that the recordings were a "textbook violation of Rule 403" because of the "extraordinary risk of prejudice posed by the offensive recordings." *Id.* at 405, 412. The Sixth Circuit concluded that the recordings had little probative value, but they made it "more likely that a jury would convict" because of the jurors' reaction on behalf of "decent society" to the defendant's "backward and intolerant views." *Id.* at 407.

Here, any probative value of the "hookers" comment was miniscule. The statement was made long after the conspiracy ended, and it had no bearing on Lopez's intent at a material time to enter an agreement to violate the Sherman Act. *See United States v. Vallejo*, 237 F.3d 1008, 1017 (9th Cir. 2001) (reversing where evidence "unfairly imputed specific knowledge to [defendant]" and "knowledge was the central question

_____

such instruction could have cured the prejudice from such a comment. *See United States v. Hankey*, 203 F.3d 1160, 1172 (9th Cir. 2000).

51

before the jury"). Moreover, to the extent the comment was offered to show Lopez's concern about nurses' mobility in response to changes in pay rates, it was cumulative of other evidence offered through Lubinsky of Lopez's statements during the period of the alleged wage fixing. *See supra* pp. 20–21. Indeed, the district court ruled before trial that "nurse mobility in the Las Vegas market [is] irrelevant." 1-ER-109.

The government chose to play only one of the five audiovisual recordings from that lunch, 5-ER-846–47 (Exs. 186–191T)—the one with the "hookers" comment—and stopped the playback to repeat the comment, using prepared transcripts so there was no mistake. 8-ER-1450:21–1451:5.

In closing, the government used the comment to escalate its rhetoric with a propensity-based argument about why Lopez engaged in wage fixing: "Because, as you heard the defendant say, he thinks nurses are like hookers. Let's be very clear about this. The defendant has so little respect for the nurses that work for him that when they're not around, he refers to them as hookers." 12-ER-2208:24–2209:3.

The jurors later asked to hear that audiovisual recording again. 12-ER-2305:8–9. (It was the only video admitted into evidence. ER-865–1018.) Shortly thereafter, they returned their verdict. 12-ER-2305, 2307.

Beyond the highly prejudicial effect of the evidence, the district court's failure to conduct any Rule 403 analysis before admitting this recording was itself an abuse of discretion that warrants reversal. *See*

*Wells*, 879 F.3d at 930 (reversing when "the district court's erroneous admissions and failure to engage in Rule 403 balancing 'so infected the trial with unfairness as to make the resulting conviction a denial of due process'" (citation omitted)).

**D.      The government's use of Lopez's inadmissible privilege log violated Lopez's Fifth and Sixth Amendment rights.**

The privilege log was inadmissible hearsay. Worse still, the government's use of it *substantively* at trial, including by asking the jury to infer the content of attorney-client communications, violated Lopez's Fifth and Sixth Amendment rights. "In reviewing a district court's evidentiary rulings, 'the selection of the applicable standard of review is contextual: The de novo standard applies when issues of law predominate in the district court's evidentiary analysis, and the abuse-of-discretion standard applies when the inquiry is essentially factual.' … In reviewing an 'essentially factual' ruling for abuse of discretion, [this Court] review[s] … any underlying factual determinations for clear error.'" *United States v. Fryberg*, 854 F.3d 1126, 1130 (9th Cir. 2017) (cleaned up). "[W]hether the party has met the requirements to establish the existence of the attorney-client privilege is reviewed de novo." *United States v. Ruehle*, 583 F.3d 600, 606 (9th Cir. 2009).

**1.      The privilege log was inadmissible hearsay.**

The privilege log was classic hearsay. It was a legal document created by an attorney in 2024, and it consisted of out-of-court statements

memorializing other statements that were themselves, at a minimum, privileged, if not also hearsay. *See* Fed. R. Evid. 801(c); *Biggs v. Chicago Bd. of Educ.*, 2022 WL 1591577, at \*9 (N.D. Ill. May 19, 2022) (a "privilege log is inadmissible hearsay" when it is offered to show "that senior staff communicated with counsel"), *aff'd*, 82 F.4th 554 (7th Cir. 2023). The log was used for the truth of the matter asserted: that Lopez communicated with his (antitrust) attorney at the Morgan Lewis firm about a criminal warrant. 12-ER-2186:7–15 (government summation).

### 2. Use of the privilege log infringed on privileged attorney-client communications.

"A criminal defendant's ability to communicate candidly and confidentially with his lawyer is essential to his defense [and] … is nearly sacrosanct." *Nordstrom v. Ryan*, 762 F.3d 903, 910 (9th Cir. 2014); *see also Chambers v. Mississippi*, 410 U.S. 284, 294 (1973) ("The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations.").

Use of the privilege log violated Lopez's Sixth Amendment right to counsel by inviting the jury to infer what Lopez discussed with his lawyer, including that Lopez sent a search warrant to his "antitrust lawyer." According to SSA Singh, the log showed that Lopez emailed someone at the Morgan Lewis law firm with an attached Northern District of California search warrant on "the same date that the defendant received the search warrant as an attachment from Google."

9-ER-1731–32. The government later returned to the privilege log in its closing argument: "An e-mail from the defendant goes to someone at Morgan Lewis and it attaches a search warrant, that same warrant that was served on the defendant's Gmail that you just saw at Exhibit 206. And who is Morgan Lewis? Well, you'll see that from defendant in just a second. That's his antitrust lawyer." 12-ER-2186:16–17.

Such use of the privilege log was error because "correspondence, bills, ledgers, statements, and time records which also reveal the motive of the client in seeking representation, litigation strategy, or the specific nature of the services provided, such as researching particular areas of law, fall within the [attorney client] privilege." *Clarke v. Am. Com. Nat'l Bank*, 974 F.2d 127, 129 (9th Cir. 1992).

The government weaponized the privilege log to bridge an evidentiary gap it faced: nearly two years had passed since the 2019 FBI interview, and Lopez's knowledge of the ongoing investigation was unclear. The government used the log to lead the jury to infer Lopez's motive for seeking representation, but that use was foreclosed by *Clarke*. Defense counsel predicted this scenario when, at the parties' pretrial conference, he expressed concern that the government would tell the jury to "infer what the conversation was" between Lopez and his lawyer. 6-ER-926:4. In response, the district court asked, "Wouldn't that be grounds for a mistrial?" 6-ER-926:11.

55

It was. The district court erred, first by admitting the log, and then, when the damage was done, by refusing to grant Lopez's request for a mistrial. It also violated Lopez's Fifth Amendment rights by putting him in the position of having to take the stand to rebut this inference about his reasons for consulting an antitrust lawyer. Improper comments which unlawfully abridge the defendant's right to remain silent are reversible error. *Hurd v. Terhune*, 619 F.3d 1080 (9th Cir. 2010); *see United States v. Schuler,* 813 F.2d 978, 981 (9th Cir. 1987) ("We are concerned … that such statements by the prosecutor during trial, or the fear of such statements in closing argument, will tend to eviscerate the right to remain silent by forcing the defendant to take the stand in reaction to or in contemplation of the prosecutor's comments."). It is unclear what Lopez knew at that moment. Moreover, why Lopez sent an email to his attorney with a warrant attached is unknown. Rebutting the government's assertions to the jury about what Lopez must have said to his lawyers would have required waiving the attorney-client privilege.

If upheld, the government's misuse of the privilege log to show a criminal defendant was seeking legal advice about a search warrant will frustrate investigations and chill lawyer-client communications. It would also serve to erode the trust and professionalism expected among lawyers when honoring their mutual disclosure obligations. This Court should reverse.

56

**E.    The government introduced reversible error when it ended its closing by exhorting the jury to "do your duty."**

The government capped off its campaign of prejudicial misconduct with plain error: the Justice Department lawyer ended his rebuttal by telling the jury, "We proved our case. I have a job. Judge has a job. You have a job. With all due respect, you took an oath, do your job. He's guilty on every single count." 12-ER-2292:12–16. This improper argument was the last thing the jury heard from the parties. *Id.* To prevail on plain error, a defendant "must establish "(1) error, (2) that was plain, (3) that affected substantial rights, and (4) that seriously affected the fairness, integrity, or public reputation of the judicial proceedings." *United States v. Gomez*, 725 F.3d 1121, 1129–30 (9th Cir. 2013).

"It is ... improper for the prosecutor to state that the duty of the jury is to find the defendant guilty." *United States v. Sanchez*, 176 F.3d 1214, 1224–25 (9th Cir. 1999). The government's admonition crossed this Court's "fine line" between "proper and improper 'do your duty' argument" styles. *Id.* at 1225.

In *Sanchez*, this Court found reversible error where the prosecutor argued, "I would ask your consideration ... that after the marshal's service has done their duty and the court has done its duty and lawyers on both sides have done their duty, that you as jurors do your duty and well consider this matter and find these defendants guilty." *Id.* That is exactly what happened here.

57

The prosecutor in *Sanchez* "implied that, just as the marshal's service has a duty to protect the court, and the court has a duty to preside over the case, and the lawyers have a duty to present the case, the jury has a duty to find the defendant guilty." *Id.* at 1131–32. So, too, here. The government affirmatively invoked the jurors' "duty" alongside the duties of others involved in the proceeding, including the judge. 12-ER-2292:12–16.

The Court noted in *Sanchez* that "[i]t is probably appropriate for a prosecutor to argue to the jury that 'if you find that every element of the crime has been proved beyond a reasonable doubt, then, in accord with your sworn duty to follow the law and apply it to the evidence, you are obligated to convict, regardless of sympathy or other sentiments that might incline you otherwise.'" *Id.* But here "the prosecutor did not tell the jury that it had a duty to find the defendant guilty only if every element of the crime had been proven beyond a reasonable doubt. Nor did he remind the jury that it had the duty to acquit … if it had a reasonable doubt regarding his guilt." *Id.*

By contrast, this Court found in *Gomez* that the prosecutor's "do your duty" argument did not constitute plain error. There, the prosecutor made his "do your job" argument "immediately after reminding the jury of the prosecution's 'burden of proof beyond a reasonable doubt.'" 725 F.3d at 1132. No such reminder was given here, during the rebuttal*;* any such references were made hours earlier in the initial close by a different

government attorney. Nor did the prosecutor in *Gomez* refer "to the 'duty' of any other person." *Id.* Like the prosecutor in *Sanchez,* the government observed no such guardrail here.

The "presentation of improper material at the end of trial magnifies its prejudicial effect because it is freshest in the mind of the jury when it retires to deliberate." *Zapata v. Vasquez*, 788 F.3d 1106, 1122 (9th Cir. 2015) (cleaned up). This Court has summarily reversed for plain error when an improper rebuttal has a propensity to confuse the jury. *United States v. Cruz*, 592 F. App'x 623, 624 (9th Cir. 2015). That is particularly true where the improper rebuttal is the last thing the jury hears and no curative instruction is provided. *Id.* And where, as here, witness credibility is central to a conviction, prosecutorial misconduct affects "the jury's ability to consider the totality of the evidence fairly," even when the misconduct is not directly related to the witness's credibility. *United States v. Arturo Sanchez*, 659 F.3d 1252, 1260–61 (9th Cir. 2011).

Thus, when "considered in the context of the entire trial, that [prosecutorial] conduct appears likely to have affected the jury's discharge of its duty to judge the evidence fairly." *Id.* at 1257 (internal citation omitted). What is more, "there was no curative instruction to mitigate the prejudice of the [prosecutor's] statement." *Id.* at 1258. The improper exhortation was the last thing the jury heard before deliberating. "[T]his timing increased the risk that the inflammatory statement would improperly influence the jurors," and this Court cannot

"assume that the jury would have convicted [the defendant] absent the prosecutor's misconduct." *Id.* at 1260, 1261.

* * *

Given the pattern of misconduct by the government, this Court should vacate and remand based on any one ground standing alone or the cumulative effect of such conduct in denying Lopez a fair trial. *See Wallace*, 848 F.2d at 1475–76.

**II.   The district court erred as a matter of law in sentencing Lopez and imposing improper forfeiture and restitution sanctions on him.**

**A.   In sentencing Lopez for wire fraud, the district court improperly used Lopez's gain as a proxy for loss in determining his sentencing range.**

The district court erred legally when it improperly calculated the "loss" amount for purposes of the wire-fraud convictions, which drove up the Sentencing Guidelines range. The district court's reasoning in its order on loss—that "this case presents another example of how resolving the question of 'loss' can be challenging," 1-ER-24—was misplaced. The uncontroverted record shows that the value of Lopez's company, Community, exceeded its purchase price and continued to grow after the sale; this analysis was supported by an independent audit by Solace's own expert in civil litigation. 5-ER-776. Two unchallenged valuation experts established that Solace received a company worth more than $15.6 million. 5-ER-776–84. Notably, that valuation was based on

60

Community's performance extending beyond the discovery of fraud and therefore accounts for any related disruptions. 2-ER-339–40.

If Solace suffered no loss, then the antitrust guidelines would govern, and the recommended Guidelines sentence would likely be 18 to 24 months in custody—much shorter than the 40-month sentence the district court imposed. This Court reviews de novo the district court's construction of the Sentencing Guidelines. *United States v. Taylor*, 78 F.4th 1132, 1136 (9th Cir. 2023).

"Loss" is the "greater of actual loss or intended loss." U.S.S.G. § 2B1.1(b)(1)(A). Absent a threshold finding that a loss occurred, "gain" cannot be used as a proxy. U.S.S.G. § 2B1.1(b)(1)(B). The district court had no basis in this case to so use gain.

### 1. There was no finding of intended loss.

The district court never found intended loss, defined as "the pecuniary harm that the defendant purposefully sought to inflict." U.S.S.G. § 2B1.1(b)(1)(C)(ii). Intended loss requires that the defendant had specific intent and "consciously desired" that the victim suffer losses because of the fraud. *United States v. Gracidas-Ulibarry*, 231 F.3d 1188, 1196 (9th Cir. 2000). The intent to commit wire fraud is not the same as the intent to "purposefully" cause or "inflict" a loss. *See Kousisis v. United States*, 145 S. Ct. 1382, 1388–92 (2025) (wire fraud does not require economic loss, intended or otherwise); U.S.S.G. § 2B1.1(b)(1)(C)(ii). This Court has held that fraudulent statements intended to enhance

61

marketability do not permit a finding of intended loss. *United States v. Crandall*, 525 F.3d 907, 914 (9th Cir. 2008) (defendant's intent to sell fraudulently converted condominiums to victims did not mean the defendant "intend[ed] that the buyers would suffer any loss"). The district court did not point to evidence that Lopez "consciously desired" Solace to suffer a loss, nor could it have. At most, as in *Crandall*, the purpose here was to enhance Community's marketability.

### 2. There was no finding of actual loss.

The district court also made no finding of actual loss, which "means the reasonably foreseeable pecuniary harm that *resulted* from the offense." U.S.S.G. § 2B1.1(b)(1)(C)(i) (emphasis added). The actual-loss analysis is inherently backward-looking, requiring a "harm that resulted from the offense." *Id.*

Instead, the district court found "the full amount of loss the victim *could* have suffered is not just exceedingly difficult to calculate—it's impossible." 1-ER-26 (emphasis added). Losses that *could* have happened, but did not, are not "actual losses" because they did not "result from the offense." U.S.S.G. § 2B1.1(b)(1)(C)(i). The district court wrongly rejected what it called "Lopez's 'no financial harm, no loss' argument." 1-ER-25. But under § 2B1.1, "no financial harm" means no actual loss. U.S.S.G. § 2B1.1(b)(1)(C)(i). Notably, "no financial harm" does not mean no punishment—it simply means an offense level that accounts for the absence of actual loss. U.S.S.G. § 2B1.1(b)(1).

62

This Court's opinion in *United States v. Zolp*, 479 F.3d 715 (9th Cir. 2007), provides the required framework for determining actual loss here. For a sale of corporate assets facilitated through fraud, actual-loss analysis requires accounting for the value of the corporate asset the buyer received. *Id.* at 720 (vacating loss finding where trial court did not account for purchased corporate assets' "value after the fraud came to light"). The Guidelines direct courts to account for "the value" of "corporate assets" the buyer received when measuring loss. U.S.S.G. § 2B1.1, Application Note 3(B)(v). The "gain that resulted from the offense" can be used as "an alternative measure of loss only if there is a loss but it reasonably cannot be determined." U.S.S.G. § 2B1.1(b)(1)(B).

Neither party centered its loss arguments on gain as a proxy for loss. The government asked the district court to focus on intended loss, and Lopez presented undisputed evidence that the actual loss was zero. As explained above, two experts' valuations and an independent audit by Solace's expert confirmed that Community was worth more than what Solace paid for the business—the amount of loss was zero. *See supra* pp. 60–61.

The district court's own statement revealed its ability to ascertain the loss: "Solace didn't suffer any significant financial loss as a result of the wire fraud." 4-ER-631:8-9. But the district court's loss order did not even address *Zolp*, under which a finding of "no loss" must prevail. Under

63

the correct analysis, Lopez's sentence would have been significantly reduced. This Court should reverse.

### B. The district court's forfeiture order lacked a legal basis and constituted an unconstitutionally excessive fine.

The district court failed to apply the plain language of 18 U.S.C. § 981(a)(2)(A). 1-ER-33. Once the court correctly found that Community "was a legitimate business that Solace purchased for a legitimate purpose," *id.* at n.8, it could not find that the sale of such a lawful business constituted an "unlawful activity" under § 981(a)(2)(A). Moreover, the court's order constitutes an excessive fine in violation of the Eighth Amendment because it was wildly disproportionate to any loss to Solace (there was none).

#### 1. The district court's order was not supported by 18 U.S.C. § 981(a)(2)(A).

The district court relied on the civil forfeiture statute, 18 U.S.C. § 981(a)(1)(C), when ordering Lopez's forfeiture. That statute permits forfeiture of property that constitutes or is derived from proceeds traceable to a violation of 18 U.S.C. § 1343. *See* 18 U.S.C. §§ 1956(c)(7), 1961(1). But § 981(a)(2)(A)–(C) limits such forfeiture to three kinds of cases, none of which applies to these facts and two of which the district court did not even invoke.

The court relied on only subsection (A), which provides that, in cases "involving illegal goods, illegal services, unlawful activities," the

64

term "proceeds" is broadly defined as "property of any kind" obtained as the result of the offense, "not limited to the net gain" realized. 18 U.S.C. § 981(a)(2)(A). In other words, for cases involving drug trafficking (illegal goods), murder for hire (an illegal service), or robbery (an unlawful activity), the definition of "proceeds" under § 981(a)(2)(A) requires the forfeiture of all gains from such a crime, without any offset. *See id.* But that statute did not authorize forfeiture here because, as the district court found, Community "was a legitimate business that Solace purchased for a legitimate purpose," even if "the sale was tainted by Lopez's fraudulent omission of the antitrust investigation." 1-ER-33 n.8. Indeed, Solace continued to operate that business. 2-ER-339–40 (statement of Solace's representative at sentencing).

The starting point for interpretation is always the language of a statute. *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 739 (1989). "If the statutory language is plain, we must enforce it according to its terms." *King v. Burwell*, 576 U.S. 473, 486 (2015). Forfeiture "is imposed as punishment for a crime," *United States v. Davis*, 706 F.3d 1081, 1083 (9th Cir. 2013), and penal statutes "must be strictly construed," *United States v. Halseth*, 342 U.S. 277, 280 (1952). If there is any ambiguity, the "rule of lenity" requires courts to resolve that ambiguity in favor of the defendant. *United States v. Santos*, 553 U.S. 507, 514 (2008).

65

Lopez's conviction does not involve "illegal goods," "illegal services," or "unlawful activities" within the meaning of § 981(a)(2)(A). To fall under § 981(a)(2)(A), the conviction must "involve property derived from 'inherently unlawful' activities, such as embezzlement or contract killing." *United States v. Davis*, 53 F.4th 833, 853 (5th Cir. 2022) (quoting *United States v. Carpenter*, 941 F.3d 1, 7 (1st Cir. 2019)). Where the underlying activity "could, hypothetically," be conducted in a lawful manner, but was in fact conducted illegally, § 981(a)(2)(A) does not apply. *Id.* This construction is necessary: interpreting "unlawful activities" in § 981(a)(2)(A) as the acts constituting wire fraud "risks rendering § 981(a)(2)(B) superfluous and thus meaningless." *United States v. Balsiger*, 910 F.3d 942, 957 (7th Cir. 2018).[17]

*Davis* exemplifies the correct approach. The Fifth Circuit squarely rejected application of § 981(a)(2)(A) where the defendant was convicted of wire fraud after making "a series of misrepresentations to fraudulently obtain VA approval for [his HVAC training program] … and to fraudulently induce veterans to enroll" in the program. *Davis*, 53 F.4th at 840. The government argued the gross amount of VA funds received—over $72 million—was subject to forfeiture under § 981(a)(2)(A) because

_____

[17] Subsection (B) addresses cases "involving lawful goods or lawful services that are sold or provided in an illegal manner," and the definition of "proceeds" requires an offset for "the direct costs incurred in providing the goods or services." 18 U.S.C. § 981(a)(2)(B).

"Davis's relevant conduct was not operating the school, but committing wire fraud." *Id.* at 852. The proper focus, the Fifth Circuit held, was on operating the HVAC training program, which was *not* an unlawful activity. *Id.* at 853–54. The "crime therefore involved a 'service that could, hypothetically, be provided in a lawful manner' (HVAC training) but that was provided in an 'illegal manner' (by fraudulently obtaining GI-Bill funds to pay students' tuition)." *Id.* at 853 (quoting *Carpenter*, 941 F.3d at 7).[18]

So, too, here. Because the "crime did not involve property derived from 'inherently unlawful' activities," the "first definition of proceeds [under § 981(a)(2)(A)] therefore does not apply." *Id. Davis* was remanded, and so should this case.

### 2. A forfeiture order of over $10.4 million constitutes an excessive fine.

Beyond its statutory infirmity, the district court's forfeiture order of over $10.4 million violates the Excessive Fines Clause of the Eighth Amendment. Under the Eighth Amendment, "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII.

---

[18] The district court relied on inapposite cases involving proceeds from outright theft, *United States v. Lo*, 839 F.3d 777, 781 (9th Cir. 2016), or conduct specifically identified in § 981(a)(2)(A), *United States v. Omidi*, 125 F.4th 1283, 1287 (9th Cir. 2025) (healthcare fraud).

The Excessive Fines Clause "limits the government's power to extract payments, whether in cash or in kind, 'as *punishment* for some offense.'" *Austin v. United States*, 509 U.S. 602, 609–10 (1993). "Forfeitures are 'fines' within the meaning of the Eighth Amendment if they 'constitute punishment for an offense.'" *United States v. $100,348.00 in U.S. Currency*, 354 F.3d 1110, 1119 (9th Cir. 2004) (quoting *United States v. Bajakajian*, 524 U.S. 321, 328 (1998)).

The key constraint imposed by the Excessive Fines Clause is proportionality: the forfeiture amount must bear some relationship to the harm caused by the offense. *See Austin*, 509 U.S. at 628 (Scalia, J., concurring in part and concurring in judgment) ("The question is not *how much* the confiscated property is worth, but whether the confiscated property has a close enough relationship to the offense."). Forfeiture violates the Excessive Fines Clause if it is "grossly disproportional to the gravity of a defendant's offense." *Bajakajian*, 524 U.S. at 328.

In this Circuit, forfeiture orders are measured against the fines allowable under the Sentencing Guidelines. *See United States v. Beecroft*, 825 F.3d 991, 1000–02 (9th Cir. 2016) (abrogated on other grounds) (recalling precedent holding that "a forfeiture amount between 3 and 20 times greater than maximum fine would be unconstitutionally excessive"). Here, the maximum fine Lopez can receive under the Sentencing Guidelines is $250,000 for each count of conviction. 18 U.S.C.

68

§ 3571(b)(3).[19] Even if some provable harm could justify more, the largest constitutionally permissible forfeiture amount cannot exceed $3,750,000, which is three times the maximum fine for each of the five wire-fraud counts supporting forfeiture. ECF 49 ¶¶ 48–50. Even if Solace had been harmed, the forfeiture amount could not exceed $3.75 million. The forfeiture order of over $10.4 million cannot stand.

## C. The district court applied the wrong legal standard in awarding Solace restitution for attorneys' fees.

The district court abused its discretion when it made a legal error in awarding Solace over $2.4 million in attorneys' fees under 18 U.S.C. § 3663A(c)(1)(A)(ii). The Supreme Court held that civil fees are not recoverable because "investigation" and "proceedings" refer to "government investigations and criminal proceedings." *Lagos v. United States*, 584 U.S. 577, 585 (2018). The district court here took a broader view, finding that Solace's fees were recoverable because they were "the proximate result of the wire fraud conviction in this case." 4-ER-679:18–20. But that is not the standard for recoverable fees. As a matter of law, Solace can recover only fees "incurred during participation in the [government's] investigation or prosecution of the offense." 18 U.S.C. § 3663A(b)(4); *Lagos*, 584 U.S. at 581.

---

[19] The district court separately imposed a fine of $100,000 for each of the five wire-fraud counts, totaling $500,000. 4-ER-681–83.

The court did not limit its award to such fees. First, it awarded fees Solace incurred while defending *itself* from prosecution, including fees incurred while Solace was in a joint-defense agreement with Lopez, *e.g.*, ECF 726 Ex. A at 660, not "during participation in the investigation or prosecution" of Lopez. Second, Solace was awarded fees for frequent conferences between its attorneys in the respective criminal and civil proceedings. *E.g., id.* at 649. Third, the district court also awarded attorneys' fees that were not even incurred by Solace, but were instead incurred by other entities, such as Oakmark Advisors, in responding to discovery subpoenas Lopez issued. *E.g., id.* at 1145. Solace's attorney explained that Solace paid such costs as part "of a larger agreement" because Solace employees were also Oakmark employees. 4-ER-645–46. That was error.

The district court's failure to discern which fees were recoverable under § 3663A(b)(4) was based partly on a related problem. Solace's invoices for fees were so heavily redacted that it made it impossible for Lopez to assess accurately which fees fell under § 3663A(b)(4). Time entries were frequently redacted to exclude any description of the subject of the work. For example, one entry read as follows:

Reviewed PRIVILEGED

PRIVILEGED
PRIVILEGED
PRIVILEGED
PRIVILEGED

70

ECF 726 Ex. A, at 690. For such entries, the court relied on a declaration by Solace's attorney, 4-ER-679:10–20, but that declaration stated only that the invoices "reflect work performed … in their representation of Solace and Webster in the Criminal Matter" (i.e., United States v. Lopez, Case No. 2:23-r-55), without laying any basis for recovery of them under § 3663A(b)(4). 5-ER-711–12 ¶¶ 2, 7. Fees incurred to represent Solace (or other entities) as to Lopez's criminal proceeding are not recoverable under § 3663A(b)(4). Neither Solace, the government, nor the district court attempted to assess the invoices to determine which fees were recoverable.

Notably, after the first sentencing hearing, the government represented that only $150,000 could be characterized as "costs incurred by victims primarily to aid the government." 5-ER-721 n.7. The district court nevertheless ordered Lopez to pay Solace roughly $1.25 million in restitution for the same period, even though it did not find the fees were costs "incurred during participation in the investigation or prosecution of the offense." 18 U.S.C. § 3663A(b)(4). Its order was based on a sum gleaned from redacted attorney invoices.

To award fees, the district court was required to determine that the fees presented were incurred "during participation in the investigation or prosecution" of Lopez and not in defending itself. 18 U.S.C. § 3663A(b)(4). It made no such finding and—based on the record before it, which involved extensive redactions—had no ability to do so. *See*

71

*United States v. Heslop*, 694 F. App'x 485, 489 (9th Cir. 2017) (remanding when "vague" descriptions of law firm's services did "not adequately support the district court's award of attorneys' fees in restitution"). This Court should vacate the award of over $2.4 million and remand for further proceedings.

## CONCLUSION

The Court should reverse Lopez's convictions, vacate his unlawful sentences and penalties, and remand for further proceedings.

DATED this 30th day of March, 2026.

DICKINSON WRIGHT PLLC

s/ Bennett Evan Cooper
Bennett Evan Cooper
1850 N. Central Avenue, Suite 1850
Phoenix, Arizona 85004

DICKINSON WRIGHT PLLC
Michael M. Beckwith
615 National Ave., Suite 220
Mountain View, California 94043

STINSON LLP
Dan W. Goldfine
1850 N. Central Ave., Suite 2100
Phoenix, Arizona 85004-4584
(602) 330-3612

Attorneys for Defendant-Appellant
Eduardo Ruben Lopez

72

73

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, Eduardo Ruben Lopez states that there are no related cases pending before this Court.

74

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the length limits permitted by Ninth Circuit Rule 32-1 because it contains 13,579 words, excluding the parts of the brief exempted by FRAP 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of FRAP 32(a)(5) and the type-style requirements of FRAP 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Office 365 in 14-point Century Schoolbook.

DATED this 30th day of March, 2026.

s/ Bennett Evan Cooper

**ADDENDUM**

TABLE OF CONTENTS

*Page*

15 U.S.C. § 7a-1 ............................................................................... Add.2

18 U.S.C. § 981 ................................................................................ Add.4

18 U.S.C. § 1956 .............................................................................. Add.14

18 U.S.C. § 1961 .............................................................................. Add.23

18 U.S.C. § 3571 .............................................................................. Add.26

18 U.S.C. § 3663A ........................................................................... Add.28

U.S.S.G. § 2B1.1 ............................................................................. Add.31

U.S.S.G. § 2R1.1 ............................................................................. Add.52

U.S.S.G. § 3D1.4 ............................................................................ Add.56

United States Code Annotated
  Title 15. Commerce and Trade
    Chapter 1. Monopolies and Combinations in Restraint of Trade (Refs & Annos)

15 U.S.C.A. § 7a-1

§ 7a-1. Limitation on recovery

Effective: October 1, 2020
Currentness

**(a) In general**

Subject to subsection (d), in any civil action alleging a violation of section 1 or 3 of this title, or alleging a violation of any similar State law, based on conduct covered by a currently effective antitrust leniency agreement, the amount of damages recovered by or on behalf of a claimant from an antitrust leniency applicant who satisfies the requirements of subsection (b), together with the amounts so recovered from cooperating individuals who satisfy such requirements, shall not exceed that portion of the actual damages sustained by such claimant which is attributable to the commerce done by the applicant in the goods or services affected by the violation.

**(b) Requirements**

Subject to subsection (c), an antitrust leniency applicant or cooperating individual satisfies the requirements of this subsection with respect to a civil action described in subsection (a) if the court in which the civil action is brought determines, after considering any appropriate pleadings from the claimant, that the applicant or cooperating individual, as the case may be, has provided satisfactory cooperation to the claimant with respect to the civil action, which cooperation shall include--

**(1)** providing a full account to the claimant of all facts known to the applicant or cooperating individual, as the case may be, that are potentially relevant to the civil action;

**(2)** furnishing all documents or other items potentially relevant to the civil action that are in the possession, custody, or control of the applicant or cooperating individual, as the case may be, wherever they are located; and

**(3)(A)** in the case of a cooperating individual--

**(i)** making himself or herself available for such interviews, depositions, or testimony in connection with the civil action as the claimant may reasonably require; and

**(ii)** responding completely and truthfully, without making any attempt either falsely to protect or falsely to implicate any person or entity, and without intentionally withholding any potentially relevant information, to all questions asked by the claimant in interviews, depositions, trials, or any other court proceedings in connection with the civil action; or

Add.2

**(B)** in the case of an antitrust leniency applicant, using its best efforts to secure and facilitate from cooperating individuals covered by the agreement the cooperation described in clauses (i) and (ii) and subparagraph (A).

**(c) Timeliness**

The court shall consider, in making the determination concerning satisfactory cooperation described in subsection (b), the timeliness of the applicant's or cooperating individual's cooperation with the claimant.

**(d) Cooperation after expiration of stay or protective order**

If the Antitrust Division does obtain a stay or protective order in a civil action based on conduct covered by an antitrust leniency agreement, once the stay or protective order, or a portion thereof, expires or is terminated, the antitrust leniency applicant and cooperating individuals shall provide without unreasonable delay any cooperation described in paragraphs (1) and (2) of subsection (b) that was prohibited by the expired or terminated stay or protective order, or the expired or terminated portion thereof, in order for the cooperation to be deemed satisfactory under such paragraphs.

**(e) Continuation**

Nothing in this section shall be construed to modify, impair, or supersede the provisions of sections 15, 15a, and 15c of this title relating to the recovery of costs of suit, including a reasonable attorney's fee, and interest on damages, to the extent that such recovery is authorized by such sections.

---

**End of Document** © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Add.3

United States Code Annotated
    Title 18. Crimes and Criminal Procedure (Refs & Annos)
        Part I. Crimes (Refs & Annos)
            Chapter 46. Forfeiture (Refs & Annos)

18 U.S.C.A. § 981

§ 981. Civil forfeiture

Effective: February 18, 2016
Currentness

**(a)(1)** The following property is subject to forfeiture to the United States:

**(A)** Any property, real or personal, involved in a transaction or attempted transaction in violation of section 1956, 1957 or 1960 of this title, or any property traceable to such property.

**(B)** Any property, real or personal, within the jurisdiction of the United States, constituting, derived from, or traceable to, any proceeds obtained directly or indirectly from an offense against a foreign nation, or any property used to facilitate such an offense, if the offense--

   **(i)** involves trafficking in nuclear, chemical, biological, or radiological weapons technology or material, or the manufacture, importation, sale, or distribution of a controlled substance (as that term is defined for purposes of the Controlled Substances Act), or any other conduct described in section 1956(c)(7)(B);

   **(ii)** would be punishable within the jurisdiction of the foreign nation by death or imprisonment for a term exceeding 1 year; and

   **(iii)** would be punishable under the laws of the United States by imprisonment for a term exceeding 1 year, if the act or activity constituting the offense had occurred within the jurisdiction of the United States.

**(C)** Any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of section 215, 471, 472, 473, 474, 476, 477, 478, 479, 480, 481, 485, 486, 487, 488, 501, 502, 510, 542, 545, 656, 657, 670, 842, 844, 1005, 1006, 1007, 1014, 1028, 1029, 1030, 1032, or 1344 of this title or any offense constituting "specified unlawful activity" (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense.

**(D)** Any property, real or personal, which represents or is traceable to the gross receipts obtained, directly or indirectly, from a violation of--

   **(i)** section 666(a)(1) (relating to Federal program fraud);

**(ii)** section 1001 (relating to fraud and false statements);

**(iii)** section 1031 (relating to major fraud against the United States);

**(iv)** section 1032 (relating to concealment of assets from conservator or receiver of insured financial institution);

**(v)** section 1341 (relating to mail fraud); or

**(vi)** section 1343 (relating to wire fraud),

if such violation relates to the sale of assets acquired or held by the the [1] Federal Deposit Insurance Corporation, as conservator or receiver for a financial institution, or any other conservator for a financial institution appointed by the Office of the Comptroller of the Currency or the National Credit Union Administration, as conservator or liquidating agent for a financial institution.

**(E)** With respect to an offense listed in subsection (a)(1)(D) committed for the purpose of executing or attempting to execute any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent statements, pretenses, representations or promises, the gross receipts of such an offense shall include all property, real or personal, tangible or intangible, which thereby is obtained, directly or indirectly.

**(F)** Any property, real or personal, which represents or is traceable to the gross proceeds obtained, directly or indirectly, from a violation of--

**(i)** section 511 (altering or removing motor vehicle identification numbers);

**(ii)** section 553 (importing or exporting stolen motor vehicles);

**(iii)** section 2119 (armed robbery of automobiles);

**(iv)** section 2312 (transporting stolen motor vehicles in interstate commerce); or

**(v)** section 2313 (possessing or selling a stolen motor vehicle that has moved in interstate commerce).

**(G)** All assets, foreign or domestic--

**(i)** of any individual, entity, or organization engaged in planning or perpetrating any any [1] Federal crime of terrorism (as defined in section 2332b(g)(5)) against the United States, citizens or residents of the United States, or their property, and all assets, foreign or domestic, affording any person a source of influence over any such entity or organization;

**(ii)** acquired or maintained by any person with the intent and for the purpose of supporting, planning, conducting, or concealing any Federal crime of terrorism (as defined in section 2332b(g)(5) [2] against the United States, citizens or residents of the United States, or their property;

**(iii)** derived from, involved in, or used or intended to be used to commit any Federal crime of terrorism (as defined in section 2332b(g)(5)) against the United States, citizens or residents of the United States, or their property; or

**(iv)** of any individual, entity, or organization engaged in planning or perpetrating any act of international terrorism (as defined in section 2331) against any international organization (as defined in section 209 of the State Department Basic Authorities Act of 1956 (22 U.S.C. 4309(b)) or against any foreign Government. [3] Where the property sought for forfeiture is located beyond the territorial boundaries of the United States, an act in furtherance of such planning or perpetration must have occurred within the jurisdiction of the United States.

**(H)** Any property, real or personal, involved in a violation or attempted violation, or which constitutes or is derived from proceeds traceable to a violation, of section 2339C of this title.

**(I)** Any property, real or personal, that is involved in a violation or attempted violation, or which constitutes or is derived from proceeds traceable to a prohibition imposed pursuant to section 104(a) of the North Korea Sanctions and Policy Enhancement Act of 2016.

**(2)** For purposes of paragraph (1), the term "proceeds" is defined as follows:

**(A)** In cases involving illegal goods, illegal services, unlawful activities, and telemarketing and health care fraud schemes, the term "proceeds" means property of any kind obtained directly or indirectly, as the result of the commission of the offense giving rise to forfeiture, and any property traceable thereto, and is not limited to the net gain or profit realized from the offense.

**(B)** In cases involving lawful goods or lawful services that are sold or provided in an illegal manner, the term "proceeds" means the amount of money acquired through the illegal transactions resulting in the forfeiture, less the direct costs incurred in providing the goods or services. The claimant shall have the burden of proof with respect to the issue of direct costs. The direct costs shall not include any part of the overhead expenses of the entity providing the goods or services, or any part of the income taxes paid by the entity.

**(C)** In cases involving fraud in the process of obtaining a loan or extension of credit, the court shall allow the claimant a deduction from the forfeiture to the extent that the loan was repaid, or the debt was satisfied, without any financial loss to the victim.

**(b)(1)** Except as provided in section 985, any property subject to forfeiture to the United States under subsection (a) may be seized by the Attorney General and, in the case of property involved in a violation investigated by the Secretary of the Treasury or the United States Postal Service, the property may also be seized by the Secretary of the Treasury or the Postal Service, respectively.

**(2)** Seizures pursuant to this section shall be made pursuant to a warrant obtained in the same manner as provided for a search warrant under the Federal Rules of Criminal Procedure, except that a seizure may be made without a warrant if--

**(A)** a complaint for forfeiture has been filed in the United States district court and the court issued an arrest warrant in rem pursuant to the Supplemental Rules for Certain Admiralty and Maritime Claims;

**(B)** there is probable cause to believe that the property is subject to forfeiture and--

**(i)** the seizure is made pursuant to a lawful arrest or search; or

**(ii)** another exception to the Fourth Amendment warrant requirement would apply; or

**(C)** the property was lawfully seized by a State or local law enforcement agency and transferred to a Federal agency.

**(3)** Notwithstanding the provisions of rule 41(a) of the Federal Rules of Criminal Procedure, a seizure warrant may be issued pursuant to this subsection by a judicial officer in any district in which a forfeiture action against the property may be filed under section 1355(b) of title 28, and may be executed in any district in which the property is found, or transmitted to the central authority of any foreign state for service in accordance with any treaty or other international agreement. Any motion for the return of property seized under this section shall be filed in the district court in which the seizure warrant was issued or in the district court for the district in which the property was seized.

**(4)(A)** If any person is arrested or charged in a foreign country in connection with an offense that would give rise to the forfeiture of property in the United States under this section or under the Controlled Substances Act, the Attorney General may apply to any Federal judge or magistrate judge in the district in which the property is located for an ex parte order restraining the property subject to forfeiture for not more than 30 days, except that the time may be extended for good cause shown at a hearing conducted in the manner provided in rule 43(e) of the Federal Rules of Civil Procedure.

**(B)** The application for the restraining order shall set forth the nature and circumstances of the foreign charges and the basis for belief that the person arrested or charged has property in the United States that would be subject to forfeiture, and shall contain a statement that the restraining order is needed to preserve the availability of property for such time as is necessary to receive evidence from the foreign country or elsewhere in support of probable cause for the seizure of the property under this subsection.

**(c)** Property taken or detained under this section shall not be repleviable, but shall be deemed to be in the custody of the Attorney General, the Secretary of the Treasury, or the Postal Service, as the case may be, subject only to the orders and decrees of the court or the official having jurisdiction thereof. Whenever property is seized under this subsection, the Attorney General, the Secretary of the Treasury, or the Postal Service, as the case may be, may--

**(1)** place the property under seal;

**(2)** remove the property to a place designated by him; or

(3) require that the General Services Administration take custody of the property and remove it, if practicable, to an appropriate location for disposition in accordance with law.

(d) For purposes of this section, the provisions of the customs laws relating to the seizure, summary and judicial forfeiture, condemnation of property for violation of the customs laws, the disposition of such property or the proceeds from the sale of such property under this section, the remission or mitigation of such forfeitures, and the compromise of claims (19 U.S.C. 1602 et seq.), insofar as they are applicable and not inconsistent with the provisions of this section, shall apply to seizures and forfeitures incurred, or alleged to have been incurred, under this section, except that such duties as are imposed upon the customs officer or any other person with respect to the seizure and forfeiture of property under the customs laws shall be performed with respect to seizures and forfeitures of property under this section by such officers, agents, or other persons as may be authorized or designated for that purpose by the Attorney General, the Secretary of the Treasury, or the Postal Service, as the case may be. The Attorney General shall have sole responsibility for disposing of petitions for remission or mitigation with respect to property involved in a judicial forfeiture proceeding.

(e) Notwithstanding any other provision of the law, except section 3 of the Anti Drug Abuse Act of 1986, the Attorney General, the Secretary of the Treasury, or the Postal Service, as the case may be, is authorized to retain property forfeited pursuant to this section, or to transfer such property on such terms and conditions as he may determine--

(1) to any other Federal agency;

(2) to any State or local law enforcement agency which participated directly in any of the acts which led to the seizure or forfeiture of the property;

(3) in the case of property referred to in subsection (a)(1)(C), to any Federal financial institution regulatory agency--

(A) to reimburse the agency for payments to claimants or creditors of the institution; and

(B) to reimburse the insurance fund of the agency for losses suffered by the fund as a result of the receivership or liquidation;

(4) in the case of property referred to in subsection (a)(1)(C), upon the order of the appropriate Federal financial institution regulatory agency, to the financial institution as restitution, with the value of the property so transferred to be set off against any amount later recovered by the financial institution as compensatory damages in any State or Federal proceeding;

(5) in the case of property referred to in subsection (a)(1)(C), to any Federal financial institution regulatory agency, to the extent of the agency's contribution of resources to, or expenses involved in, the seizure and forfeiture, and the investigation leading directly to the seizure and forfeiture, of such property;

(6) as restoration to any victim of the offense giving rise to the forfeiture, including, in the case of a money laundering offense, any offense constituting the underlying specified unlawful activity; or

Add.8

**(7)** In [3] the case of property referred to in subsection (a)(1)(D), to the Resolution Trust Corporation, the Federal Deposit Insurance Corporation, or any other Federal financial institution regulatory agency (as defined in section 8(e)(7)(D) of the Federal Deposit Insurance Act).

The Attorney General, the Secretary of the Treasury, or the Postal Service, as the case may be, shall ensure the equitable transfer pursuant to paragraph (2) of any forfeited property to the appropriate State or local law enforcement agency so as to reflect generally the contribution of any such agency participating directly in any of the acts which led to the seizure or forfeiture of such property. A decision by the Attorney General, the Secretary of the Treasury, or the Postal Service pursuant to paragraph (2) shall not be subject to review. The United States shall not be liable in any action arising out of the use of any property the custody of which was transferred pursuant to this section to any non-Federal agency. The Attorney General, the Secretary of the Treasury, or the Postal Service may order the discontinuance of any forfeiture proceedings under this section in favor of the institution of forfeiture proceedings by State or local authorities under an appropriate State or local statute. After the filing of a complaint for forfeiture under this section, the Attorney General may seek dismissal of the complaint in favor of forfeiture proceedings under State or local law. Whenever forfeiture proceedings are discontinued by the United States in favor of State or local proceedings, the United States may transfer custody and possession of the seized property to the appropriate State or local official immediately upon the initiation of the proper actions by such officials. Whenever forfeiture proceedings are discontinued by the United States in favor of State or local proceedings, notice shall be sent to all known interested parties advising them of the discontinuance or dismissal. The United States shall not be liable in any action arising out of the seizure, detention, and transfer of seized property to State or local officials. The United States shall not be liable in any action arising out of a transfer under paragraph (3), (4), or (5) of this subsection.

**(f)** All right, title, and interest in property described in subsection (a) of this section shall vest in the United States upon commission of the act giving rise to forfeiture under this section.

**(g)(1)** Upon the motion of the United States, the court shall stay the civil forfeiture proceeding if the court determines that civil discovery will adversely affect the ability of the Government to conduct a related criminal investigation or the prosecution of a related criminal case.

**(2)** Upon the motion of a claimant, the court shall stay the civil forfeiture proceeding with respect to that claimant if the court determines that--

**(A)** the claimant is the subject of a related criminal investigation or case;

**(B)** the claimant has standing to assert a claim in the civil forfeiture proceeding; and

**(C)** continuation of the forfeiture proceeding will burden the right of the claimant against self-incrimination in the related investigation or case.

**(3)** With respect to the impact of civil discovery described in paragraphs (1) and (2), the court may determine that a stay is unnecessary if a protective order limiting discovery would protect the interest of one party without unfairly limiting the ability of the opposing party to pursue the civil case. In no case, however, shall the court impose a protective order as an alternative to a stay if the effect of such protective order would be to allow one party to pursue discovery while the other party is substantially unable to do so.

**(4)** In this subsection, the terms "related criminal case" and "related criminal investigation" mean an actual prosecution or investigation in progress at the time at which the request for the stay, or any subsequent motion to lift the stay is made. In determining whether a criminal case or investigation is "related" to a civil forfeiture proceeding, the court shall consider the degree of similarity between the parties, witnesses, facts, and circumstances involved in the two proceedings, without requiring an identity with respect to any one or more factors.

**(5)** In requesting a stay under paragraph (1), the Government may, in appropriate cases, submit evidence ex parte in order to avoid disclosing any matter that may adversely affect an ongoing criminal investigation or pending criminal trial.

**(6)** Whenever a civil forfeiture proceeding is stayed pursuant to this subsection, the court shall enter any order necessary to preserve the value of the property or to protect the rights of lienholders or other persons with an interest in the property while the stay is in effect.

**(7)** A determination by the court that the claimant has standing to request a stay pursuant to paragraph (2) shall apply only to this subsection and shall not preclude the Government from objecting to the standing of the claimant by dispositive motion or at the time of trial.

**(h)** In addition to the venue provided for in section 1395 of title 28 or any other provision of law, in the case of property of a defendant charged with a violation that is the basis for forfeiture of the property under this section, a proceeding for forfeiture under this section may be brought in the judicial district in which the defendant owning such property is found or in the judicial district in which the criminal prosecution is brought.

**(i)(1)** Whenever property is civilly or criminally forfeited under this chapter, the Attorney General or the Secretary of the Treasury, as the case may be, may transfer the forfeited personal property or the proceeds of the sale of any forfeited personal or real property to any foreign country which participated directly or indirectly in the seizure or forfeiture of the property, if such a transfer--

    **(A)** has been agreed to by the Secretary of State;

    **(B)** is authorized in an international agreement between the United States and the foreign country; and

    **(C)** is made to a country which, if applicable, has been certified under section 481(h) of the Foreign Assistance Act of 1961.

A decision by the Attorney General or the Secretary of the Treasury pursuant to this paragraph shall not be subject to review. The foreign country shall, in the event of a transfer of property or proceeds of sale of property under this subsection, bear all expenses incurred by the United States in the seizure, maintenance, inventory, storage, forfeiture, and disposition of the property, and all transfer costs. The payment of all such expenses, and the transfer of assets pursuant to this paragraph, shall be upon such terms and conditions as the Attorney General or the Secretary of the Treasury may, in his discretion, set.

**(2)** The provisions of this section shall not be construed as limiting or superseding any other authority of the United States to provide assistance to a foreign country in obtaining property related to a crime committed in the foreign country, including property which is sought as evidence of a crime committed in the foreign country.

**(3)** A certified order or judgment of forfeiture by a court of competent jurisdiction of a foreign country concerning property which is the subject of forfeiture under this section and was determined by such court to be the type of property described in subsection (a)(1)(B) of this section, and any certified recordings or transcripts of testimony taken in a foreign judicial proceeding concerning such order or judgment of forfeiture, shall be admissible in evidence in a proceeding brought pursuant to this section. Such certified order or judgment of forfeiture, when admitted into evidence, shall constitute probable cause that the property forfeited by such order or judgment of forfeiture is subject to forfeiture under this section and creates a rebuttable presumption of the forfeitability of such property under this section.

**(4)** A certified order or judgment of conviction by a court of competent jurisdiction of a foreign country concerning an unlawful drug activity which gives rise to forfeiture under this section and any certified recordings or transcripts of testimony taken in a foreign judicial proceeding concerning such order or judgment of conviction shall be admissible in evidence in a proceeding brought pursuant to this section. Such certified order or judgment of conviction, when admitted into evidence, creates a rebuttable presumption that the unlawful drug activity giving rise to forfeiture under this section has occurred.

**(5)** The provisions of paragraphs (3) and (4) of this subsection shall not be construed as limiting the admissibility of any evidence otherwise admissible, nor shall they limit the ability of the United States to establish probable cause that property is subject to forfeiture by any evidence otherwise admissible.

**(j)** For purposes of this section--

    **(1)** the term "Attorney General" means the Attorney General or his delegate; and

    **(2)** the term "Secretary of the Treasury" means the Secretary of the Treasury or his delegate.

**(k) Interbank accounts.--**

    **(1) In general.--**

        **(A) In general.**--For the purpose of a forfeiture under this section or under the Controlled Substances Act (21 U.S.C. 801 et seq.), if funds are deposited into an account at a foreign financial institution (as defined in section 984(c)(2)(A) of this title), and that foreign financial institution (as defined in section 984(c)(2)(A) of this title) has an interbank account in the United States with a covered financial institution (as defined in section 5318(j)(1) of title 31), the funds shall be deemed to have been deposited into the interbank account in the United States, and any restraining order, seizure warrant, or arrest warrant in rem regarding the funds may be served on the covered financial institution, and funds in the interbank account, up to the value of the funds deposited into the account at the foreign financial institution (as defined in section 984(c)(2) (A) of this title), may be restrained, seized, or arrested.

**(B) Authority to suspend.**--The Attorney General, in consultation with the Secretary of the Treasury, may suspend or terminate a forfeiture under this section if the Attorney General determines that a conflict of law exists between the laws of the jurisdiction in which the foreign financial institution (as defined in section 984(c)(2)(A) of this title) is located and the laws of the United States with respect to liabilities arising from the restraint, seizure, or arrest of such funds, and that such suspension or termination would be in the interest of justice and would not harm the national interests of the United States.

**(2) No requirement for government to trace funds.**--If a forfeiture action is brought against funds that are restrained, seized, or arrested under paragraph (1), it shall not be necessary for the Government to establish that the funds are directly traceable to the funds that were deposited into the foreign financial institution (as defined in section 984(c)(2)(A) of this title), nor shall it be necessary for the Government to rely on the application of section 984.

**(3) Claims brought by owner of the funds.**--If a forfeiture action is instituted against funds restrained, seized, or arrested under paragraph (1), the owner of the funds deposited into the account at the foreign financial institution (as defined in section 984(c)(2)(A) of this title) may contest the forfeiture by filing a claim under section 983.

**(4) Definitions.**--For purposes of this subsection, the following definitions shall apply:

**(A) Interbank account.**--The term "interbank account" has the same meaning as in section 984(c)(2)(B).

**(B) Owner.--**

**(i) In general.**--Except as provided in clause (ii), the term "owner"--

**(I)** means the person who was the owner, as that term is defined in section 983(d)(6), of the funds that were deposited into the foreign financial institution (as defined in section 984(c)(2)(A) of this title) at the time such funds were deposited; and

**(II)** does not include either the foreign financial institution (as defined in section 984(c)(2)(A) of this title) or any financial institution acting as an intermediary in the transfer of the funds into the interbank account.

**(ii) Exception.**--The foreign financial institution (as defined in section 984(c)(2)(A) of this title) may be considered the "owner" of the funds (and no other person shall qualify as the owner of such funds) only if--

**(I)** the basis for the forfeiture action is wrongdoing committed by the foreign financial institution (as defined in section 984(c)(2)(A) of this title); or

**(II)** the foreign financial institution (as defined in section 984(c)(2)(A) of this title) establishes, by a preponderance of the evidence, that prior to the restraint, seizure, or arrest of the funds, the foreign financial institution (as defined in section 984(c)(2)(A) of this title) had discharged all or part of its obligation to the prior owner of the funds, in which case the foreign financial institution (as defined in section 984(c)(2)(A) of this title) shall be deemed the owner of the funds to the extent of such discharged obligation.

§ 981. Civil forfeiture, 18 USCA § 981

**Footnotes**

1        So in original.

2        So in original. A closing parenthesis probably should appear.

3        So in original. Probably should not be capitalized.

---

End of Document                                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
  Title 18. Crimes and Criminal Procedure (Refs & Annos)
    Part I. Crimes (Refs & Annos)
      Chapter 95. Racketeering (Refs & Annos)

18 U.S.C.A. § 1956

§ 1956. Laundering of monetary instruments

Effective: December 23, 2022
Currentness

**(a)(1)** Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity--

  **(A)(i)** with the intent to promote the carrying on of specified unlawful activity; or

  **(ii)** with intent to engage in conduct constituting a violation of section 7201 or 7206 of the Internal Revenue Code of 1986; or

  **(B)** knowing that the transaction is designed in whole or in part--

    **(i)** to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or

    **(ii)** to avoid a transaction reporting requirement under State or Federal law,

shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both. For purposes of this paragraph, a financial transaction shall be considered to be one involving the proceeds of specified unlawful activity if it is part of a set of parallel or dependent transactions, any one of which involves the proceeds of specified unlawful activity, and all of which are part of a single plan or arrangement.

**(2)** Whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States--

  **(A)** with the intent to promote the carrying on of specified unlawful activity; or

**(B)** knowing that the monetary instrument or funds involved in the transportation, transmission, or transfer represent the proceeds of some form of unlawful activity and knowing that such transportation, transmission, or transfer is designed in whole or in part--

**(i)** to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or

**(ii)** to avoid a transaction reporting requirement under State or Federal law,

shall be sentenced to a fine of not more than $500,000 or twice the value of the monetary instrument or funds involved in the transportation, transmission, or transfer, whichever is greater, or imprisonment for not more than twenty years, or both. For the purpose of the offense described in subparagraph (B), the defendant's knowledge may be established by proof that a law enforcement officer represented the matter specified in subparagraph (B) as true, and the defendant's subsequent statements or actions indicate that the defendant believed such representations to be true.

**(3)** Whoever, with the intent--

**(A)** to promote the carrying on of specified unlawful activity;

**(B)** to conceal or disguise the nature, location, source, ownership, or control of property believed to be the proceeds of specified unlawful activity; or

**(C)** to avoid a transaction reporting requirement under State or Federal law,

conducts or attempts to conduct a financial transaction involving property represented to be the proceeds of specified unlawful activity, or property used to conduct or facilitate specified unlawful activity, shall be fined under this title or imprisoned for not more than 20 years, or both. For purposes of this paragraph and paragraph (2), the term "represented" means any representation made by a law enforcement officer or by another person at the direction of, or with the approval of, a Federal official authorized to investigate or prosecute violations of this section.

**(b) Penalties.--**

**(1) In general.**--Whoever conducts or attempts to conduct a transaction described in subsection (a)(1) or (a)(3), or section 1957, or a transportation, transmission, or transfer described in subsection (a)(2), is liable to the United States for a civil penalty of not more than the greater of--

**(A)** the value of the property, funds, or monetary instruments involved in the transaction; or

**(B)** $10,000.

WESTLAW  © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Add.15

**(2) Jurisdiction over foreign persons.**--For purposes of adjudicating an action filed or enforcing a penalty ordered under this section, the district courts shall have jurisdiction over any foreign person, including any financial institution authorized under the laws of a foreign country, against whom the action is brought, if service of process upon the foreign person is made under the Federal Rules of Civil Procedure or the laws of the country in which the foreign person is found, and--

**(A)** the foreign person commits an offense under subsection (a) involving a financial transaction that occurs in whole or in part in the United States;

**(B)** the foreign person converts, to his or her own use, property in which the United States has an ownership interest by virtue of the entry of an order of forfeiture by a court of the United States; or

**(C)** the foreign person is a financial institution that maintains a bank account at a financial institution in the United States.

**(3) Court authority over assets.**--A court may issue a pretrial restraining order or take any other action necessary to ensure that any bank account or other property held by the defendant in the United States is available to satisfy a judgment under this section.

**(4) Federal receiver.**--

**(A) In general.**--A court may appoint a Federal Receiver, in accordance with subparagraph (B) of this paragraph, to collect, marshal, and take custody, control, and possession of all assets of the defendant, wherever located, to satisfy a civil judgment under this subsection, a forfeiture judgment under section 981 or 982, or a criminal sentence under section 1957 or subsection (a) of this section, including an order of restitution to any victim of a specified unlawful activity.

**(B) Appointment and authority.**--A Federal Receiver described in subparagraph (A)--

**(i)** may be appointed upon application of a Federal prosecutor or a Federal or State regulator, by the court having jurisdiction over the defendant in the case;

**(ii)** shall be an officer of the court, and the powers of the Federal Receiver shall include the powers set out in section 754 of title 28, United States Code; and

**(iii)** shall have standing equivalent to that of a Federal prosecutor for the purpose of submitting requests to obtain information regarding the assets of the defendant--

**(I)** from the Financial Crimes Enforcement Network of the Department of the Treasury; or

**(II)** from a foreign country pursuant to a mutual legal assistance treaty, multilateral agreement, or other arrangement for international law enforcement assistance, provided that such requests are in accordance with the policies and procedures of the Attorney General.

Add.16

**(c)** As used in this section--

**(1)** the term "knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity" means that the person knew the property involved in the transaction represented proceeds from some form, though not necessarily which form, of activity that constitutes a felony under State, Federal, or foreign law, regardless of whether or not such activity is specified in paragraph (7);

**(2)** the term "conducts" includes initiating, concluding, or participating in initiating, or concluding a transaction;

**(3)** the term "transaction" includes a purchase, sale, loan, pledge, gift, transfer, delivery, or other disposition, and with respect to a financial institution includes a deposit, withdrawal, transfer between accounts, exchange of currency, loan, extension of credit, purchase or sale of any stock, bond, certificate of deposit, or other monetary instrument, use of a safe deposit box, or any other payment, transfer, or delivery by, through, or to a financial institution, by whatever means effected;

**(4)** the term "financial transaction" means (A) a transaction which in any way or degree affects interstate or foreign commerce (i) involving the movement of funds by wire or other means or (ii) involving one or more monetary instruments, or (iii) involving the transfer of title to any real property, vehicle, vessel, or aircraft, or (B) a transaction involving the use of a financial institution which is engaged in, or the activities of which affect, interstate or foreign commerce in any way or degree;

**(5)** the term "monetary instruments" means (i) coin or currency of the United States or of any other country, travelers' checks, personal checks, bank checks, and money orders, or (ii) investment securities or negotiable instruments, in bearer form or otherwise in such form that title thereto passes upon delivery;

**(6)** the term "financial institution" includes--

**(A)** any financial institution, as defined in section 5312(a)(2) of title 31, United States Code, or the regulations promulgated thereunder; and

**(B)** any foreign bank, as defined in section 1 [1] of the International Banking Act of 1978 (12 U.S.C. 3101);

**(7)** the term "specified unlawful activity" means--

**(A)** any act or activity constituting an offense listed in section 1961(1) of this title except an act which is indictable under subchapter II of chapter 53 of title 31;

**(B)** with respect to a financial transaction occurring in whole or in part in the United States, an offense against a foreign nation involving--

**(i)** the manufacture, importation, sale, or distribution of a controlled substance (as such term is defined for the purposes of the Controlled Substances Act);

**(ii)** murder, kidnapping, robbery, extortion, destruction of property by means of explosive or fire, or a crime of violence (as defined in section 16);

**(iii)** fraud, or any scheme or attempt to defraud, by or against a foreign bank (as defined in paragraph 7 of section 1(b) of the International Banking Act of 1978)); [2]

**(iv)** bribery of a public official, or the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official;

**(v)** smuggling or export control violations involving--

**(I)** an item controlled on the United States Munitions List established under section 38 of the Arms Export Control Act (22 U.S.C. 2778); or

**(II)** an item controlled under regulations under the Export Administration Regulations (15 C.F.R. Parts 730-774);

**(vi)** an offense with respect to which the United States would be obligated by a multilateral treaty, either to extradite the alleged offender or to submit the case for prosecution, if the offender were found within the territory of the United States; or

**(vii)** trafficking in persons, selling or buying of children, sexual exploitation of children, or transporting, recruiting or harboring a person, including a child, for commercial sex acts;

**(C)** any act or acts constituting a continuing criminal enterprise, as that term is defined in section 408 of the Controlled Substances Act (21 U.S.C. 848);

**(D)** an offense under section 32 (relating to the destruction of aircraft), section 37 (relating to violence at international airports), section 115 (relating to influencing, impeding, or retaliating against a Federal official by threatening or injuring a family member), section 152 (relating to concealment of assets; false oaths and claims; bribery), section 175c (relating to the variola virus), section 215 (relating to commissions or gifts for procuring loans), section 351 (relating to congressional or Cabinet officer assassination), any of sections 500 through 503 (relating to certain counterfeiting offenses), section 513 (relating to securities of States and private entities), section 541 (relating to goods falsely classified), section 542 (relating to entry of goods by means of false statements), section 545 (relating to smuggling goods into the United States), section 549 (relating to removing goods from Customs custody), section 554 (relating to smuggling goods from the United States), section 555 (relating to border tunnels), section 641 (relating to public money, property, or records), section 656 (relating to theft, embezzlement, or misapplication by bank officer or employee), section 657 (relating to lending, credit, and insurance institutions), section 658 (relating to property mortgaged or pledged to farm credit agencies), section 666 (relating to theft or bribery concerning programs receiving Federal funds), section 793, 794, or 798 (relating to espionage), section 831

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

(relating to prohibited transactions involving nuclear materials), section 844(f) or (i) (relating to destruction by explosives or fire of Government property or property affecting interstate or foreign commerce), section 875 (relating to interstate communications), section 922(l) (relating to the unlawful importation of firearms), section 924(n), 932, or 933 (relating to firearms trafficking), section 956 (relating to conspiracy to kill, kidnap, maim, or injure certain property in a foreign country), section 1005 (relating to fraudulent bank entries), 1006[3] (relating to fraudulent Federal credit institution entries), 1007[3] (relating to Federal Deposit Insurance transactions), 1014[3] (relating to fraudulent loan or credit applications), section 1030 (relating to computer fraud and abuse), 1032[3] (relating to concealment of assets from conservator, receiver, or liquidating agent of financial institution), section 1111 (relating to murder), section 1114 (relating to murder of United States law enforcement officials), section 1116 (relating to murder of foreign officials, official guests, or internationally protected persons), section 1201 (relating to kidnaping), section 1203 (relating to hostage taking), section 1361 (relating to willful injury of Government property), section 1363 (relating to destruction of property within the special maritime and territorial jurisdiction), section 1708 (theft from the mail), section 1751 (relating to Presidential assassination), section 2113 or 2114 (relating to bank and postal robbery and theft), section 2252A (relating to child pornography) where the child pornography contains a visual depiction of an actual minor engaging in sexually explicit conduct, section 2260 (production of certain child pornography for importation into the United States), section 2280 (relating to violence against maritime navigation), section 2281 (relating to violence against maritime fixed platforms), section 2319 (relating to copyright infringement), section 2320 (relating to trafficking in counterfeit goods and services), section 2332 (relating to terrorist acts abroad against United States nationals), section 2332a (relating to use of weapons of mass destruction), section 2332b (relating to international terrorist acts transcending national boundaries), section 2332g (relating to missile systems designed to destroy aircraft), section 2332h (relating to radiological dispersal devices), section 2339A or 2339B (relating to providing material support to terrorists), section 2339C (relating to financing of terrorism), or section 2339D (relating to receiving military-type training from a foreign terrorist organization) of this title, section 46502 of title 49, United States Code, a felony violation of the Chemical Diversion and Trafficking Act of 1988 (relating to precursor and essential chemicals), section 590 of the Tariff Act of 1930 (19 U.S.C. 1590) (relating to aviation smuggling), section 422 of the Controlled Substances Act (relating to transportation of drug paraphernalia), section 38(c) (relating to criminal violations) of the Arms Export Control Act, section 11 (relating to violations) of the Export Administration Act of 1979, section 206 (relating to penalties) of the International Emergency Economic Powers Act, section 16 (relating to offenses and punishment) of the Trading with the Enemy Act, any felony violation of section 15 of the Food and Nutrition Act of 2008 (relating to supplemental nutrition assistance program benefits fraud) involving a quantity of benefits having a value of not less than $5,000, any violation of section 543(a)(1) of the Housing Act of 1949 (relating to equity skimming), any felony violation of the Foreign Agents Registration Act of 1938, any felony violation of the Foreign Corrupt Practices Act, section 92 of the Atomic Energy Act of 1954 (42 U.S.C. 2122) (relating to prohibitions governing atomic weapons), or section 104(a) of the North Korea Sanctions Enforcement Act of 2016 (relating to prohibited activities with respect to North Korea);

### ENVIRONMENTAL CRIMES

(E) a felony violation of the Federal Water Pollution Control Act (33 U.S.C. 1251 et seq.), the Ocean Dumping Act (33 U.S.C. 1401 et seq.), the Act to Prevent Pollution from Ships (33 U.S.C. 1901 et seq.), the Safe Drinking Water Act (42 U.S.C. 300f et seq.), or the Resources Conservation and Recovery Act (42 U.S.C. 6901 et seq.);

(F) any act or activity constituting an offense involving a Federal health care offense; or

(G) any act that is a criminal violation of subparagraph (A), (B), (C), (D), (E), or (F) of paragraph (1) of section 9(a) of the Endangered Species Act of 1973 (16 U.S.C. 1538(a)(1)), section 2203 of the African Elephant Conservation Act (16 U.S.C. 4223), or section 7(a) of the Rhinoceros and Tiger Conservation Act of 1994 (16 U.S.C. 5305a(a)), if the endangered or threatened species of fish or wildlife, products, items, or substances involved in the violation and relevant conduct, as applicable, have a total value of more than $10,000;

**(8)** the term "State" includes a State of the United States, the District of Columbia, and any commonwealth, territory, or possession of the United States; and

**(9)** the term "proceeds" means any property derived from or obtained or retained, directly or indirectly, through some form of unlawful activity, including the gross receipts of such activity.

**(d)** Nothing in this section shall supersede any provision of Federal, State, or other law imposing criminal penalties or affording civil remedies in addition to those provided for in this section.

**(e)** Violations of this section may be investigated by such components of the Department of Justice as the Attorney General may direct, and by such components of the Department of the Treasury as the Secretary of the Treasury may direct, as appropriate, and, with respect to offenses over which the Department of Homeland Security has jurisdiction, by such components of the Department of Homeland Security as the Secretary of Homeland Security may direct, and, with respect to offenses over which the United States Postal Service has jurisdiction, by the Postal Service. Such authority of the Secretary of the Treasury, the Secretary of Homeland Security, and the Postal Service shall be exercised in accordance with an agreement which shall be entered into by the Secretary of the Treasury, the Secretary of Homeland Security, the Postal Service, and the Attorney General. Violations of this section involving offenses described in paragraph (c)(7)(E) may be investigated by such components of the Department of Justice as the Attorney General may direct, and the National Enforcement Investigations Center of the Environmental Protection Agency.

**(f)** There is extraterritorial jurisdiction over the conduct prohibited by this section if--

**(1)** the conduct is by a United States citizen or, in the case of a non-United States citizen, the conduct occurs in part in the United States; and

**(2)** the transaction or series of related transactions involves funds or monetary instruments of a value exceeding $10,000.

**(g) Notice of conviction of financial institutions.**--If any financial institution or any officer, director, or employee of any financial institution has been found guilty of an offense under this section, section 1957 or 1960 of this title, or section 5322 or 5324 of title 31, the Attorney General shall provide written notice of such fact to the appropriate regulatory agency for the financial institution.

**(h)** Any person who conspires to commit any offense defined in this section or section 1957 shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy.

**(i) Venue.--(1)** Except as provided in paragraph (2), a prosecution for an offense under this section or section 1957 may be brought in--

**(A)** any district in which the financial or monetary transaction is conducted; or

**(B)** any district where a prosecution for the underlying specified unlawful activity could be brought, if the defendant participated in the transfer of the proceeds of the specified unlawful activity from that district to the district where the financial or monetary transaction is conducted.

**(2)** A prosecution for an attempt or conspiracy offense under this section or section 1957 may be brought in the district where venue would lie for the completed offense under paragraph (1), or in any other district where an act in furtherance of the attempt or conspiracy took place.

**(3)** For purposes of this section, a transfer of funds from 1 place to another, by wire or any other means, shall constitute a single, continuing transaction. Any person who conducts (as that term is defined in subsection (c)(2)) any portion of the transaction may be charged in any district in which the transaction takes place.

**(j) Seven-year limitation.**--Notwithstanding section 3282, no person shall be prosecuted, tried, or punished for a violation of this section or section 1957 if the specified unlawful activity constituting the violation is the activity defined in subsection (c)(7)(B) of this section, unless the indictment is found or the information is instituted not later than 7 years after the date on which the offense was committed.

**Footnotes**

1       So in original. Probably should read "section 1(b)".

2       So in original. The second closing parenthesis probably should not appear.

3       So in original. Probably should be preceded by "section".

---

**End of Document**                                         © 2026 Thomson Reuters. No claim to original U.S. Government Works.

---

§ 1961. Definitions, 18 USCA § 1961

---

United States Code Annotated
  Title 18. Crimes and Criminal Procedure (Refs & Annos)
    Part I. Crimes (Refs & Annos)
      Chapter 96. Racketeer Influenced and Corrupt Organizations (Refs & Annos)

18 U.S.C.A. § 1961

§ 1961. Definitions

Effective: June 25, 2022
Currentness

As used in this chapter--

**(1)** "racketeering activity" means (A) any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substances Act), which is chargeable under State law and punishable by imprisonment for more than one year; (B) any act which is indictable under any of the following provisions of title 18, United States Code: Section 201 (relating to bribery), section 224 (relating to sports bribery), sections 471, 472, and 473 (relating to counterfeiting), section 659 (relating to theft from interstate shipment) if the act indictable under section 659 is felonious, section 664 (relating to embezzlement from pension and welfare funds), sections 891-894 (relating to extortionate credit transactions), section 932 (relating to straw purchasing), section 933 (relating to trafficking in firearms), section 1028 (relating to fraud and related activity in connection with identification documents), section 1029 (relating to fraud and related activity in connection with access devices), section 1084 (relating to the transmission of gambling information), section 1341 (relating to mail fraud), section 1343 (relating to wire fraud), section 1344 (relating to financial institution fraud), section 1351 (relating to fraud in foreign labor contracting), section 1425 (relating to the procurement of citizenship or nationalization unlawfully), section 1426 (relating to the reproduction of naturalization or citizenship papers), section 1427 (relating to the sale of naturalization or citizenship papers), sections 1461-1465 (relating to obscene matter), section 1503 (relating to obstruction of justice), section 1510 (relating to obstruction of criminal investigations), section 1511 (relating to the obstruction of State or local law enforcement), section 1512 (relating to tampering with a witness, victim, or an informant), section 1513 (relating to retaliating against a witness, victim, or an informant), section 1542 (relating to false statement in application and use of passport), section 1543 (relating to forgery or false use of passport), section 1544 (relating to misuse of passport), section 1546 (relating to fraud and misuse of visas, permits, and other documents), sections 1581-1592 (relating to peonage, slavery, and trafficking in persons)., [1] sections 1831 and 1832 (relating to economic espionage and theft of trade secrets), section 1951 (relating to interference with commerce, robbery, or extortion), section 1952 (relating to racketeering), section 1953 (relating to interstate transportation of wagering paraphernalia), section 1954 (relating to unlawful welfare fund payments), section 1955 (relating to the prohibition of illegal gambling businesses), section 1956 (relating to the laundering of monetary instruments), section 1957 (relating to engaging in monetary transactions in property derived from specified unlawful activity), section 1958 (relating to use of interstate commerce facilities in the commission of murder-for-hire), section 1960 (relating to illegal money transmitters), sections 2251, 2251A, 2252, and 2260 (relating to sexual exploitation of children), sections 2312 and 2313 (relating to interstate transportation of stolen motor vehicles), sections 2314 and 2315 (relating to interstate transportation of stolen property), section 2318 (relating to trafficking in counterfeit labels for phonorecords, computer programs or computer program documentation or packaging and copies of motion pictures or other audiovisual works), section 2319 (relating to criminal infringement of a copyright), section 2319A (relating to unauthorized fixation of and trafficking in sound recordings and music videos of live musical performances), section 2320 (relating to trafficking in goods or services bearing counterfeit marks), section 2321 (relating to trafficking in certain motor vehicles or motor vehicle parts), sections 2341-2346 (relating to

trafficking in contraband cigarettes), sections 2421-24 (relating to white slave traffic), sections 175-178 (relating to biological weapons), sections 229-229F (relating to chemical weapons), section 831 (relating to nuclear materials), (C) any act which is indictable under title 29, United States Code, section 186 (dealing with restrictions on payments and loans to labor organizations) or section 501(c) (relating to embezzlement from union funds), (D) any offense involving fraud connected with a case under title 11 (except a case under section 157 of this title), fraud in the sale of securities, or the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substances Act), punishable under any law of the United States, (E) any act which is indictable under the Currency and Foreign Transactions Reporting Act, (F) any act which is indictable under the Immigration and Nationality Act, section 274 (relating to bringing in and harboring certain aliens), section 277 (relating to aiding or assisting certain aliens to enter the United States), or section 278 (relating to importation of alien for immoral purpose) if the act indictable under such section of such Act was committed for the purpose of financial gain, or (G) any act that is indictable under any provision listed in section 2332b(g)(5)(B);

**(2)** "State" means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, any territory or possession of the United States, any political subdivision, or any department, agency, or instrumentality thereof;

**(3)** "person" includes any individual or entity capable of holding a legal or beneficial interest in property;

**(4)** "enterprise" includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity;

**(5)** "pattern of racketeering activity" requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity;

**(6)** "unlawful debt" means a debt (A) incurred or contracted in gambling activity which was in violation of the law of the United States, a State or political subdivision thereof, or which is unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury, and (B) which was incurred in connection with the business of gambling in violation of the law of the United States, a State or political subdivision thereof, or the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate;

**(7)** "racketeering investigator" means any attorney or investigator so designated by the Attorney General and charged with the duty of enforcing or carrying into effect this chapter;

**(8)** "racketeering investigation" means any inquiry conducted by any racketeering investigator for the purpose of ascertaining whether any person has been involved in any violation of this chapter or of any final order, judgment, or decree of any court of the United States, duly entered in any case or proceeding arising under this chapter;

**(9)** "documentary material" includes any book, paper, document, record, recording, or other material; and

**(10)** "Attorney General" includes the Attorney General of the United States, the Deputy Attorney General of the United States, the Associate Attorney General of the United States, any Assistant Attorney General of the United States, or any employee of the Department of Justice or any employee of any department or agency of the United States so designated by

the Attorney General to carry out the powers conferred on the Attorney General by this chapter. Any department or agency so designated may use in investigations authorized by this chapter either the investigative provisions of this chapter or the investigative power of such department or agency otherwise conferred by law.

**Footnotes**

1       So in original.

     © 2026 Thomson Reuters. No claim to original U.S. Government Works.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works.

§ 3571. Sentence of fine, 18 USCA § 3571

---

United States Code Annotated
    Title 18. Crimes and Criminal Procedure (Refs & Annos)
        Part II. Criminal Procedure
            Chapter 227. Sentences (Refs & Annos)
                Subchapter C. Fines (Refs & Annos)

18 U.S.C.A. § 3571

§ 3571. Sentence of fine

Currentness

**(a) In general.**--A defendant who has been found guilty of an offense may be sentenced to pay a fine.

**(b) Fines for individuals.**--Except as provided in subsection (e) of this section, an individual who has been found guilty of an offense may be fined not more than the greatest of--

  **(1)** the amount specified in the law setting forth the offense;

  **(2)** the applicable amount under subsection (d) of this section;

  **(3)** for a felony, not more than $250,000;

  **(4)** for a misdemeanor resulting in death, not more than $250,000;

  **(5)** for a Class A misdemeanor that does not result in death, not more than $100,000;

  **(6)** for a Class B or C misdemeanor that does not result in death, not more than $5,000; or

  **(7)** for an infraction, not more than $5,000.

**(c) Fines for organizations.**--Except as provided in subsection (e) of this section, an organization that has been found guilty of an offense may be fined not more than the greatest of--

  **(1)** the amount specified in the law setting forth the offense;

  **(2)** the applicable amount under subsection (d) of this section;

  **(3)** for a felony, not more than $500,000;

---

**(4)** for a misdemeanor resulting in death, not more than $500,000;

**(5)** for a Class A misdemeanor that does not result in death, not more than $200,000;

**(6)** for a Class B or C misdemeanor that does not result in death, not more than $10,000; and

**(7)** for an infraction, not more than $10,000.

**(d) Alternative fine based on gain or loss.**--If any person derives pecuniary gain from the offense, or if the offense results in pecuniary loss to a person other than the defendant, the defendant may be fined not more than the greater of twice the gross gain or twice the gross loss, unless imposition of a fine under this subsection would unduly complicate or prolong the sentencing process.

**(e) Special rule for lower fine specified in substantive provision.**--If a law setting forth an offense specifies no fine or a fine that is lower than the fine otherwise applicable under this section and such law, by specific reference, exempts the offense from the applicability of the fine otherwise applicable under this section, the defendant may not be fined more than the amount specified in the law setting forth the offense.

End of Document
© 2026 Thomson Reuters. No claim to original U.S. Government Works.

Add.27

§ 3663A. Mandatory restitution to victims of certain crimes, 18 USCA § 3663A

---

United States Code Annotated
  Title 18. Crimes and Criminal Procedure (Refs & Annos)
    Part II. Criminal Procedure
      Chapter 232. Miscellaneous Sentencing Provisions

18 U.S.C.A. § 3663A

§ 3663A. Mandatory restitution to victims of certain crimes

Effective: July 30, 2024
Currentness

**(a)(1)** Notwithstanding any other provision of law, when sentencing a defendant convicted of an offense described in subsection (c), the court shall order, in addition to, or in the case of a misdemeanor, in addition to or in lieu of, any other penalty authorized by law, that the defendant make restitution to the victim of the offense or, if the victim is deceased, to the victim's estate.

**(2)** For the purposes of this section, the term "victim" means a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern. In the case of a victim who is under 18 years of age, incompetent, incapacitated, or deceased, the legal guardian of the victim or representative of the victim's estate, another family member, or any other person appointed as suitable by the court, may assume the victim's rights under this section, but in no event shall the defendant be named as such representative or guardian.

**(3)** The court shall also order, if agreed to by the parties in a plea agreement, restitution to persons other than the victim of the offense.

**(4) Clarification.**--In ordering restitution under this section, a court shall order the defendant to make restitution to a person who has assumed the victim's rights under paragraph (2) to reimburse that person's necessary and reasonable--

**(A)** lost income, child care, transportation, and other expenses incurred during and directly related to participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense;

**(B)** lost income, transportation, and other expenses incurred that are directly related to transporting the victim for necessary medical and related professional services and devices relating to physical, psychiatric, and psychological care, including nonmedical care and treatment rendered in accordance with a method of healing recognized by the law of the place of treatment; and

**(C)** lost income, transportation, and other expenses incurred that are directly related to transporting the victim to receive necessary physical and occupational therapy and rehabilitation.

**(b)** The order of restitution shall require that such defendant--

---

**(1)** in the case of an offense resulting in damage to or loss or destruction of property of a victim of the offense--

**(A)** return the property to the owner of the property or someone designated by the owner; or

**(B)** if return of the property under subparagraph (A) is impossible, impracticable, or inadequate, pay an amount equal to--

**(i)** the greater of--

**(I)** the value of the property on the date of the damage, loss, or destruction; or

**(II)** the value of the property on the date of sentencing, less

**(ii)** the value (as of the date the property is returned) of any part of the property that is returned;

**(2)** in the case of an offense resulting in bodily injury to a victim--

**(A)** pay an amount equal to the cost of necessary medical and related professional services and devices relating to physical, psychiatric, and psychological care, including nonmedical care and treatment rendered in accordance with a method of healing recognized by the law of the place of treatment;

**(B)** pay an amount equal to the cost of necessary physical and occupational therapy and rehabilitation; and

**(C)** reimburse the victim for income lost by such victim as a result of such offense;

**(3)** in the case of an offense resulting in bodily injury that results in the death of the victim, pay an amount equal to the cost of necessary funeral and related services; and

**(4)** in any case, reimburse the victim for lost income and necessary child care, transportation, and other expenses incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense.

**(c)(1)** This section shall apply in all sentencing proceedings for convictions of, or plea agreements relating to charges for, any offense--

**(A)** that is--

**(i)** a crime of violence, as defined in section 16;

§ 3663A. Mandatory restitution to victims of certain crimes, 18 USCA § 3663A

**(ii)** an offense against property under this title, or under section 416(a) of the Controlled Substances Act (21 U.S.C. 856(a)), including any offense committed by fraud or deceit;

**(iii)** an offense described in section 3 of the Rodchenkov Anti-Doping Act of 2019;

**(iv)** an offense described in section 1365 (relating to tampering with consumer products); or

**(v)** an offense under section 670 (relating to theft of medical products); and

**(B)** in which an identifiable victim or victims has suffered a physical injury or pecuniary loss.

**(2)** In the case of a plea agreement that does not result in a conviction for an offense described in paragraph (1), this section shall apply only if the plea specifically states that an offense listed under such paragraph gave rise to the plea agreement.

**(3)** This section shall not apply in the case of an offense described in paragraph (1)(A)(ii) or (iii) if the court finds, from facts on the record, that--

**(A)** the number of identifiable victims is so large as to make restitution impracticable; or

**(B)** determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process.

**(d)** An order of restitution under this section shall be issued and enforced in accordance with section 3664.

End of Document    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

§2B1.1

# PART B — BASIC ECONOMIC OFFENSES

## 1. THEFT, EMBEZZLEMENT, RECEIPT OF STOLEN PROPERTY, PROPERTY DESTRUCTION, AND OFFENSES INVOLVING FRAUD OR DECEIT

### Introductory Commentary

These sections address basic forms of property offenses: theft, embezzlement, fraud, forgery, counterfeiting (other than offenses involving altered or counterfeit bearer obligations of the United States), insider trading, transactions in stolen goods, and simple property damage or destruction. (Arson is dealt with separately in Chapter Two, Part K (Offenses Involving Public Safety)). These guidelines apply to offenses prosecuted under a wide variety of federal statutes, as well as offenses that arise under the Assimilative Crimes Act.

| *Historical Note* | Effective November 1, 1987. Amended effective November 1, 1989 (amendment 303); November 1, 2001 (amendment 617). |
|---|---|

---

**§2B1.1.** **Larceny, Embezzlement, and Other Forms of Theft; Offenses Involving Stolen Property; Property Damage or Destruction; Fraud and Deceit; Forgery; Offenses Involving Altered or Counterfeit Instruments Other than Counterfeit Bearer Obligations of the United States**

(a) Base Offense Level:

    (1) **7**, if (A) the defendant was convicted of an offense referenced to this guideline; and (B) that offense of conviction has a statutory maximum term of imprisonment of 20 years or more; or

    (2) **6**, otherwise.

(b) Specific Offense Characteristics

    (1) If the loss exceeded $6,500, increase the offense level as follows:

| Loss (Apply the Greatest) | | Increase in Level |
|---|---|---|
| (A) | $6,500 or less | no increase |
| (B) | More than $6,500 | add **2** |
| (C) | More than $15,000 | add **4** |
| (D) | More than $40,000 | add **6** |
| (E) | More than $95,000 | add **8** |
| (F) | More than $150,000 | add **10** |
| (G) | More than $250,000 | add **12** |
| (H) | More than $550,000 | add **14** |
| (I) | More than $1,500,000 | add **16** |

**§2B1.1**

| (J) | More than $3,500,000 | add **18** |
|---|---|---|
| (K) | More than $9,500,000 | add **20** |
| (L) | More than $25,000,000 | add **22** |
| (M) | More than $65,000,000 | add **24** |
| (N) | More than $150,000,000 | add **26** |
| (O) | More than $250,000,000 | add **28** |
| (P) | More than $550,000,000 | add **30**. |

**\*Notes to Table:**

(A)  **Loss.**—Loss is the greater of actual loss or intended loss.

(B)  **Gain.**—The court shall use the gain that resulted from the offense as an alternative measure of loss only if there is a loss but it reasonably cannot be determined.

(C)  For purposes of this guideline—

(i)  "***Actual loss***" means the reasonably foreseeable pecuniary harm that resulted from the offense.

(ii)  "***Intended loss***" (I) means the pecuniary harm that the defendant purposely sought to inflict; and (II) includes intended pecuniary harm that would have been impossible or unlikely to occur (*e.g.*, as in a government sting operation, or an insurance fraud in which the claim exceeded the insured value).

(iii)  "***Pecuniary harm***" means harm that is monetary or that otherwise is readily measurable in money. Accordingly, pecuniary harm does not include emotional distress, harm to reputation, or other non-economic harm.

(iv)  "***Reasonably foreseeable pecuniary harm***" means pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense.

(2)  (Apply the greatest) If the offense—

(A)  (i) involved 10 or more victims; (ii) was committed through mass-marketing; or (iii) resulted in substantial financial hardship to one or more victims, increase by **2** levels;

(B)  resulted in substantial financial hardship to five or more victims, increase by **4** levels; or

§2B1.1

    (C)   resulted in substantial financial hardship to 25 or more victims, increase by **6** levels.

(3)   If the offense involved a theft from the person of another, increase by **2** levels.

(4)   If the offense involved receiving stolen property, and the defendant was a person in the business of receiving and selling stolen property, increase by **2** levels.

(5)   If the offense involved theft of, damage to, destruction of, or trafficking in, property from a national cemetery or veterans' memorial, increase by **2** levels.

(6)   If (A) the defendant was convicted of an offense under 18 U.S.C. § 1037; and (B) the offense involved obtaining electronic mail addresses through improper means, increase by **2** levels.

(7)   If (A) the defendant was convicted of a federal health care offense involving a government health care program; and (B) the loss under subsection (b)(1) to the government health care program was (i) more than $1,000,000, increase by **2** levels; (ii) more than $7,000,000, increase by **3** levels; or (iii) more than $20,000,000, increase by **4** levels.

(8)   (Apply the greater) If—

    (A)   the offense involved conduct described in 18 U.S.C. § 670, increase by **2** levels; or

    (B)   the offense involved conduct described in 18 U.S.C. § 670, and the defendant was employed by, or was an agent of, an organization in the supply chain for the pre-retail medical product, increase by **4** levels.

(9)   If the offense involved (A) a misrepresentation that the defendant was acting on behalf of a charitable, educational, religious, or political organization, or a government agency; (B) a misrepresentation or other fraudulent action during the course of a bankruptcy proceeding; (C) a violation of any prior, specific judicial or administrative order, injunction, decree, or process not addressed elsewhere in the guidelines; or (D) a misrepresentation to a consumer in connection with obtaining, providing, or furnishing financial assistance for an institution of higher education, increase by **2** levels. If the resulting offense level is less than level **10**, increase to level **10**.

**Add.33**

**§2B1.1**

(10) If (A) the defendant relocated, or participated in relocating, a fraudulent scheme to another jurisdiction to evade law enforcement or regulatory officials; (B) a substantial part of a fraudulent scheme was committed from outside the United States; or (C) the offense otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means, increase by **2** levels. If the resulting offense level is less than level **12**, increase to level **12**.

(11) If the offense involved (A) the possession or use of any (i) device-making equipment, or (ii) authentication feature; (B) the production or trafficking of any (i) unauthorized access device or counterfeit access device, or (ii) authentication feature; or (C)(i) the unauthorized transfer or use of any means of identification unlawfully to produce or obtain any other means of identification, or (ii) the possession of 5 or more means of identification that unlawfully were produced from, or obtained by the use of, another means of identification, increase by **2** levels. If the resulting offense level is less than level **12**, increase to level **12**.

(12) If the offense involved conduct described in 18 U.S.C. § 1040, increase by **2** levels. If the resulting offense level is less than level **12**, increase to level **12**.

(13) If the defendant was convicted under 42 U.S.C. § 408(a), § 1011(a), or § 1383a(a) and the statutory maximum term of ten years' imprisonment applies, increase by **4** levels. If the resulting offense level is less than **12**, increase to level **12**.

(14) (Apply the greater) If the offense involved misappropriation of a trade secret and the defendant knew or intended—

   (A) that the trade secret would be transported or transmitted out of the United States, increase by **2** levels; or

   (B) that the offense would benefit a foreign government, foreign instrumentality, or foreign agent, increase by **4** levels.

   If subparagraph (B) applies and the resulting offense level is less than level **14**, increase to level **14**.

(15) If the offense involved an organized scheme to steal or to receive stolen (A) vehicles or vehicle parts; or (B) goods or chattels that are part of a cargo shipment, increase by **2** levels. If the resulting offense level is less than level **14**, increase to level **14**.

(16) If the offense involved (A) the conscious or reckless risk of death or serious bodily injury; or (B) possession of a dangerous weapon (including a firearm) in connection with the offense, increase by **2** levels. If the resulting offense level is less than level **14**, increase to level **14**.

(17) (Apply the greater) If—

   (A) the defendant derived more than $1,000,000 in gross receipts from one or more financial institutions as a result of the offense, increase by **2** levels; or

   (B) the offense (i) substantially jeopardized the safety and soundness of a financial institution; or (ii) substantially endangered the solvency or financial security of an organization that, at any time during the offense, (I) was a publicly traded company; or (II) had 1,000 or more employees, increase by **4** levels.

   (C) The cumulative adjustments from application of both subsections (b)(2) and (b)(17)(B) shall not exceed **8** levels, except as provided in subparagraph (D).

   (D) If the resulting offense level determined under subparagraph (A) or (B) is less than level **24**, increase to level **24**.

(18) If (A) the defendant was convicted of an offense under 18 U.S.C. § 1030, and the offense involved an intent to obtain personal information, or (B) the offense involved the unauthorized public dissemination of personal information, increase by **2** levels.

(19) (A) (Apply the greatest) If the defendant was convicted of an offense under:

     (i) 18 U.S.C. § 1030, and the offense involved a computer system used to maintain or operate a critical infrastructure, or used by or for a government entity in furtherance of the administration of justice, national defense, or national security, increase by **2** levels.

     (ii) 18 U.S.C. § 1030(a)(5)(A), increase by **4** levels.

     (iii) 18 U.S.C. § 1030, and the offense caused a substantial disruption of a critical infrastructure, increase by **6** levels.

   (B) If subparagraph (A)(iii) applies, and the offense level is less than level **24**, increase to level **24**.

**§2B1.1**

  (20) If the offense involved—

    (A) a violation of securities law and, at the time of the offense, the defendant was (i) an officer or a director of a publicly traded company; (ii) a registered broker or dealer, or a person associated with a broker or dealer; or (iii) an investment adviser, or a person associated with an investment adviser; or

    (B) a violation of commodities law and, at the time of the offense, the defendant was (i) an officer or a director of a futures commission merchant or an introducing broker; (ii) a commodities trading advisor; or (iii) a commodity pool operator,

    increase by **4** levels.

 (c) Cross References

  (1) If (A) a firearm, destructive device, explosive material, or controlled substance was taken, or the taking of any such item was an object of the offense; or (B) the stolen property received, transported, transferred, transmitted, or possessed was a firearm, destructive device, explosive material, or controlled substance, apply §2D1.1 (Unlawful Manufacturing, Importing, Exporting, or Trafficking (Including Possession with Intent to Commit These Offenses); Attempt or Conspiracy), §2D2.1 (Unlawful Possession; Attempt or Conspiracy), §2K1.3 (Unlawful Receipt, Possession, or Transportation of Explosive Materials; Prohibited Transactions Involving Explosive Materials), or §2K2.1 (Unlawful Receipt, Possession, or Transportation of Firearms or Ammunition; Prohibited Transactions Involving Firearms or Ammunition), as appropriate.

  (2) If the offense involved arson, or property damage by use of explosives, apply §2K1.4 (Arson; Property Damage by Use of Explosives), if the resulting offense level is greater than that determined above.

  (3) If (A) neither paragraph (1) nor (2) of this subsection applies; (B) the defendant was convicted under a statute proscribing false, fictitious, or fraudulent statements or representations generally (*e.g.*, 18 U.S.C. § 1001, § 1341, § 1342, or § 1343); and (C) the conduct set forth in the count of conviction establishes an offense specifically covered by another guideline in Chapter Two (Offense Conduct), apply that other guideline.

  (4) If the offense involved a cultural heritage resource or a paleontological resource, apply §2B1.5 (Theft of, Damage to, or Destruction of, Cultural Heritage Resources or Paleontological Resources; Unlawful

**§2B1.1**

Sale, Purchase, Exchange, Transportation, or Receipt of Cultural Heritage Resources or Paleontological Resources), if the resulting offense level is greater than that determined above.

**Commentary**

**Statutory Provisions:** 5 U.S.C. §§ 8345a, 8466a; 7 U.S.C. §§ 6, 6b, 6c, 6h, 6o, 13, 23; 15 U.S.C. §§ 50, 77e, 77q, 77x, 78j, 78ff, 80b-6, 1644, 6821; 18 U.S.C. §§ 38, 220, 225, 285–289, 471–473, 500, 510, 553(a)(1), 641, 656, 657, 659, 662, 664, 1001–1008, 1010–1014, 1016–1022, 1025, 1026, 1028, 1029, 1030(a)(4)–(5), 1031, 1037, 1040, 1341–1344, 1348, 1350, 1361, 1363, 1369, 1702, 1703 (if vandalism or malicious mischief, including destruction of mail, is involved), 1708, 1831, 1832, 1992(a)(1), (a)(5), 2113(b), 2282A, 2282B, 2291, 2312–2317, 2332b(a)(1), 2701; 19 U.S.C. § 2401f; 20 U.S.C. § 1097(a), (b), (d), (e); 29 U.S.C. § 501(c); 42 U.S.C. § 1011; 49 U.S.C. §§ 14915, 30170, 46317(a), 60123(b). For additional statutory provision(s), *see* Appendix A (Statutory Index).

**Application Notes:**

1.  **Definitions.**—For purposes of this guideline:

    "*Cultural heritage resource*" has the meaning given that term in Application Note 1 of the Commentary to §2B1.5 (Theft of, Damage to, or Destruction of, Cultural Heritage Resources or Paleontological Resources; Unlawful Sale, Purchase, Exchange, Transportation, or Receipt of Cultural Heritage Resources or Paleontological Resources).

    "*Equity security*" has the meaning given that term in section 3(a)(11) of the Securities Exchange Act of 1934 (15 U.S.C. § 78c(a)(11)).

    "*Federal health care offense*" has the meaning given that term in 18 U.S.C. § 24.

    "*Financial institution*" includes any institution described in 18 U.S.C. § 20, § 656, § 657, § 1005, § 1006, § 1007, or § 1014; any state or foreign bank, trust company, credit union, insurance company, investment company, mutual fund, savings (building and loan) association, union or employee pension fund; any health, medical, or hospital insurance association; brokers and dealers registered, or required to be registered, with the Securities and Exchange Commission; futures commodity merchants and commodity pool operators registered, or required to be registered, with the Commodity Futures Trading Commission; and any similar entity, whether or not insured by the federal government. "Union or employee pension fund" and "any health, medical, or hospital insurance association," primarily include large pension funds that serve many persons (*e.g.*, pension funds of large national and international organizations, unions, and corporations doing substantial interstate business), and associations that undertake to provide pension, disability, or other benefits (*e.g.*, medical or hospitalization insurance) to large numbers of persons.

    "*Firearm*" and "*destructive device*" have the meaning given those terms in the Commentary to §1B1.1 (Application Instructions).

    "*Foreign instrumentality*" and "*foreign agent*" have the meaning given those terms in 18 U.S.C. § 1839(1) and (2), respectively.

    "*Government health care program*" means any plan or program that provides health benefits, whether directly, through insurance, or otherwise, which is funded directly, in whole or in part, by federal or state government. Examples of such programs are the Medicare program, the Medicaid program, and the CHIP program.

**Add.37**

## §2B1.1

"*Means of identification*" has the meaning given that term in 18 U.S.C. § 1028(d)(7), except that such means of identification shall be of an actual (*i.e.*, not fictitious) individual, other than the defendant or a person for whose conduct the defendant is accountable under §1B1.3 (Relevant Conduct).

"*National cemetery*" means a cemetery (A) established under section 2400 of title 38, United States Code; or (B) under the jurisdiction of the Secretary of the Army, the Secretary of the Navy, the Secretary of the Air Force, or the Secretary of the Interior.

"*Paleontological resource*" has the meaning given that term in Application Note 1 of the Commentary to §2B1.5 (Theft of, Damage to, or Destruction of, Cultural Heritage Resources or Paleontological Resources; Unlawful Sale, Purchase, Exchange, Transportation, or Receipt of Cultural Heritage Resources or Paleontological Resources).

"*Personal information*" means sensitive or private information involving an identifiable individual (including such information in the possession of a third party), including (A) medical records; (B) wills; (C) diaries; (D) private correspondence, including e-mail; (E) financial records; (F) photographs of a sensitive or private nature; or (G) similar information.

"*Pre-retail medical product*" has the meaning given that term in 18 U.S.C. § 670(e).

"*Publicly traded company*" means an issuer (A) with a class of securities registered under section 12 of the Securities Exchange Act of 1934 (15 U.S.C. § 78l); or (B) that is required to file reports under section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. § 78o(d)). "Issuer" has the meaning given that term in section 3 of the Securities Exchange Act of 1934 (15 U.S.C. § 78c).

"*Supply chain*" has the meaning given that term in 18 U.S.C. § 670(e).

"*Theft from the person of another*" means theft, without the use of force, of property that was being held by another person or was within arms' reach. Examples include pick-pocketing and non-forcible purse-snatching, such as the theft of a purse from a shopping cart.

"*Trade secret*" has the meaning given that term in 18 U.S.C. § 1839(3).

"*Veterans' memorial*" means any structure, plaque, statue, or other monument described in 18 U.S.C. § 1369(a).

"*Victim*" means (A) any person who sustained any part of the actual loss determined under subsection (b)(1); or (B) any individual who sustained bodily injury as a result of the offense. "Person" includes individuals, corporations, companies, associations, firms, partnerships, societies, and joint stock companies.

2.  **Application of Subsection (a)(1).—**

    (A)  **"Referenced to this Guideline".—**For purposes of subsection (a)(1), an offense is "***referenced to this guideline***" if (i) this guideline is the applicable Chapter Two guideline specifically referenced in Appendix A (Statutory Index) for the offense of conviction, as determined under the provisions of §1B1.2 (Applicable Guidelines); or (ii) in the case of a conviction for conspiracy, solicitation, or attempt to which §2X1.1 (Attempt, Solicitation, or Conspiracy) applies, this guideline is the appropriate guideline for the offense the defendant was convicted of conspiring, soliciting, or attempting to commit.

(B) **Definition of "Statutory Maximum Term of Imprisonment".**—For purposes of this guideline, "*statutory maximum term of imprisonment*" means the maximum term of imprisonment authorized for the offense of conviction, including any increase in that maximum term under a statutory enhancement provision.

(C) **Base Offense Level Determination for Cases Involving Multiple Counts.**—In a case involving multiple counts sentenced under this guideline, the applicable base offense level is determined by the count of conviction that provides the highest statutory maximum term of imprisonment.

3. **Loss Under Subsection (b)(1).**—This application note applies to the determination of loss under subsection (b)(1).

   (A) **Rules of Construction in Certain Cases.**—In the cases described in clauses (i) through (iii), reasonably foreseeable pecuniary harm shall be considered to include the pecuniary harm specified for those cases as follows:

   (i) **Product Substitution Cases.**—In the case of a product substitution offense, the reasonably foreseeable pecuniary harm includes the reasonably foreseeable costs of making substitute transactions and handling or disposing of the product delivered, or of retrofitting the product so that it can be used for its intended purpose, and the reasonably foreseeable costs of rectifying the actual or potential disruption to the victim's business operations caused by the product substitution.

   (ii) **Procurement Fraud Cases.**—In the case of a procurement fraud, such as a fraud affecting a defense contract award, reasonably foreseeable pecuniary harm includes the reasonably foreseeable administrative costs to the government and other participants of repeating or correcting the procurement action affected, plus any increased costs to procure the product or service involved that was reasonably foreseeable.

   (iii) **Offenses Under 18 U.S.C. § 1030.**—In the case of an offense under 18 U.S.C. § 1030, actual loss includes the following pecuniary harm, regardless of whether such pecuniary harm was reasonably foreseeable: any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other damages incurred because of interruption of service.

   (B) **Estimation of Loss.**—The court need only make a reasonable estimate of the loss. The sentencing judge is in a unique position to assess the evidence and estimate the loss based upon that evidence. For this reason, the court's loss determination is entitled to appropriate deference. *See* 18 U.S.C. § 3742(e) and (f).

   The estimate of the loss shall be based on available information, taking into account, as appropriate and practicable under the circumstances, factors such as the following:

   (i) The fair market value of the property unlawfully taken, copied, or destroyed; or, if the fair market value is impracticable to determine or inadequately measures the harm, the cost to the victim of replacing that property.

   (ii) In the case of proprietary information (*e.g.*, trade secrets), the cost of developing that information or the reduction in the value of that information that resulted from the offense.

**§2B1.1**

     (iii)   The cost of repairs to damaged property.

     (iv)   The approximate number of victims multiplied by the average loss to each victim.

     (v)   The reduction that resulted from the offense in the value of equity securities or other corporate assets.

     (vi)   More general factors, such as the scope and duration of the offense and revenues generated by similar operations.

(C)   **Exclusions from Loss.**—Loss shall not include the following:

     (i)   Interest of any kind, finance charges, late fees, penalties, amounts based on an agreed-upon return or rate of return, or other similar costs.

     (ii)   Costs to the government of, and costs incurred by victims primarily to aid the government in, the prosecution and criminal investigation of an offense.

(D)   **Credits Against Loss.**—Loss shall be reduced by the following:

     (i)   The money returned, and the fair market value of the property returned and the services rendered, by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected. The time of detection of the offense is the earlier of (I) the time the offense was discovered by a victim or government agency; or (II) the time the defendant knew or reasonably should have known that the offense was detected or about to be detected by a victim or government agency.

     (ii)   In a case involving collateral pledged or otherwise provided by the defendant, the amount the victim has recovered at the time of sentencing from disposition of the collateral, or if the collateral has not been disposed of by that time, the fair market value of the collateral at the time of sentencing.

     (iii)   Notwithstanding clause (ii), in the case of a fraud involving a mortgage loan, if the collateral has not been disposed of by the time of sentencing, use the fair market value of the collateral as of the date on which the guilt of the defendant has been established, whether by guilty plea, trial, or plea of *nolo contendere*.

         In such a case, there shall be a rebuttable presumption that the most recent tax assessment value of the collateral is a reasonable estimate of the fair market value. In determining whether the most recent tax assessment value is a reasonable estimate of the fair market value, the court may consider, among other factors, the recency of the tax assessment and the extent to which the jurisdiction's tax assessment practices reflect factors not relevant to fair market value.

(E)   **Special Rules.**—Notwithstanding subparagraph (A), the following special rules shall be used to assist in determining loss in the cases indicated:

     (i)   **Stolen or Counterfeit Credit Cards and Access Devices; Purloined Numbers and Codes.**—In a case involving any counterfeit access device or unauthorized access device, loss includes any unauthorized charges made with the counterfeit access device or unauthorized access device and shall be not less than $500 per access device. However, if the unauthorized access device is a means of telecommunications access that identifies a specific telecommunications instrument or telecommunications account (including an electronic serial number/mobile identification number (ESN/MIN)

**Add.40**

pair), and that means was only possessed, and not used, during the commission of the offense, loss shall be not less than $100 per unused means. For purposes of this clause, "***counterfeit access device***" and "***unauthorized access device***" have the meaning given those terms in Application Note 10(A).

(ii)  **Government Benefits.**—In a case involving government benefits (*e.g.*, grants, loans, entitlement program payments), loss shall be considered to be not less than the value of the benefits obtained by unintended recipients or diverted to unintended uses, as the case may be. For example, if the defendant was the intended recipient of food stamps having a value of $100 but fraudulently received food stamps having a value of $150, loss is $50.

(iii)  **Davis–Bacon Act Violations.**—In a case involving a Davis–Bacon Act violation (*i.e.*, a violation of 40 U.S.C. § 3142, criminally prosecuted under 18 U.S.C. § 1001), the value of the benefits shall be considered to be not less than the difference between the legally required wages and actual wages paid.

(iv)  **Ponzi and Other Fraudulent Investment Schemes.**—In a case involving a fraudulent investment scheme, such as a Ponzi scheme, loss shall not be reduced by the money or the value of the property transferred to any individual investor in the scheme in excess of that investor's principal investment (*i.e.*, the gain to an individual investor in the scheme shall not be used to offset the loss to another individual investor in the scheme).

(v)  **Certain Other Unlawful Misrepresentation Schemes.**—In a case involving a scheme in which (I) services were fraudulently rendered to the victim by persons falsely posing as licensed professionals; (II) goods were falsely represented as approved by a governmental regulatory agency; or (III) goods for which regulatory approval by a government agency was required but not obtained, or was obtained by fraud, loss shall include the amount paid for the property, services or goods transferred, rendered, or misrepresented, with no credit provided for the value of those items or services.

(vi)  **Value of Controlled Substances.**—In a case involving controlled substances, loss is the estimated street value of the controlled substances.

(vii)  **Value of Cultural Heritage Resources or Paleontological Resources.**—In a case involving a cultural heritage resource or paleontological resource, loss attributable to that resource shall be determined in accordance with the rules for determining the "value of the resource" set forth in Application Note 2 of the Commentary to §2B1.5.

(viii)  **Federal Health Care Offenses Involving Government Health Care Programs.**—In a case in which the defendant is convicted of a federal health care offense involving a government health care program, the aggregate dollar amount of fraudulent bills submitted to the government health care program shall constitute prima facie evidence of the amount of the intended loss, *i.e.*, is evidence sufficient to establish the amount of the intended loss, if not rebutted.

(ix)  **Fraudulent Inflation or Deflation in Value of Securities or Commodities.**—In a case involving the fraudulent inflation or deflation in the value of a publicly traded security or commodity, the court in determining loss may use any method that is appropriate and practicable under the circumstances. One such method the court

**§2B1.1**

may consider is a method under which the actual loss attributable to the change in value of the security or commodity is the amount determined by—

(I)     calculating the difference between the average price of the security or commodity during the period that the fraud occurred and the average price of the security or commodity during the 90-day period after the fraud was disclosed to the market, and

(II)    multiplying the difference in average price by the number of shares outstanding.

In determining whether the amount so determined is a reasonable estimate of the actual loss attributable to the change in value of the security or commodity, the court may consider, among other factors, the extent to which the amount so determined includes significant changes in value not resulting from the offense (*e.g.*, changes caused by external market forces, such as changed economic circumstances, changed investor expectations, and new industry-specific or firm-specific facts, conditions, or events).

4.     **Application of Subsection (b)(2).**—

(A)    **Definition.**—For purposes of subsection (b)(2), "***mass-marketing***" means a plan, program, promotion, or campaign that is conducted through solicitation by telephone, mail, the Internet, or other means to induce a large number of persons to (i) purchase goods or services; (ii) participate in a contest or sweepstakes; or (iii) invest for financial profit. "Mass-marketing" includes, for example, a telemarketing campaign that solicits a large number of individuals to purchase fraudulent life insurance policies.

(B)    **Applicability to Transmission of Multiple Commercial Electronic Mail Messages.**—For purposes of subsection (b)(2), an offense under 18 U.S.C. § 1037, or any other offense involving conduct described in 18 U.S.C. § 1037, shall be considered to have been committed through mass-marketing. Accordingly, the defendant shall receive at least a two-level enhancement under subsection (b)(2) and may, depending on the facts of the case, receive a greater enhancement under such subsection, if the defendant was convicted under, or the offense involved conduct described in, 18 U.S.C. § 1037.

(C)    **Undelivered United States Mail.**—

(i)     **In General.**—In a case in which undelivered United States mail was taken, or the taking of such item was an object of the offense, or in a case in which the stolen property received, transported, transferred, transmitted, or possessed was undelivered United States mail, "***victim***" means (I) any victim as defined in Application Note 1; or (II) any person who was the intended recipient, or addressee, of the undelivered United States mail.

(ii)    **Special Rule.**—A case described in subparagraph (C)(i) of this note that involved—

(I)     a United States Postal Service relay box, collection box, delivery vehicle, satchel, or cart, shall be considered to have involved at least 10 victims.

(II)    a housing unit cluster box or any similar receptacle that contains multiple mailboxes, whether such receptacle is owned by the United States Postal Service or otherwise owned, shall, unless proven otherwise, be presumed to have involved the number of victims corresponding to the number of mailboxes in each cluster box or similar receptacle.

§2B1.1

     (iii) **Definition.**—"*Undelivered United States mail*" means mail that has not actually been received by the addressee or the addressee's agent (*e.g.*, mail taken from the addressee's mail box).

(D) **Vulnerable Victims.**—If subsection (b)(2)(B) or (C) applies, an enhancement under §3A1.1(b)(2) shall not apply.

(E) **Cases Involving Means of Identification.**—For purposes of subsection (b)(2), in a case involving means of identification "*victim*" means (i) any victim as defined in Application Note 1; or (ii) any individual whose means of identification was used unlawfully or without authority.

(F) **Substantial Financial Hardship.**—In determining whether the offense resulted in substantial financial hardship to a victim, the court shall consider, among other factors, whether the offense resulted in the victim—

    (i)    becoming insolvent;

    (ii)   filing for bankruptcy under the Bankruptcy Code (title 11, United States Code);

    (iii)  suffering substantial loss of a retirement, education, or other savings or investment fund;

    (iv)  making substantial changes to his or her employment, such as postponing his or her retirement plans;

    (v)   making substantial changes to his or her living arrangements, such as relocating to a less expensive home; and

    (vi)  suffering substantial harm to his or her ability to obtain credit.

5. **Enhancement for Business of Receiving and Selling Stolen Property under Subsection (b)(4).**—For purposes of subsection (b)(4), the court shall consider the following non-exhaustive list of factors in determining whether the defendant was in the business of receiving and selling stolen property:

(A) The regularity and sophistication of the defendant's activities.

(B) The value and size of the inventory of stolen property maintained by the defendant.

(C) The extent to which the defendant's activities encouraged or facilitated other crimes.

(D) The defendant's past activities involving stolen property.

6. **Application of Subsection (b)(6).**—For purposes of subsection (b)(6), "*improper means*" includes the unauthorized harvesting of electronic mail addresses of users of a website, proprietary service, or other online public forum.

7. **Application of Subsection (b)(8)(B).**—If subsection (b)(8)(B) applies, do not apply an adjustment under §3B1.3 (Abuse of Position of Trust or Use of Special Skill).

## §2B1.1

8. **Application of Subsection (b)(9).—**

(A) **In General.**—The adjustments in subsection (b)(9) are alternative rather than cumulative.

(B) **Misrepresentations Regarding Charitable and Other Institutions.**—Subsection (b)(9)(A) applies in any case in which the defendant represented that the defendant was acting to obtain a benefit on behalf of a charitable, educational, religious, or political organization, or a government agency (regardless of whether the defendant actually was associated with the organization or government agency) when, in fact, the defendant intended to divert all or part of that benefit (*e.g.*, for the defendant's personal gain). Subsection (b)(9)(A) applies, for example, to the following:

(i) A defendant who solicited contributions for a non-existent famine relief organization.

(ii) A defendant who solicited donations from church members by falsely claiming to be a fundraiser for a religiously affiliated school.

(iii) A defendant, chief of a local fire department, who conducted a public fundraiser representing that the purpose of the fundraiser was to procure sufficient funds for a new fire engine when, in fact, the defendant intended to divert some of the funds for the defendant's personal benefit.

(C) **Fraud in Contravention of Prior Judicial Order.**—Subsection (b)(9)(C) provides an enhancement if the defendant commits a fraud in contravention of a prior, official judicial or administrative warning, in the form of an order, injunction, decree, or process, to take or not to take a specified action. A defendant who does not comply with such a prior, official judicial or administrative warning demonstrates aggravated criminal intent and deserves additional punishment. If it is established that an entity the defendant controlled was a party to the prior proceeding that resulted in the official judicial or administrative action, and the defendant had knowledge of that prior decree or order, this enhancement applies even if the defendant was not a specifically named party in that prior case. For example, a defendant whose business previously was enjoined from selling a dangerous product, but who nonetheless engaged in fraudulent conduct to sell the product, is subject to this enhancement. This enhancement does not apply if the same conduct resulted in an enhancement pursuant to a provision found elsewhere in the guidelines (*e.g.*, a violation of a condition of release addressed in §3C1.3 (Commission of Offense While on Release) or a violation of probation addressed in §4A1.1 (Criminal History Category)).

(D) **College Scholarship Fraud.**—For purposes of subsection (b)(9)(D):

"*Financial assistance*" means any scholarship, grant, loan, tuition, discount, award, or other financial assistance for the purpose of financing an education.

"*Institution of higher education*" has the meaning given that term in section 101 of the Higher Education Act of 1954 (20 U.S.C. § 1001).

(E) **Non-Applicability of Chapter Three Adjustments.—**

(i) **Subsection (b)(9)(A).**—If the conduct that forms the basis for an enhancement under subsection (b)(9)(A) is the only conduct that forms the basis for an adjustment under §3B1.3 (Abuse of Position of Trust or Use of Special Skill), do not apply that adjustment under §3B1.3.

(ii) **Subsection (b)(9)(B) and (C).**—If the conduct that forms the basis for an enhancement under subsection (b)(9)(B) or (C) is the only conduct that forms the basis for an adjustment under §3C1.1 (Obstructing or Impeding the Administration of Justice), do not apply that adjustment under §3C1.1.

9. **Application of Subsection (b)(10).**—

(A) **Definition of United States.**—For purposes of subsection (b)(10)(B), "*United States*" means each of the 50 states, the District of Columbia, the Commonwealth of Puerto Rico, the United States Virgin Islands, Guam, the Northern Mariana Islands, and American Samoa.

(B) **Sophisticated Means Enhancement under Subsection (b)(10)(C).**—For purposes of subsection (b)(10)(C), "*sophisticated means*" means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense. For example, in a telemarketing scheme, locating the main office of the scheme in one jurisdiction but locating soliciting operations in another jurisdiction ordinarily indicates sophisticated means. Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means.

(C) **Non-Applicability of Chapter Three Adjustment.**—If the conduct that forms the basis for an enhancement under subsection (b)(10) is the only conduct that forms the basis for an adjustment under §3C1.1, do not apply that adjustment under §3C1.1.

10. **Application of Subsection (b)(11).**—

(A) **Definitions.**—For purposes of subsection (b)(11):

"*Authentication feature*" has the meaning given that term in 18 U.S.C. § 1028(d)(1).

"*Counterfeit access device*" (i) has the meaning given that term in 18 U.S.C. § 1029(e)(2); and (ii) includes a telecommunications instrument that has been modified or altered to obtain unauthorized use of telecommunications service.

"*Device-making equipment*" (i) has the meaning given that term in 18 U.S.C. § 1029(e)(6); and (ii) includes (I) any hardware or software that has been configured as described in 18 U.S.C. § 1029(a)(9); and (II) a scanning receiver referred to in 18 U.S.C. § 1029(a)(8). "Scanning receiver" has the meaning given that term in 18 U.S.C. § 1029(e)(8).

"*Produce*" includes manufacture, design, alter, authenticate, duplicate, or assemble. "*Production*" includes manufacture, design, alteration, authentication, duplication, or assembly.

"*Telecommunications service*" has the meaning given that term in 18 U.S.C. § 1029(e)(9).

"*Unauthorized access device*" has the meaning given that term in 18 U.S.C. § 1029(e)(3).

(B) **Authentication Features and Identification Documents.**—Offenses involving authentication features, identification documents, false identification documents, and means of identification, in violation of 18 U.S.C. § 1028, also are covered by this guideline. If the primary purpose of the offense, under 18 U.S.C. § 1028, was to violate, or assist another to violate, the law pertaining to naturalization, citizenship, or legal resident status, apply

## §2B1.1

§2L2.1 (Trafficking in a Document Relating to Naturalization) or §2L2.2 (Fraudulently Acquiring Documents Relating to Naturalization), as appropriate, rather than this guideline.

(C) **Application of Subsection (b)(11)(C)(i).**—

    (i) **In General.**—Subsection (b)(11)(C)(i) applies in a case in which a means of identification of an individual other than the defendant (or a person for whose conduct the defendant is accountable under §1B1.3 (Relevant Conduct)) is used without that individual's authorization unlawfully to produce or obtain another means of identification.

    (ii) **Examples.**—Examples of conduct to which subsection (b)(11)(C)(i) applies are as follows:

        (I) A defendant obtains an individual's name and social security number from a source (*e.g.*, from a piece of mail taken from the individual's mailbox) and obtains a bank loan in that individual's name. In this example, the account number of the bank loan is the other means of identification that has been obtained unlawfully.

        (II) A defendant obtains an individual's name and address from a source (*e.g.*, from a driver's license in a stolen wallet) and applies for, obtains, and subsequently uses a credit card in that individual's name. In this example, the credit card is the other means of identification that has been obtained unlawfully.

    (iii) **Non-Applicability of Subsection (b)(11)(C)(i).**—Examples of conduct to which subsection (b)(11)(C)(i) does not apply are as follows:

        (I) A defendant uses a credit card from a stolen wallet only to make a purchase. In such a case, the defendant has not used the stolen credit card to obtain another means of identification.

        (II) A defendant forges another individual's signature to cash a stolen check. Forging another individual's signature is not producing another means of identification.

(D) **Application of Subsection (b)(11)(C)(ii).**—Subsection (b)(11)(C)(ii) applies in any case in which the offense involved the possession of 5 or more means of identification that unlawfully were produced or obtained, regardless of the number of individuals in whose name (or other identifying information) the means of identification were so produced or so obtained.

11. **Interaction of Subsection (b)(13) and §3B1.3 (Abuse of Position of Trust or Use of Special Skill).**—If subsection (b)(13) applies, do not apply §3B1.3.

12. **Application of Subsection (b)(15).**—Subsection (b)(15) provides a minimum offense level in the case of an ongoing, sophisticated operation (*e.g.*, an auto theft ring or "chop shop") to steal or to receive stolen (A) vehicles or vehicle parts; or (B) goods or chattels that are part of a cargo shipment. For purposes of this subsection, "***vehicle***" means motor vehicle, vessel, or aircraft. A "***cargo shipment***" includes cargo transported on a railroad car, bus, steamboat, vessel, or airplane.

§2B1.1

13.  **Gross Receipts Enhancement under Subsection (b)(17)(A).—**

(A)  **In General.**—For purposes of subsection (b)(17)(A), the defendant shall be considered to have derived more than $1,000,000 in gross receipts if the gross receipts to the defendant individually, rather than to all participants, exceeded $1,000,000.

(B)  **Definition.**—"***Gross receipts from the offense***" includes all property, real or personal, tangible or intangible, which is obtained directly or indirectly as a result of such offense. *See* 18 U.S.C. § 982(a)(4).

14.  **Application of Subsection (b)(17)(B).—**

(A)  **Application of Subsection (b)(17)(B)(i).**—The following is a non-exhaustive list of factors that the court shall consider in determining whether, as a result of the offense, the safety and soundness of a financial institution was substantially jeopardized:

(i)  The financial institution became insolvent.

(ii)  The financial institution substantially reduced benefits to pensioners or insureds.

(iii)  The financial institution was unable on demand to refund fully any deposit, payment, or investment.

(iv)  The financial institution was so depleted of its assets as to be forced to merge with another institution in order to continue active operations.

(v)  One or more of the criteria in clauses (i) through (iv) was likely to result from the offense but did not result from the offense because of federal government intervention, such as a "bailout".

(B)  **Application of Subsection (b)(17)(B)(ii).—**

(i)  **Definition.**—For purposes of this subsection, "***organization***" has the meaning given that term in Application Note 1 of §8A1.1 (Applicability of Chapter Eight).

(ii)  **In General.**—The following is a non-exhaustive list of factors that the court shall consider in determining whether, as a result of the offense, the solvency or financial security of an organization that was a publicly traded company or that had more than 1,000 employees was substantially endangered:

(I)  The organization became insolvent or suffered a substantial reduction in the value of its assets.

(II)  The organization filed for bankruptcy under Chapters 7, 11, or 13 of the Bankruptcy Code (title 11, United States Code).

(III)  The organization suffered a substantial reduction in the value of its equity securities or the value of its employee retirement accounts.

(IV)  The organization substantially reduced its workforce.

(V)  The organization substantially reduced its employee pension benefits.

**Add.47**

## §2B1.1

(VI) The liquidity of the equity securities of a publicly traded company was substantially endangered. For example, the company was delisted from its primary listing exchange, or trading of the company's securities was halted for more than one full trading day.

(VII) One or more of the criteria in subclauses (I) through (VI) was likely to result from the offense but did not result from the offense because of federal government intervention, such as a "bailout".

15. **Application of Subsection (b)(19).—**

(A) **Definitions.—**For purposes of subsection (b)(19):

"*Critical infrastructure*" means systems and assets vital to national defense, national security, economic security, public health or safety, or any combination of those matters. A critical infrastructure may be publicly or privately owned. Examples of critical infrastructures include gas and oil production, storage, and delivery systems, water supply systems, telecommunications networks, electrical power delivery systems, financing and banking systems, emergency services (including medical, police, fire, and rescue services), transportation systems and services (including highways, mass transit, airlines, and airports), and government operations that provide essential services to the public.

"*Government entity*" has the meaning given that term in 18 U.S.C. § 1030(e)(9).

(B) **Subsection (b)(19)(A)(iii).—**If the same conduct that forms the basis for an enhancement under subsection (b)(19)(A)(iii) is the only conduct that forms the basis for an enhancement under subsection (b)(17)(B), do not apply the enhancement under subsection (b)(17)(B).

16. **Application of Subsection (b)(20).—**

(A) **Definitions.—**For purposes of subsection (b)(20):

"*Commodities law*" means (i) the Commodity Exchange Act (7 U.S.C. § 1 *et seq.*) and 18 U.S.C. § 1348; and (ii) includes the rules, regulations, and orders issued by the Commodity Futures Trading Commission.

"*Commodity pool operator*" has the meaning given that term in section 1a(11) of the Commodity Exchange Act (7 U.S.C. § 1a(11)).

"*Commodity trading advisor*" has the meaning given that term in section 1a(12) of the Commodity Exchange Act (7 U.S.C. § 1a(12)).

"*Futures commission merchant*" has the meaning given that term in section 1a(28) of the Commodity Exchange Act (7 U.S.C. § 1a(28)).

"*Introducing broker*" has the meaning given that term in section 1a(31) of the Commodity Exchange Act (7 U.S.C. § 1a(31)).

"*Investment adviser*" has the meaning given that term in section 202(a)(11) of the Investment Advisers Act of 1940 (15 U.S.C. § 80b-2(a)(11)).

"*Person associated with a broker or dealer*" has the meaning given that term in section 3(a)(18) of the Securities Exchange Act of 1934 (15 U.S.C. § 78c(a)(18)).

"*Person associated with an investment adviser*" has the meaning given that term in section 202(a)(17) of the Investment Advisers Act of 1940 (15 U.S.C. § 80b-2(a)(17)).

"*Registered broker or dealer*" has the meaning given that term in section 3(a)(48) of the Securities Exchange Act of 1934 (15 U.S.C. § 78c(a)(48)).

"*Securities law*" (i) means 18 U.S.C. §§ 1348, 1350, and the provisions of law referred to in section 3(a)(47) of the Securities Exchange Act of 1934 (15 U.S.C. § 78c(a)(47)); and (ii) includes the rules, regulations, and orders issued by the Securities and Exchange Commission pursuant to the provisions of law referred to in such section.

(B) **In General.**—A conviction under a securities law or commodities law is not required in order for subsection (b)(20) to apply. This subsection would apply in the case of a defendant convicted under a general fraud statute if the defendant's conduct violated a securities law or commodities law. For example, this subsection would apply if an officer of a publicly traded company violated regulations issued by the Securities and Exchange Commission by fraudulently influencing an independent audit of the company's financial statements for the purposes of rendering such financial statements materially misleading, even if the officer is convicted only of wire fraud.

(C) **Nonapplicability of §3B1.3 (Abuse of Position of Trust or Use of Special Skill).**—If subsection (b)(20) applies, do not apply §3B1.3.

17. **Cross Reference in Subsection (c)(3).**—Subsection (c)(3) provides a cross reference to another guideline in Chapter Two (Offense Conduct) in cases in which the defendant is convicted of a general fraud statute, and the count of conviction establishes an offense involving fraudulent conduct that is more aptly covered by another guideline. Sometimes, offenses involving fraudulent statements are prosecuted under 18 U.S.C. § 1001, or a similarly general statute, although the offense involves fraudulent conduct that is also covered by a more specific statute. Examples include false entries regarding currency transactions, for which §2S1.3 (Structuring Transactions to Evade Reporting Requirements) likely would be more apt, and false statements to a customs officer, for which §2T3.1 (Evading Import Duties or Restrictions (Smuggling); Receiving or Trafficking in Smuggled Property) likely would be more apt. In certain other cases, the mail or wire fraud statutes, or other relatively broad statutes, are used primarily as jurisdictional bases for the prosecution of other offenses. For example, a state employee who improperly influenced the award of a contract and used the mails to commit the offense may be prosecuted under 18 U.S.C. § 1341 for fraud involving the deprivation of the intangible right of honest services. Such a case would be more aptly sentenced pursuant to §2C1.1 (Offering, Giving, Soliciting, or Receiving a Bribe; Extortion Under Color of Official Right; Fraud involving the Deprivation of the Intangible Right to Honest Services of Public Officials; Conspiracy to Defraud by Interference with Governmental Functions).

18. **Continuing Financial Crimes Enterprise.**—If the defendant is convicted under 18 U.S.C. § 225 (relating to a continuing financial crimes enterprise), the offense level is that applicable to the underlying series of offenses comprising the "continuing financial crimes enterprise".

19. **Partially Completed Offenses.**—In the case of a partially completed offense (*e.g.*, an offense involving a completed theft or fraud that is part of a larger, attempted theft or fraud), the offense level is to be determined in accordance with the provisions of §2X1.1 (Attempt, Solicitation, or Conspiracy) whether the conviction is for the substantive offense, the inchoate offense (attempt, solicitation, or conspiracy), or both. *See* Application Note 4 of the Commentary to §2X1.1.

20. **Multiple-Count Indictments.**—Some fraudulent schemes may result in multiple-count indictments, depending on the technical elements of the offense. The cumulative loss produced by a

## §2B1.1

common scheme or course of conduct should be used in determining the offense level, regardless of the number of counts of conviction. *See* Chapter Three, Part D (Multiple Counts).

**Background:** This guideline covers offenses involving theft, stolen property, property damage or destruction, fraud, forgery, and counterfeiting (other than offenses involving altered or counterfeit bearer obligations of the United States).

Because federal fraud statutes often are broadly written, a single pattern of offense conduct usually can be prosecuted under several code sections, as a result of which the offense of conviction may be somewhat arbitrary. Furthermore, most fraud statutes cover a broad range of conduct with extreme variation in severity. The specific offense characteristics and cross references contained in this guideline are designed with these considerations in mind.

The Commission has determined that, ordinarily, the sentences of defendants convicted of federal offenses should reflect the nature and magnitude of the loss caused or intended by their crimes. Accordingly, along with other relevant factors under the guidelines, loss serves as a measure of the seriousness of the offense and the defendant's relative culpability and is a principal factor in determining the offense level under this guideline.

Theft from the person of another, such as pickpocketing or non-forcible purse-snatching, receives an enhanced sentence because of the increased risk of physical injury. This guideline does not include an enhancement for thefts from the person by means of force or fear; such crimes are robberies and are covered under §2B3.1 (Robbery).

A minimum offense level of level 14 is provided for offenses involving an organized scheme to steal vehicles or vehicle parts. Typically, the scope of such activity is substantial, but the value of the property may be particularly difficult to ascertain in individual cases because the stolen property is rapidly resold or otherwise disposed of in the course of the offense. Therefore, the specific offense characteristic of "organized scheme" is used as an alternative to "loss" in setting a minimum offense level.

Use of false pretenses involving charitable causes and government agencies enhances the sentences of defendants who take advantage of victims' trust in government or law enforcement agencies or the generosity and charitable motives of victims. Taking advantage of a victim's self-interest does not mitigate the seriousness of fraudulent conduct; rather, defendants who exploit victims' charitable impulses or trust in government create particular social harm. In a similar vein, a defendant who has been subject to civil or administrative proceedings for the same or similar fraudulent conduct demonstrates aggravated criminal intent and is deserving of additional punishment for not conforming with the requirements of judicial process or orders issued by federal, state, or local administrative agencies.

Offenses that involve the use of financial transactions or financial accounts outside the United States in an effort to conceal illicit profits and criminal conduct involve a particularly high level of sophistication and complexity. These offenses are difficult to detect and require costly investigations and prosecutions. Diplomatic processes often must be used to secure testimony and evidence beyond the jurisdiction of United States courts. Consequently, a minimum offense level of level 12 is provided for these offenses.

Subsection (b)(5) implements the instruction to the Commission in section 2 of Public Law 105–101 and the directive to the Commission in section 3 of Public Law 110–384.

Subsection (b)(7) implements the directive to the Commission in section 10606 of Public Law 111–148.

Subsection (b)(8) implements the directive to the Commission in section 7 of Public Law 112–186.

Subsection (b)(9)(D) implements, in a broader form, the directive in section 3 of the College Scholarship Fraud Prevention Act of 2000, Public Law 106–420.

Subsection (b)(10) implements, in a broader form, the instruction to the Commission in section 6(c)(2) of Public Law 105–184.

Subsections (b)(11)(A)(i) and (B)(i) implement the instruction to the Commission in section 4 of the Wireless Telephone Protection Act, Public Law 105–172.

Subsection (b)(11)(C) implements the directive to the Commission in section 4 of the Identity Theft and Assumption Deterrence Act of 1998, Public Law 105–318. This subsection focuses principally on an aggravated form of identity theft known as "affirmative identity theft" or "breeding", in which a defendant uses another individual's name, social security number, or some other form of identification (the "means of identification") to "breed" (*i.e.*, produce or obtain) new or additional forms of identification. Because 18 U.S.C. § 1028(d) broadly defines "means of identification", the new or additional forms of identification can include items such as a driver's license, a credit card, or a bank loan. This subsection provides a minimum offense level of level 12, in part because of the seriousness of the offense. The minimum offense level accounts for the fact that the means of identification that were "bred" (*i.e.*, produced or obtained) often are within the defendant's exclusive control, making it difficult for the individual victim to detect that the victim's identity has been "stolen." Generally, the victim does not become aware of the offense until certain harms have already occurred (*e.g.*, a damaged credit rating or an inability to obtain a loan). The minimum offense level also accounts for the non-monetary harm associated with these types of offenses, much of which may be difficult or impossible to quantify (*e.g.*, harm to the individual's reputation or credit rating, inconvenience, and other difficulties resulting from the offense). The legislative history of the Identity Theft and Assumption Deterrence Act of 1998 indicates that Congress was especially concerned with providing increased punishment for this type of harm.

Subsection (b)(12) implements the directive in section 5 of Public Law 110–179.

Subsection (b)(14) implements the directive in section 3 of Public Law 112–269.

Subsection (b)(16)(B) implements, in a broader form, the instruction to the Commission in section 110512 of Public Law 103–322.

Subsection (b)(17)(A) implements, in a broader form, the instruction to the Commission in section 2507 of Public Law 101–647.

Subsection (b)(17)(B)(i) implements, in a broader form, the instruction to the Commission in section 961(m) of Public Law 101–73.

Subsection (b)(18) implements the directive in section 209 of Public Law 110–326.

Subsection (b)(19) implements the directive in section 225(b) of Public Law 107–296. The minimum offense level of level 24 provided in subsection (b)(19)(B) for an offense that resulted in a substantial disruption of a critical infrastructure reflects the serious impact such an offense could have on national security, national economic security, national public health or safety, or a combination of any of these matters.

| | |
|---|---|
| *Historical Note* | Effective November 1, 1987. Amended effective June 15, 1988 (amendment 7); November 1, 1989 (amendments 99, 100, 101 and 303); November 1, 1990 (amendments 312, 317, and 361); November 1, 1991 (amendments 364, and 393); November 1, 1993 (amendments 481 and 482); November 1, 1995 (amendment 512); November 1, 1997 (amendment 551); November 1, 1998 (amendment 576); November 1, 2000 (amendment 596); November 1, 2001 (amendment 617); November 1, 2002 (amendments 637, 638, and 646); January 25, 2003 (amendment 647); November 1, 2003 (amendments 653, 654, 655, and 661); November 1, 2004 (amendments 665, 666, and 674); November 1, 2005 (amendment 679); November 1, 2006 (amendments 685 and 696); November 1, 2007 (amendments 699, 700, and 702); February 6, 2008 (amendment 714); November 1, 2008 (amendments 719 and 725); November 1, 2009 (amendments 726, 733, and 737); November 1, 2010 (amendments 745 and 747); November 1, 2011 (amendment 749); November 1, 2012 (amendment 761); |

§2R1.1

# PART R — ANTITRUST OFFENSES

## §2R1.1. Bid-Rigging, Price-Fixing or Market-Allocation Agreements Among Competitors

(a)  Base Offense Level: **12**

(b)  Specific Offense Characteristics

(1)  If the conduct involved participation in an agreement to submit non-competitive bids, increase by **1** level.

(2)  If the volume of commerce attributable to the defendant was more than $1,000,000, adjust the offense level as follows:

| VOLUME OF COMMERCE (APPLY THE GREATEST) | ADJUSTMENT TO OFFENSE LEVEL |
|---|---|
| (A)  More than $1,000,000 | add **2** |
| (B)  More than $10,000,000 | add **4** |
| (C)  More than $50,000,000 | add **6** |
| (D)  More than $100,000,000 | add **8** |
| (E)  More than $300,000,000 | add **10** |
| (F)  More than $600,000,000 | add **12** |
| (G)  More than $1,200,000,000 | add **14** |
| (H)  More than $1,850,000,000 | add **16**. |

For purposes of this guideline, the volume of commerce attributable to an individual participant in a conspiracy is the volume of commerce done by him or his principal in goods or services that were affected by the violation. When multiple counts or conspiracies are involved, the volume of commerce should be treated cumulatively to determine a single, combined offense level.

(c)  Special Instruction for Fines

(1)  For an individual, the guideline fine range shall be from one to five percent of the volume of commerce, but not less than $20,000.

(d)  Special Instructions for Fines — Organizations

(1)  In lieu of the pecuniary loss under subsection (a)(3) of §8C2.4 (Base Fine), use 20 percent of the volume of affected commerce.

(2)  When applying §8C2.6 (Minimum and Maximum Multipliers), neither the minimum nor maximum multiplier shall be less than 0.75.

**§2R1.1**

(3)   In a bid-rigging case in which the organization submitted one or more complementary bids, use as the organization's volume of commerce the greater of (A) the volume of commerce done by the organization in the goods or services that were affected by the violation, or (B) the largest contract on which the organization submitted a complementary bid in connection with the bid-rigging conspiracy.

**Commentary**

**Statutory Provisions:** 15 U.S.C. §§ 1, 3(a). For additional statutory provision(s), *see* Appendix A (Statutory Index).

**Application Notes:**

1.   **Application of Chapter Three (Adjustments).**—Sections 3B1.1 (Aggravating Role), 3B1.2 (Mitigating Role), 3B1.3 (Abuse of Position of Trust or Use of Special Skill), and 3C1.1 (Obstructing or Impeding the Administration of Justice) may be relevant in determining the seriousness of the defendant's offense. For example, if a sales manager organizes or leads the price-fixing activity of five or more participants, the 4-level increase at §3B1.1(a) should be applied to reflect the defendant's aggravated role in the offense. For purposes of applying §3B1.2, an individual defendant should be considered for a mitigating role adjustment only if he were responsible in some minor way for his firm's participation in the conspiracy.

2.   **Considerations in Setting Fine for Individuals.**—In setting the fine for individuals, the court should consider the extent of the defendant's participation in the offense, the defendant's role, and the degree to which the defendant personally profited from the offense (including salary, bonuses, and career enhancement). If the court concludes that the defendant lacks the ability to pay the guideline fine, it should impose community service in lieu of a portion of the fine. The community service should be equally as burdensome as a fine.

3.   **Fines for Organizations.**—The fine for an organization is determined by applying Chapter Eight (Sentencing of Organizations). In selecting a fine for an organization within the guideline fine range, the court should consider both the gain to the organization from the offense and the loss caused by the organization. It is estimated that the average gain from price-fixing is 10 percent of the selling price. The loss from price-fixing exceeds the gain because, among other things, injury is inflicted upon consumers who are unable or for other reasons do not buy the product at the higher prices. Because the loss from price-fixing exceeds the gain, subsection (d)(1) provides that 20 percent of the volume of affected commerce is to be used in lieu of the pecuniary loss under §8C2.4(a)(3). The purpose for specifying a percent of the volume of commerce is to avoid the time and expense that would be required for the court to determine the actual gain or loss. In cases in which the actual monopoly overcharge appears to be either substantially more or substantially less than 10 percent, this factor should be considered in setting the fine within the guideline fine range.

4.   **Another Consideration in Setting Fine.**—Another consideration in setting the fine is that the average level of mark-up due to price-fixing may tend to decline with the volume of commerce involved.

5.   **Use of Alternatives Other Than Imprisonment.**—It is the intent of the Commission that alternatives such as community confinement not be used to avoid imprisonment of antitrust offenders.

## §2R1.1

6.  **Understatement of Seriousness.**—Understatement of seriousness is especially likely in cases involving complementary bids. If, for example, the defendant participated in an agreement not to submit a bid, or to submit an unreasonably high bid, on one occasion, in exchange for his being allowed to win a subsequent bid that he did not in fact win, his volume of commerce would be zero, although he would have contributed to harm that possibly was quite substantial. The court should consider sentences near the top of the guideline range in such cases.

7.  **Defendant with Previous Antitrust Convictions.**—In the case of a defendant with previous antitrust convictions, a sentence at the maximum of the applicable guideline range may be warranted.

**Background:** This guideline applies to violations of the antitrust laws. Although they are not unlawful in all countries, there is near universal agreement that restrictive agreements among competitors, such as horizontal price-fixing (including bid-rigging) and horizontal market-allocation, can cause serious economic harm. There is no consensus, however, about the harmfulness of other types of antitrust offenses, which furthermore are rarely prosecuted and may involve unsettled issues of law. Consequently, only one guideline, which deals with horizontal agreements in restraint of trade, has been promulgated.

The agreements among competitors covered by this section are almost invariably covert conspiracies that are intended to, and serve no purpose other than to, restrict output and raise prices, and that are so plainly anticompetitive that they have been recognized as illegal *per se*, *i.e.*, without any inquiry in individual cases as to their actual competitive effect.

Under the guidelines, prison terms for these offenders should be much more common, and usually somewhat longer, than typical under pre-guidelines practice. Absent adjustments, the guidelines require some period of confinement in the great majority of cases that are prosecuted, including all bid-rigging cases. The court will have the discretion to impose considerably longer sentences within the guideline ranges. Adjustments from Chapter Three, Part E (Acceptance of Responsibility) and, in rare instances, Chapter Three, Part B (Role in the Offense), may decrease these minimum sentences; nonetheless, in very few cases will the guidelines not require that some confinement be imposed. Adjustments will not affect the level of fines.

Tying the offense level to the scale or scope of the offense is important in order to ensure that the sanction is in fact punitive and that there is an incentive to desist from a violation once it has begun. The offense levels are not based directly on the damage caused or profit made by the defendant because damages are difficult and time consuming to establish. The volume of commerce is an acceptable and more readily measurable substitute. The limited empirical data available as to pre-guidelines practice showed that fines increased with the volume of commerce and the term of imprisonment probably did as well.

The Commission believes that the volume of commerce is liable to be an understated measure of seriousness in some bid-rigging cases. For this reason, and consistent with pre-guidelines practice, the Commission has specified a 1-level increase for bid-rigging.

Substantial fines are an essential part of the sentence. For an individual, the guideline fine range is from one to five percent of the volume of commerce, but not less than $20,000. For an organization, the guideline fine range is determined under Chapter Eight (Sentencing of Organizations), but pursuant to subsection (d)(2), the minimum multiplier is at least 0.75. This multiplier, which requires a minimum fine of 15 percent of the volume of commerce for the least serious case, was selected to provide an effective deterrent to antitrust offenses. At the same time, this minimum multiplier maintains incentives for desired organizational behavior. Because the Department of Justice has a well-estab-

**§2R1.1**

lished amnesty program for organizations that self-report antitrust offenses, no lower minimum multiplier is needed as an incentive for self-reporting. A minimum multiplier of at least 0.75 ensures that fines imposed in antitrust cases will exceed the average monopoly overcharge.

The Commission believes that most antitrust defendants have the resources and earning capacity to pay the fines called for by this guideline, at least over time on an installment basis.

| | |
|---|---|
| *Historical Note* | Effective November 1, 1987. Amended effective November 1, 1989 (amendments 211 and 303); November 1, 1991 (amendments 377 and 422); November 1, 2003 (amendment 661); November 1, 2004 (amendment 674); November 1, 2005 (amendment 678); November 1, 2015 (amendment 791); November 1, 2018 (amendment 813); November 1, 2024 (amendment 830); November 1, 2025 (amendment 836). |

**Add.55**

§3D1.4

**Commentary**

**Application Notes:**

1.  The "*offense level*" for a count refers to the offense level from Chapter Two after all adjustments from Parts A, B, and C of Chapter Three.

2.  When counts are grouped pursuant to §3D1.2(a)–(c), the highest offense level of the counts in the group is used. Ordinarily, it is necessary to determine the offense level for each of the counts in a Group in order to ensure that the highest is correctly identified. Sometimes, it will be clear that one count in the Group cannot have a higher offense level than another, as with a count for an attempt or conspiracy to commit the completed offense. The formal determination of the offense level for such a count may be unnecessary.

3.  When counts are grouped pursuant to §3D1.2(d), the offense guideline applicable to the aggregate behavior is used. If the counts in the Group are covered by different guidelines, use the guideline that produces the highest offense level. Determine whether the specific offense characteristics or adjustments from Chapter Three, Parts A, B, and C apply based upon the combined offense behavior taken as a whole. Note that guidelines for similar property offenses have been coordinated to produce identical offense levels, at least when substantial property losses are involved. However, when small sums are involved the differing specific offense characteristics that require increasing the offense level to a certain minimum may affect the outcome.

**Background:** This section provides rules for determining the offense level associated with each Group of Closely Related Counts. Summary examples of the application of these rules are provided at the end of the Commentary to this part.

| | |
|---|---|
| *Historical Note* | Effective November 1, 1987. Amended effective November 1, 1989 (amendments 257 and 303); November 1, 2001 (amendment 617); November 1, 2004 (amendment 674); November 1, 2023 (amendment 824); November 1, 2025 (amendment 836). |

## §3D1.4. Determining the Combined Offense Level

The combined offense level is determined by taking the offense level applicable to the Group with the highest offense level and increasing that offense level by the amount indicated in the following table:

| NUMBER OF UNITS | INCREASE IN OFFENSE LEVEL |
|---|---|
| 1 | none |
| 1 1/2 | add **1** level |
| 2 | add **2** levels |
| 2 1/2 – 3 | add **3** levels |
| 3 1/2 – 5 | add **4** levels |
| More than 5 | add **5** levels. |

Add.56

## §3D1.5

In determining the number of Units for purposes of this section:

(a) Count as one Unit the Group with the highest offense level. Count one additional Unit for each Group that is equally serious or from **1** to **4** levels less serious.

(b) Count as one-half Unit any Group that is **5** to **8** levels less serious than the Group with the highest offense level.

(c) Disregard any Group that is **9** or more levels less serious than the Group with the highest offense level. Such Groups will not increase the applicable offense level but may provide a reason for sentencing at the higher end of the sentencing range for the applicable offense level.

### Commentary

**Application Notes:**

1. Application of the rules in §§3D1.2 and 3D1.3 may produce a single Group of Closely Related Counts. In such cases, the combined offense level is the level corresponding to the Group determined in accordance with §3D1.3.

2. The procedure for calculating the combined offense level when there is more than one Group of Closely Related Counts is as follows: First, identify the offense level applicable to the most serious Group; assign it one Unit. Next, determine the number of Units that the remaining Groups represent. Finally, increase the offense level for the most serious Group by the number of levels indicated in the table corresponding to the total number of Units.

**Background:** When Groups are of roughly comparable seriousness, each Group will represent one Unit. When the most serious Group carries an offense level substantially higher than that applicable to the other Groups, however, counting the lesser Groups fully for purposes of the table could add excessive punishment, possibly even more than those offenses would carry if prosecuted separately. To avoid this anomalous result and produce declining marginal punishment, Groups 9 or more levels less serious than the most serious Group should not be counted for purposes of the table, and that Groups 5 to 8 levels less serious should be treated as equal to one-half of a Group. Thus, if the most serious Group is at offense level 15 and if two other Groups are at level 10, there would be a total of two Units for purposes of the table (one plus one-half plus one-half) and the combined offense level would be 17.

| *Historical Note* | Effective November 1, 1987. Amended effective November 1, 1990 (amendment 350); November 1, 2023 (amendment 824); November 1, 2025 (amendment 836). |
|---|---|

## §3D1.5.   Determining the Total Punishment

Use the combined offense level to determine the appropriate sentence in accordance with the provisions of Chapter Five.