**No. 25-7652**

IN THE
# United States Court of Appeals
# for the Ninth Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

EDUARDO RUBEN LOPEZ,

*Defendant-Appellant.*

On Appeal from the
United States District Court for the District of Nevada
No. 2:23-cr-00055 (Hon. Cristina D. Silva)

## ANSWERING BRIEF FOR THE UNITED STATES

STANLEY E. WOODWARD, JR.
*Associate Attorney General*

DANIEL W. GLAD
*Acting Deputy Assistant Attorney
General for Criminal Enforcement*

| | |
|---|---|
| LESLIE A. WULFF | DANIEL E. HAAR |
| MIKAL J. CONDON | STRATTON C. STRAND |
| JEFFREY CRAMER | MATTHEW A. WARING |
| ANDREW MAST | *Attorneys* |
| *Attorneys* | U.S. DEPARTMENT OF JUSTICE |
| U.S. DEPARTMENT OF JUSTICE | ANTITRUST DIVISION |
| ANTITRUST DIVISION | 950 Pennsylvania Ave., N.W. |
| | Room 3224 |
| | Washington, D.C. 20530-0001 |
| | (202) 532-4186 |
| | matthew.waring@usdoj.gov |

*Counsel for the United States*

## RULE 26.1(b) DISCLOSURE STATEMENT

Defendant-Appellant Eduardo Ruben Lopez was convicted of wage fixing, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and five counts of wire fraud, in violation of 18 U.S.C. § 1343. There are no organizational victims of the wage-fixing conduct. The victim of the wire fraud counts was Care Options for Kids (formerly Solace Healthcare Nevada, LLC). Care Options for Kids is a wholly-owned subsidiary of Solace Healthcare Group, Inc. Solace Healthcare Group, Inc., is a wholly-owned subsidiary of Solace Healthcare HoldCo, Inc. Solace Healthcare HoldCo, Inc., is a wholly-owned subsidiary of Solace Healthcare Mid-Co, Inc. Solace Healthcare Mid-Co, Inc., is a wholly-owned subsidiary of Solace Healthcare Holdings, LP. On information and belief, Webster Equity Partners is the majority shareholder of Solace Healthcare Holdings, LP.

# TABLE OF CONTENTS

Page

RULE 26.1(b) DISCLOSURE STATEMENT ...............................................ii

TABLE OF AUTHORITIES.................................................................vi

STATEMENT OF JURISDICTION...........................................................1

ISSUES PRESENTED ....................................................................1

STATUTORY PROVISIONS.................................................................2

INTRODUCTION .........................................................................2

STATEMENT OF THE CASE ...............................................................3

   I.      Procedural History ..........................................................3

   II.     Factual Background .........................................................4

      A.    The Las Vegas Home-Healthcare Market.................................4

      B.    For Three Years, Lopez Conspires to Fix Nurse Wages............5

         1. "We all have a mutual agreement": The conspiracy begins. .....5

         2. "Sounds like a deal": Lopez and Lubinsky set specific wage ranges. ...................................................................7

         3. "[Y]ou know they will ask for more": Lopez supports the conspiracy from Reno. ..............................................8

         4. "I'm staying with[in] our agreed rates": Lopez returns to Las Vegas and expands the conspiracy. ............................9

      C.    The Government Launches a Criminal Investigation.............11

         1. Recorded communications corroborate the conspiracy............11

         2. "[K]eep[ing] wages within the arena": Lopez admits the conspiracy to the FBI. ...........................................13

         3. "Delete this once read": Lopez shows his awareness of the continuing investigation..........................................14

      D.    Lopez Sells CHH to Solace Without Disclosing the Criminal Investigation. .......................................................15

## TABLE OF CONTENTS—Continued

Page

SUMMARY OF ARGUMENT ................................................................. 18

ARGUMENT .......................................................................................... 20

I. Lopez's Challenges To His Conviction Fail. ............................ 20

   A. Lopez Shows Neither Plain Error Nor Error in the District Court's Denial of His New-Trial Motion Based on Alleged *Napue* and *Brady* Error ............................................................ 20

      1. Background .......................................................................... 21

      2. Legal Principles and Standard of Review ............................ 26

      3. Discussion ........................................................................... 30

   B. The District Court Did Not Plainly Err in Admitting Agent Singh's Lay Opinion Testimony; Lopez Waived His Challenge to the Court's Curative Instruction. ........................................ 40

      1. Background .......................................................................... 40

      2. Standards of Review ............................................................ 43

      3. Discussion ........................................................................... 44

   C. The District Court Did Not Abuse Its Discretion in Admitting Lopez's "Hookers" Comment. ................................................... 47

      1. Background .......................................................................... 48

      2. Legal Principles and Standard of Review ............................ 49

      3. Discussion ........................................................................... 50

   D. The District Court Did Not Abuse Its Discretion by Admitting an Excerpt from Lopez's Privilege Log, or by Denying a Related Mistrial Motion. ......................................................... 54

      1. Background .......................................................................... 54

      2. Standard of Review ............................................................. 56

      3. Discussion ........................................................................... 57

   E. Lopez Shows No Plain Error in the Government's Rebuttal Argument. ............................................................................... 61

# TABLE OF CONTENTS—Continued

Page

    1. Lopez Shows No Error, Much Less Obvious Error. ................ 61

    2. Lopez Shows No Prejudice, Much Less a Serious Effect on the Fairness, Integrity, or Public Reputation of the Proceedings. 66

II.    Lopez's Challenges To His Sentence Lack Merit. .................... 68

  A.    Lopez Shows No Clear Error in the Loss Calculation. ........... 68

    1. Background .................................................................................. 69

    2. Standard of Review ................................................................ 70

    3. Discussion .................................................................................. 70

  B.    The District Court Correctly Ordered Forfeiture of Lopez's $10.459 Million Fraud Proceeds. ............................................ 74

    1. Background .................................................................................. 74

    2. Legal Principles and Standard of Review ............................... 75

    3. Discussion .................................................................................. 77

  C.    The District Court Did Not Abuse Its Discretion in Ordering Restitution. .......................................................................... 80

    1. Background .................................................................................. 80

    2. Legal Principles and Standard of Review ............................... 82

    3. Discussion .................................................................................. 84

CONCLUSION ....................................................................................... 87

CIRCUIT FORM 8 (COMPLIANCE) ...................................................... 88

STATUTORY ADDENDUM

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Albrecht v. Horn,*
485 F.3d 103 (3d Cir. 2007) ............................................................... 35

*Anderson v. Shipowners' Ass'n of Pac. Coast,*
272 U.S. 359 (1926) ............................................................................ 2

*Austin v. United States,*
509 U.S. 602 (1993) ........................................................................... 78

*Biggs v. Chi. Bd. of Educ.,*
2022 WL 1591577 (N.D. Ill. May 19, 2022) ....................................... 58

*Brady v. Maryland,*
373 U.S. 83 (1963) .................................................................... *passim*

*Cage v. Harper,*
No. 17-CV-7621, 2021 WL 3022316 (N.D. Ill. July 16, 2021) ............ 60

*Catlin v. Broomfield,*
124 F.4th 702 (9th Cir. 2024) ........................................................... 37

*Clutchette v. Rushen,*
770 F.2d 1469 (9th Cir. 1985) ........................................................... 61

*Cunningham v. Wong,*
704 F.3d 1143 (9th Cir. 2013) ........................................................... 35

*Giglio v. United States,*
405 U.S. 150 (1972) ........................................................................... 29

# TABLE OF AUTHORITIES—Continued

Page(s)

*Greer v. United States,*
593 U.S. 503 (2021) ...................................................................... 68

*Hampton v. Shinn,*
143 F.4th 1047 (9th Cir. 2025) ............................................... 29, 31

*Heckler & Koch, Inc. v. German Sport Guns GmbH,*
2014 WL 12756372 (S.D. Ind. 2014) .......................................... 59

*Henderson v. United States,*
568 U.S. 266 (2013) ...................................................................... 68

*Honeycutt v. United States,*
581 U.S. 443 (2017) ...................................................................... 76

*In re Grand Jury,*
23 F.4th 1088 (9th Cir. 2021) ...................................................... 59

*Johnson v. United States,*
520 U.S. 461 (1997) ....................................................... 32, 38, 68

*Jones v. York,*
34 F.4th 550 (7th Cir. 2022) ........................................................ 36

*Klein v. Martin,*
607 U.S. 213 (2026) ...................................................................... 29

*Kyles v. Whitley,*
514 U.S. 419 (1995) ................................................................ 29, 38

*Lagos v. United States,*
584 U.S. 577 (2018) ....................................................... 82, 83, 84

# TABLE OF AUTHORITIES—Continued

Page(s)

*Marion Diagnostic Ctr., LLC v. Becton Dickinson & Co.,*
   29 F.4th 337 (7th Cir. 2022) ..............................................................21

*Martinez v. Ryan,*
   926 F.3d 1215 (9th Cir. 2019).............................................................33

*Milke v. Ryan,*
   711 F.3d 998 (9th Cir. 2013)...............................................................35

*Napue v. Illinois,*
   360 U.S. 264 (1959) ......................................................................*passim*

*Nat'l Collegiate Athletic Ass'n v. Alston,*
   594 U.S. 69, (2021) ..............................................................................2

*Ocasio v. United States,*
   578 U.S. 282 (2016).............................................................................78

*Old Chief v. United States,*
   519 U.S. 172 (1997) .............................................................................52

*Puckett v. United States,*
   556 U.S. 129 (2009) .............................................................................28

*Rhoades v. Henry,*
   638 F.3d 1027 (9th Cir. 2011).............................................................34

*Totten v. Merkle,*
   137 F.3d 1172 (9th Cir. 1998)..............................................................58

*United States v. Abdelbary,*
   746 F.3d 570 (4th Cir. 2014)...............................................................85

# TABLE OF AUTHORITIES—Continued

Page(s)

*United States v. Avenatti,*
  81 F.4th 171 (2d Cir. 2023)..............................................................85

*United States v. Bajakajian,*
  524 U.S. 321 (1998)........................................................................76

*United States v. Beecroft,*
  825 F.3d 991 (9th Cir. 2016).................................................76, 79, 80

*United States v. Bellot,*
  113 F.4th 1151 (9th Cir. 2024) ........................................................42

*United States v. Bikundi,*
  926 F.3d 761 (D.C. Cir. 2019) .........................................................79

*United States v. Brown,*
  563 F.3d 410 (9th Cir. 2009).............................................................30

*United States v. Bruce,*
  984 F.3d 884 (9th Cir. 2021).............................................................27

*United States v. Campos,*
  217 F.3d 707 (9th Cir. 2000).............................................................63

*United States v. Carranco,*
  551 F.2d 1197 (10th Cir. 1977).........................................................49

*United States v. Cloud,*
  102 F.4th 968 (9th Cir. 2024) ......................................................29, 30

*United States v. Crandall,*
  525 F.3d 907 (9th Cir. 2008).................................................71, 72, 73

# TABLE OF AUTHORITIES—Continued

Page(s)

*United States v. Dadyan,*
    76 F.4th 955 (9th Cir. 2023) .......................................................83, 86

*United States v. Dominguez Benitez,*
    542 U.S. 74 (2004) ...................................................................28

*United States v. Eyraud,*
    809 F.3d 462 (9th Cir. 2015) ......................................................82, 84

*United States v. Feldman,*
    853 F.2d 648 (9th Cir. 1988) ...............................................................79

*United States v. Figueroa-Lopez,*
    125 F.3d 1241 (9th Cir. 1997) ............................................................46

*United States v. Gagarin,*
    950 F.3d 596 (9th Cir. 2020) .............................................................83

*United States v. Gallo,*
    543 F.2d 361 (D.C. Cir. 1976) ...........................................................53

*United States v. Golb,*
    69 F.3d 1417 (9th Cir. 1995) .............................................................38

*United States v. Gomez,*
    725 F.3d 112131 (9th Cir. 2013) ................................................*passim*

*United States v. Grammer,*
    513 F.2d 673 (9th Cir. 1975) .............................................................59

*United States v. Hankey,*
    203 F.3d 1160 (9th Cir. 2000) ................................................49, 51, 52

x

# TABLE OF AUTHORITIES—Continued

Page(s)

*United States v. Harmon,*
833 F.3d 1199 (9th Cir. 2016) ............................................................... 38

*United States v. Hazelwood,*
979 F.3d 398 (6th Cir. 2020) ........................................................... 51, 52

*United States v. Holmes,*
163 F.4th 547 (9th Cir. 2025) .................................................... 28, 30, 31

*United States v. Houston,*
648 F.3d 806 (9th Cir. 2011) ............................................................... 27

*United States v. Jeremiah,*
493 F.3d 1042 (9th Cir. 2007) ............................................................. 68

*United States v. Jimenez-Chaidez,*
96 F.4th 1257 (9th Cir. 2024) ............................................................. 43

*United States v. Johnson,*
956 F.3d 510 (8th Cir. 2020) ............................................................... 79

*United States v. Joyce,*
895 F.3d 673 (9th Cir. 2018) ............................................................... 53

*United States v. Justus,*
162 F.4th 962 (9th Cir. 2025) ............................................................. 52

*United States v. Kaplan,*
836 F.3d 1199 (9th Cir. 2016) ....................................................... 44, 47

*United States v. Killen,*
761 F.3d 945 (8th Cir. 2014) ............................................................... 73

xi

# TABLE OF AUTHORITIES—Continued

Page(s)

*United States v. Lague,*
  971 F.3d 1032 (9th Cir. 2020) ............................................................... 54

*United States v. Lemus,*
  847 F.3d 1016 (9th Cir. 2016) ............................................................... 57

*United States v. Livoti,*
  196 F.3d 322 (2d Cir. 1999) .................................................................. 50

*United States v. Lloyd,*
  807 F.3d 1128 (9th Cir. 2015) ............................................................... 46

*United States v. Lo,*
  839 F.3d 777 (9th Cir. 2016) ........................................................... 74, 77

*United States v. Mackby,*
  339 F.3d 1013 (9th Cir. 2003) ............................................................... 79

*United States v. Martin,*
  278 F.3d 988 (9th Cir. 2002) ................................................................. 59

*United States v. Monaghan,*
  741 F.2d 1434 (D.C. Cir. 1984) ............................................................. 67

*United States v. Nosal,*
  844 F.3d 1024 (9th Cir. 2016) ......................................................... 83, 86

*United States v. Olivas,*
  150 F.4th 1107 (9th Cir. 2025) .............................................................. 28

*United States v. Omidi,*
  125 F.4th 1283 (9th Cir. 2025) .......................................... 74, 75, 76, 77

xii

# TABLE OF AUTHORITIES—Continued

Page(s)

*United States v. Orm Hieng,*
  679 F.3d 1131 (9th Cir. 2012) .............................................................. 56

*United States v. Perez,*
  962 F.3d 420 (9th Cir. 2020) ............................................................... 45

*United States v. Phillips,*
  704 F.3d 754 (9th Cir. 2012) ............................................................... 75

*United States v. Pinillos-Prieto,*
  419 F.3d 61 (1st Cir. 2005) ................................................................. 45

*United States v. Pope,*
  686 F.3d 1078 (9th Cir. 2012) ............................................................. 85

*United States v. Price,*
  566 F.3d 900 (9th Cir. 2009) ............................................................... 33

*United States v. Rankin,*
  2023 WL 7403638 (D. Conn. Nov. 9, 2023) ......................................... 86

*United States v. Renzi,*
  769 F.3d 731 (9th Cir. 2014) ............................................................... 27

*United States v. Robertson,*
  895 F.3d 1206 (9th Cir. 2018) ............................................................. 51

*United States v. Rodriguez,*
  766 F.3d 970 (9th Cir. 2014) ............................................................... 26

*United States v. Ruiz,*
  167 F.4th 1024 (9th Cir. 2026) ...................................................... 49, 52

xiii

# TABLE OF AUTHORITIES—Continued

Page(s)

*United States v. Saini,*
23 F.4th 1155 (9th Cir. 2022) ...........................................................30

*United States v. Sanchez,*
176 F.3d 1214 (9th Cir. 1999)..............................................61, 62, 65

*United States v. Serang,*
156 F.3d 910 (9th Cir. 1998)..............................................................50

*United States v. Shen Zhen New World I, LLC,*
115 F.4th 1167 (9th Cir. 2024) ..........................................................57

*United States v. Shuemake,*
124 F.4th 1174 (9th Cir. 2024) ..........................................................57

*United States v. Simon,*
12 F.4th 1 (1st Cir. 2021)...................................................................47

*United States v. Simtob,*
901 F.2d 799 (9th Cir. 1990)..............................................................66

*United States v. Singh,*
783 F. App'x 765 (9th Cir. 2019) .......................................................80

*United States v. Sullivan,*
118 F.4th 170 (2d Cir. 2024)..............................................................86

*United States v. Swacker,*
628 F.2d 1250 (9th Cir. 1980)............................................................61

*United States v. Thomsen,*
830 F.3d 1049 (9th Cir. 2016)............................................................70

# TABLE OF AUTHORITIES—Continued

Page(s)

*United States v. VonWillie,*
  59 F.3d 922 (9th Cir. 1995)..................................................................45

*United States v. Wahchumwah,*
  710 F.3d 862 (9th Cir. 2013)........................................................47, 61

*United States v. Weatherspoon,*
  410 F.3d 1142 (9th Cir. 2005)..............................................................66

*United States v. Wilkes,*
  662 F.3d 524 (9th Cir. 2011)................................................................33

*United States v. Williams,*
  No. 25-12357, 2026 WL 891936 (11th Cir. Apr. 1, 2026) ...................54

*United States v. Yafa,*
  No. 23-4108, 2025 WL 1408412 (9th Cir. May 15, 2025) ...................70

*United States v. Zolp,*
  479 F.3d 715 (9th Cir. 2007)..................................................69, 70, 72

*Weeks v. Angelone,*
  528 U.S. 225 (2000)................................................................39, 47

*Williams v. Union Carbide Corp.,*
  790 F.2d 552 (6th Cir. 1986)................................................................58

**Statutes**

15 U.S.C. § 1 .......................................................................ii, 2, 3, 39

15 U.S.C. § 7a-1(a)........................................................................21, 22

15 U.S.C. § 15(a) ....................................................................................21

# TABLE OF AUTHORITIES—Continued

<u>Page(s)</u>

18 U.S.C. § 981 .................................................................................. 75

18 U.S.C. § 981(a)(1)(C) ........................................................ 74, 76, 77

18 U.S.C. § 981(a)(2)(A) ........................................................ 75, 76, 77

18 U.S.C. § 981(a)(2)(B) .................................................................. 78

18 U.S.C. § 1343 ............................................................................ ii, 3

18 U.S.C. § 3663 .............................................................................. 81

18 U.S.C. § 3663A ........................................................................... 81

18 U.S.C. § 3663A(a) ....................................................................... 33

18 U.S.C. § 3663A(a)(2) ................................................................... 85

18 U.S.C. § 3663A(b)(1) ...................................................... 82, 84, 85

18 U.S.C. § 3663A(b)(4) ........................................................... *passim*

18 U.S.C. § 3663A(c)(1) ................................................................... 33

18 U.S.C. § 3664(e) .......................................................................... 84

28 U.S.C. § 2461(c) ......................................................................... 76

**Rules**

Fed. R. Crim. P. 33 .......................................................................... 26

Fed. R. Evid. 103(a)(1) ..................................................................... 43

## TABLE OF AUTHORITIES—Continued

Page(s)

Fed. R. Evid. 103(e) ............................................................... 43

Fed. R. Evid. 403.......................................................... 47, 49, 54

Fed. R. Evid. 701.............................................................. 44, 45

Fed. R. Evid. 801(d)(2)(D) .................................................. 19, 57

U.S.S.G. § 2B1.1 .............................................................. 69, 72

U.S.S.G. § 2B1.1(a)(1)............................................................ 70

U.S.S.G. § 2B1.1(b)(1)............................................................ 69

U.S.S.G. § 2B1.1(b)(1)(K) ................................................... 70, 74

**Other Authorities**

Corporate Leniency Policy (Aug. 10, 1993) ............................................21

*Cost*, Black's Law Dictionary (12th ed. 2024) ........................................78

Frequently Asked Questions About the Antitrust
Division's Leniency Program and Model Leniency Letters
   (Jan. 26, 2017)........................................................... 22, 34

Ninth Circuit Model Criminal Jury Instr. 6.5 ..................................... 62

## STATEMENT OF JURISDICTION

The government agrees with Lopez's jurisdictional statement.

## ISSUES PRESENTED

I.    Whether the district court:

A.    plainly erred in denying Lopez's *Napue*-based new-trial motion or erred in denying Lopez's *Brady*-based new-trial motion?

B.    plainly erred in admitting an FBI witness's lay opinion testimony?

C.    abused its discretion in admitting Lopez's recorded, contemporaneous statement that nurses who change jobs for higher wages are "like hookers"?

D.    abused its discretion in admitting an excerpt from Lopez's privilege log and denying a related mistrial motion?

E.    plainly erred in failing sua sponte to intervene in the government's rebuttal closing argument?

1

II.  Whether the district court:

A.  clearly erred in using Lopez's $10.459 million gain to calculate his Guidelines offense level?

B.  erred, or violated the Excessive Fines Clause, in ordering forfeiture of the proceeds of Lopez's fraud?

C.  abused its discretion in ordering restitution of the criminal attorney's fees incurred by Lopez's fraud victim?

## STATUTORY PROVISIONS

Except for those in this brief's addendum, relevant statutes are in Lopez's addendum.

## INTRODUCTION

Conspiring to fix wages is per se illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1. *Anderson v. Shipowners' Ass'n of Pac. Coast*, 272 U.S. 359, 361-65 (1926). Price-fixing labor "extinguishes the free market in which individuals can otherwise obtain fair compensation for their work." *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69, (2021) (Kavanaugh, J., concurring).

A jury found Lopez guilty of conspiring to fix wages and five counts of wire fraud based on overwhelming evidence that he agreed

with competitors to suppress pay for home-healthcare nurses in Las Vegas and then, after the FBI launched a criminal antitrust investigation, sold his company and received $10.459 million without disclosing the investigation to the purchaser. The evidence included contemporaneous text messages, emails, and calls in which Lopez openly discussed the wage-fixing conspiracy; his detailed confession to the FBI; and his concededly false representations before the sale. Lopez now challenges his conviction and sentence, but his scattershot arguments—which do not contest the sufficiency of the evidence, and many of which he raises for the first time on appeal—are meritless.

## STATEMENT OF THE CASE

### I.     Procedural History

On March 15, 2023, a grand jury charged Lopez with conspiring to fix wages, in violation of 15 U.S.C. § 1. 10-SER-1984-1991. By superseding indictment filed on September 6, 2023, a grand jury charged Lopez with the Section 1 count and five counts of wire fraud, in violation of 18 U.S.C. § 1343. 10-SER-1966-1983. On April 14, 2025, a jury found Lopez guilty on all counts. 13-ER-2509. On November 21, 2025, the district court sentenced Lopez to 40 months' imprisonment

3

and a two-year term of supervised release, 1-ER-4-5, and ordered him to pay a $550,000 fine, pay $2,496,101 in restitution, 1-ER-8, and forfeit $10,459,817.50, 1-ER-10-11.

## II.    Factual Background

### A.    The Las Vegas Home-Healthcare Market

Home-healthcare agencies provide "one-to-one nursing in the patient's home," 7-ER-1239:19-20, for patients who need a "longer, more intense type of care," 8-SER-1572:6-7. Home-healthcare nurses are often the only caregivers in these patients' homes, working shifts of up to sixteen hours. 7-SER-1486:9-22; 3-SER-429:23-430:4, 3-SER-435:12-436:5; 9-ER-1655:3-16. The nurses may be responsible for their own transportation, 9-ER-1656:17-1657:8, 7-SER-1495:9-14, their own supplies, 9-ER-1657:9-15, 7-SER-1495:15-17, and the costs of becoming a registered nurse (RN) or licensed practical nurse (LPN) and maintaining their certification, 6-SER-1198:14-18; 3-SER-452:10-453:5. Given these expenses, "[a]ny amount" of additional compensation—even "a dollar or two an hour"— makes a difference. 9-ER-1659:13-17.

In 2016, three agencies controlled 90% of the Las Vegas home-healthcare market: Spring View, which Lopez managed; Maxim; and

NurseCore. 7-ER-1233:19-1234:6; 7-ER-1244:18-1245:2. Each agency's main source of revenue was billing nurses' time to insurers, particularly Nevada Medicaid. 7-ER-1233:1-1234:9, 6-SER-1168:5-12. And nurse wages were each agency's largest expense. 7-ER-1234:14-1235:7.

### B. For Three Years, Lopez Conspires to Fix Nurse Wages.

#### 1. "We all have a mutual agreement": The conspiracy begins.

In March 2016, Nevada Medicaid announced that it planned to increase its home-healthcare reimbursement rate for the first time in seven years. 8-ER-1515:7-12; 9-SER-1888:21-25; 12-SER-2413. The prospective rate increase presented a lucrative opportunity: if the agencies could keep nurse wages steady, they could increase profits—in Maxim's case, by roughly $500,000 a year. 7-ER-1243:7-21; 8-ER-1346:14.

Eight days after the rate-increase announcement, Lopez had lunch with Dan Lubinsky and Megan Testa, who, respectively, managed Maxim's and NurseCore's Las Vegas offices. 7-ER-1244:18-24, 7-ER-1269:20-1270:19; 10-SER-2004. Although competitors, the three had "built trust" with each other, 7-ER-1253:23, by emailing about business matters, 7-ER-1247:9-15; 9-SER-1863:8-18, including nurse wages, 10-

5

SER-2003; 7-ER-1255:4-13; and by periodically having lunch to "get on the same page" about industry issues, 7-ER-1253:23-24; *see* 7-ER-1238:5-1239:5, 9-SER-1863:19-20.

At the March 2016 lunch, Lopez, Lubinsky, and Testa agreed to "set nurse [wage] rates" by keeping their firms' Las Vegas rates "in line with one another," 7-ER-1270:2-1272:9.[1] After the lunch, Lopez immediately reported the agreement to Spring View's owner, Jennifer Basilio, texting her that he had "just had lunch with Megan and Dan" and that "[w]e all have a mutual agreement that[,] with the pay increase, all 3 companies will stay within the same hourly rate." 10-SER-1992; 7-ER-1287:12-18. Basilio responded, "That's great! It's good that we are all [o]n the same page in terms of rate so the nurses are not running around shopping for an agency. Thank you!" 10-SER-1992.

In August 2016, Testa emailed Lopez and Lubinsky that a NurseCore nurse had heard from another agency that "Medicaid rates are going up so [the nurses] should all be getting raises." 10-SER-2005; 7-ER-1303:22-24. Testa asked whether Lopez and Lubinsky had told

---

[1]     Testa testified for the defense. On cross, after being impeached with her grand jury testimony, she admitted "[i]t's possible" that she fixed wages with Lubinsky and Lopez. 9-SER-1954:7-10.

their nurses about the impending rate increase. 10-SER-2005; 7-ER-1303:25. Both Lopez and Lubinsky said they had not. 10-SER-2005, 10-SER-2014; 7-ER-1304:3-4.

### 2. "Sounds like a deal": Lopez and Lubinsky set specific wage ranges.

In September 2016, Lopez attended the hearing at which Nevada Medicaid adopted the previously proposed increase. 7-ER-1312:19-1313:5, 8-ER-1347:22-1348:15. After the hearing, Lopez texted Lubinsky the news. 10-SER-1994; 8-ER-1350:2-7. With the new reimbursement rates confirmed, Lopez and Lubinsky "now put[] set numbers" on the wage-fixing agreement. 8-ER-1351:20-25; 8-ER-1380:1-4; 8-ER-1407:8-25. Lopez wrote: "I think we will offer [$]30-35 for RN[.]" 10-SER-1994; 8-ER-1351:6-7. Lubinsky countered, "Ok. How about we offer [$]27-30?" Lopez replied, "Sounds like a deal." 10-SER-1994; 8-ER-1352:4-7. Lopez further proposed that, for LPNs, "[$]21-23. Is our max[.]" 10-SER-1994; 8-ER-1352:16-22. "Same as us," Lubinsky replied, 10-SER-1994; 8-ER-1353:4-5, indicating he agreed to that range, 8-ER-1353:4-8.

### 3. "[Y]ou know they will ask for more": Lopez supports the conspiracy from Reno.

In early 2017, Lopez resigned from Spring View and moved to Reno to establish a new home-healthcare agency. 9-ER-1583:17-1585:1. While in Reno, Lopez visited Las Vegas periodically and stayed in touch with Lubinsky. 9-ER-1612:19-25.[2] He also supported the continuing conspiracy. 8-ER-1379:15-21.

Specifically, in April 2018, Lubinsky texted Lopez that "Spring View [was] trying to out[]bid [Maxim] on a nurse" by offering the nurse $25 per hour. 10-SER-1995; 8-ER-1374:5-6. Lopez responded by referring Lubinsky to Spring View's new manager, Rob Wyley, and saying, "[t]hat's crazy! No profit at $25.00 and above. And you know they will ask for more." 10-SER-1995; 8-ER-1376:5-7. Lubinsky emailed Wyley, explaining that "Spring View, NurseCore, and Maxim always had a partnership" not to "outbid each other" for nurses and stating, "I don't want to get into this with our competition." 10-SER-2008; 8-ER-1377:7-11. Wyley replied: "I acknowledge and respect the relationships built in the city prior to my arrival as well as the awesome rates we

---

[2]      Testa left NurseCore in November 2016. 9-SER-1817:23-1818:5.

benefit from. I'm not looking to screw the market over by shooting up our pay rates. We are all in this together." 10-SER-2008; 8-ER-1380:24-1381:2. And Wyley's colleague assured Lopez that "we were only paying the nurse $1 more an hour. [The nurse] exaggerated." 10-SER-2002; 9-ER-1720:18-20.

### 4. "I'm staying with[in] our agreed rates": Lopez returns to Las Vegas and expands the conspiracy.

In August 2018, Lopez informed Lubinsky that he was returning to Las Vegas to open a new home-healthcare agency. 10-SER-1996; 8-ER-1386:17-18, 1387:8-9. Lubinsky reminded Lopez of their wage-fixing agreement, writing, "Good for you. We just have to play nice with rates." 10-SER-1996; 8-ER-1386:25-1387:1. Lopez assured him, "Yes. I'm staying with in [sic] our agreed rates." 10-SER-1996; 8-ER-1387:7-8.

Several months later, after Lopez's new agency, Community Home Healthcare ("CHH"), had opened, Lubinsky asked Lopez, "[H]ow much are you paying LPNs?" 10-SER-1997; 8-ER-1388:10-13. Lopez responded, "[$]20-23. Which I think is the same as everyone in town[.]" 10-SER-1997; 8-ER-1388:14-15. That range was consistent with the range the two had agreed to in September 2016. 8-ER-1389:12-16. Two

9

days later, Lubinsky emailed Maxim's Las Vegas team: "[Lopez] has given me his word that he is keeping his pay rates in line with all of our competitors." 10-SER-2010; 8-ER-1390:10-19.

In May 2019, Lubinsky discovered that Lopez was paying RNs up to $33 an hour—more than the agreed-on rates. 8-ER-1393:3-13; 10-SER-2012. "After our [Medicaid] rate increase, all of our market competitors agreed that $27-$30 would be the range we try and stay within," he emailed Maxim colleagues. 10-SER-2012-2013; *see* 8-ER-1392:23-24.

When Lubinsky texted Lopez, Lopez confirmed that "[$]30-35 is our pay for RN[s]," explaining that "we've been growing and needed [to] hire quickly." 10-SER-2000; 8-ER-1398:8-10. Lopez promised, "Now that we are stable with hiring crunch we will lower rates." 10-SER-2000; *see* 8-ER-1398:17-18. But Lubinsky considered the deal "off." 8-ER-1407:21-22. He informed his team that, "[t]o stay competitive[,] we will also increase our pay range from $27 to $30 to **$28 to $32.**" 10-SER-2006; 8-ER-1405:17-19.

10

### C. The Government Launches a Criminal Investigation.

Within months, Maxim's legal department discovered the wage-fixing agreement while reviewing company emails for a potential acquisition. 7-ER-1222:15-19. Maxim reported the conspiracy to the Antitrust Division, which began an investigation. 8-ER-1408:5-9; 9-ER-1689:5-14, 9-ER-1690:6-24; 13-ER-2429-34.

#### 1. Recorded communications corroborate the conspiracy.

Lubinsky sat for FBI interviews in which he described the wage-fixing conspiracy. 8-ER-1408:10-12; 9-ER-1692:9-13. He also recorded conversations with Lopez. 8-ER-1422:1-3; 9-ER-1692:11-13.

In July 2019, two days after his first FBI interview, Lubinsky asked Lopez in a text exchange, "Do you think NurseCore ... would be onboard keeping their pay rates in line with us like before?" 10-SER-2001; 8-ER-1424:19-20. Lopez responded, "Let's have [a] meeting with them. Now that they have new leadership so we can all be on the same page[.]" 10-SER-2001; *see* 8-ER-1424:22-24.

Lopez and Lubinsky spoke the following day. The two discussed the problem of nurses leaving their agencies for higher pay and taking patients with them. 11-SER-2293:9-2296:21. Lubinsky reminded Lopez,

11

"[Y]ou know, back in the day we kind of talked about keeping our rates in line." 11-SER-2300:22-2301:1. Lopez said, "Yeah." 11-SER-2301:2. Lubinsky then said, "I know there's new people in charge [at NurseCore] ... I don't know if you know those guys better if you want to coordinate something." 11-SER-2301:3-4, 7-8. Lopez responded, "Yeah. What I'll do is I'll [indiscernible] everybody next week and see if I can coordinate a lunch." 11-SER-2301:9-11.

In September 2019, Lopez; Lubinsky; Testa, who now worked for Lopez at CHH; Terry Ann Bruesehoff, of NurseCore; and Rhonda Jacobs, of Aveanna Healthcare (Spring View's successor-in-interest), met for lunch. 7-ER-1235:16-23; 8-ER-1443:9-1444:4. Lubinsky recorded the meeting. 8-ER-1446:5-1448:2. When Lubinsky commented that patients had left Maxim because the patients' nurses were being offered more money elsewhere, Lopez responded that, at CHH, "we don't offer a nurse more money and say, hey, come work for us for like two dollars more an hour." 11-SER-2350:18-20. Bruesehoff rejoined, "[t]hey're not going to stay," 11-SER-2351:2-3, and Lopez agreed, "They're not. Because they're going to leave. They're like hookers," 11-SER-2351:4-5. This comment drew several rounds of assent, including:

12

JACOBS: They're just looking for the best-paying job.

TESTA: Because they've probably already been to the other three companies anyways.

...

JACOBS: They jump around.

TESTA: They make their rounds.

11-SER-2351:6-17; *see* 12-ER-2209:19-23.

### 2. "[K]eep[ing] wages within the arena": Lopez admits the conspiracy to the FBI.

The next month, FBI agents conducted simultaneous knock-and-talk interviews with Lopez and others. 9-ER-1694:12-1695:6, 11-ER-1932:6-1933:1. Lopez told his interviewer, Supervisory Special Agent Anand Singh, that he and his competitors had set an "industry standard" to "keep nurse wage rates within one dollar of each other." 9-ER-1698:24-1699:2. And he admitted that he met with competitors "to keep wages within the arena," 9-ER-1699:3-9—*i.e.*, "to agree on what wage rate they would want to pay," 9-ER-1700:13-17.

During the interview, Lopez texted with Basilio, stating (*inter alia*): "FBI is at my house"; "They are investigating Maxium [sic] spring view and nursecore", "Community home health"; "I call you when they

13

leave.", "But they saw Dan and Rhonda and Megan this morning. About a Antitrust investigation from 2015", "-2016". 10-SER-1993; 9-ER-1701:21-23; 9-ER-1703:7-23.

While at Lopez's residence, and with his consent, agents imaged his phone. 9-ER-1705:1-1706:19. Although Lopez's consent obviated the need for the search warrants Singh had obtained for Lopez's person and residence, Singh gave Lopez the warrants before leaving to "convey to him the seriousness of the investigation." 9-ER-1707:21-1709:25. Singh also gave Lopez a grand jury subpoena directing CHH to preserve and provide documents for the period from January 2015 through the date of the knock-and-talk. 9-ER-1711:8-1713:23. Shortly after the agents left, Lopez called both Lubinsky and Testa. 8-ER-1452:20-1454:8; 9-ER-1717:9-1718:16; 11-ER-1939:11-25. Lopez called Lubinsky "to get us on the same page as far as a—our story." 8-ER-1454:22-25.

### 3. "Delete this once read": Lopez shows his awareness of the continuing investigation.

In April 2021, Google notified Lopez that it had received a search warrant for his Gmail account. 12-SER-2405; 9-ER-1722:20-24. After Lopez asked for a copy "to provide to legal coun[sel]," 12-SER-2405; 9-ER-1723:21-22, Google provided the warrant, which stated that it

14

pertained to an antitrust investigation, 12-SER-2400; 9-ER-1725:17-21. That day, Lopez sent the warrant to Morgan Lewis. 12-SER-2398; 9-ER-1737:9-1738:13. (In a September 2021 email to himself, Lopez listed Morgan Lewis as his "Antitrust Attorney." 11-SER-2278-2279; 10-ER-1778:17-1779:12.)

In September 2021, Lopez emailed Testa about *United States v. Hee*, a criminal case alleging wage-fixing among nurse employers. 10-SER-2016-2070; 3-SER-550:15-19. Lopez wrote, "If your lawyer hasn't shared this info, here it is. Apparently that HEE guy was interviewed the same day we were, in addition, there was live stream audio of the interviews that none of us [were] aware of[]. Delete this once read.[]" 10-SER-2016; 3-SER-550:15-19.

### D. Lopez Sells CHH to Solace Without Disclosing the Criminal Investigation.

In July 2021, three months after Lopez received the Gmail warrant, he learned of Solace's interest in acquiring CHH. 3-SER-497:6-18. In September 2021, two days after sending Testa the "[d]elete this once read" email, Lopez executed a letter of intent to sell CHH to Solace. 12-SER-2406-2412; 3-SER-499:14-500:14.

15

In the ensuing three-month due-diligence process, 3-SER-500:17-22, Lopez repeatedly failed to disclose the criminal antitrust investigation. Specifically, in September 2021, Lopez completed a questionnaire that asked whether CHH was involved in "any pending litigation, action, suit, proceeding, claim, arbitration, subpoena, civil investigative demand, investigation or any other request for documents or testimony by a court or government agency." 10-SER-2076; 3-SER-510:12-16. Lopez answered that there was a civil suit against CHH but did not mention the antitrust investigation. 10-SER-2076; 3-SER-511:3-15.

In October 2021, Lopez updated his responses but again omitted the antitrust investigation. 10-SER-2077-2082; 3-SER-513:15-515:9. And in December 2021, Lopez responded to a supplemental request asking about "each threatened or pending litigation, audit, investigation or arbitration, including with any governmental authority." 10-SER-2090; 3-SER-534:12-16. As before, Lopez answered that there was a civil suit but did not mention the antitrust investigation. 10-SER-2090; 3-SER-534:19-535:16.

16

Solace purchased CHH in December 2021. 11-SER-2095-2277; 3-SER-554:3-6. In the final purchase agreement, Lopez falsely certified that there were "no, and during the past three (3) years have been no, ... investigations pending or threatened ... against or affecting [CHH] or any of their respective directors, officers or employees," other than two civil lawsuits. 11-SER-2106-2107; 11-SER-2158; 3-SER-554:23-555:2, 3-SER-557:15-558:14. The purchase agreement identified this warranty as a "material inducement" to the purchase. 11-SER-2106.

Whether CHH was under federal criminal investigation was "critical" for Solace to know. 3-SER-512:9-21. If a criminal investigation leads to a healthcare company's losing its license, the company will be out of business. 4-SER-663:10-13, 4-SER-672:10-24. And because a purchaser inherits the acquired company's liabilities, Solace's acquisition of a company under criminal investigation could affect the licenses of Solace's other businesses. 4-SER-672:18-673:5. Given these risks, had Lopez told Solace "any version of the truth," "all activities as it relates to making the acquisition of CHH would have immediately come to a halt." 7-ER-1148:15-20. "[W]e would [have] walk[ed] away

17

from the deal, because that would have the potential to shut the entire business down." 4-SER-689:24-690:7.

## SUMMARY OF ARGUMENT

1.      The district court did not plainly err in denying Lopez's new-trial motion for alleged *Napue* error. As the district court found, Maxim's leniency agreement was its only agreement with the government. Thus, the agreement could not have been "false evidence" of its own meaning. And prosecutors' arguments are not evidence, so they could not have been "false evidence."

Nor did the district court err in denying Lopez's new-trial motion for alleged *Brady* error. The government's interpretation of the leniency agreement's restitution obligation was not favorable, because it would not have served to impeach Lubinsky; was not suppressed, because (*inter alia*) it was incorporated by reference into the agreement; and was not material, because any additional impeachment of Lubinsky would have been cumulative at best and, anyway, would not have created a reasonable probability of a different outcome on the wage-fixing count given the overwhelming evidence of Lopez's guilt.

18

2.      The district court did not plainly err in admitting, as lay opinion testimony, Agent Singh's two generic statements about how conspirators behave. And Lopez waived his challenge to the court's instruction striking Singh's two "breaking the law" statements by affirmatively accepting the instruction.

3.      The district court did not abuse its discretion in admitting Lopez's statement that nurses who change jobs for higher wages are "like hookers." The statement was highly probative of (*inter alia*) Lopez's motive for participating in the wage-fixing conspiracy, and there was little risk of unfair prejudice.

4.      The district court did not abuse its discretion in admitting an excerpt from Lopez's privilege log, which was nonhearsay under Rule 801(d)(2)(D). Nor did the court abuse its discretion in denying Lopez's mistrial motion, where the log was not attorney-client privileged and the government relied on it in closing only to show that Lopez was aware of the government's investigation when he sold CHH.

5.      Lopez shows no error, much less plain error, in the government's rebuttal argument. The government correctly argued that

19

the jury had a duty to convict *because* the government had proved guilt beyond a reasonable doubt.

6.     The district court did not clearly err in using Lopez's $10.459 million gain to calculate his offense level. Even if it had, its finding of actual loss of $10.459 million would have yielded the same offense level.

7.     The forfeiture order against Lopez was statutorily authorized, and not "grossly disproportional" under the Eighth Amendment, because it corresponded to the proceeds of his fraud.

8.     The district court did not abuse its discretion in ordering restitution to Solace, the victim of Lopez's fraud crimes, for the criminal attorney's fees it incurred because of the fraud.

## ARGUMENT

**I.     Lopez's Challenges To His Conviction Fail.**

> **A.     Lopez Shows Neither Plain Error Nor Error in the District Court's Denial of His New-Trial Motion Based on Alleged *Napue* and *Brady* Error.**

Without directly addressing the denial of his new-trial motion, Lopez argues (Br.35-40), for the first time on appeal, that the government violated *Napue v. Illinois*, 360 U.S. 264 (1959), by introducing "false evidence" of Maxim's leniency agreement—

20

specifically, the agreement itself. He also argues (Br.40-43) that the government violated *Brady v. Maryland*, 373 U.S. 83, 87 (1963), by disclosing the agreement in discovery but failing to disclose its "true" substance. He shows neither plain *Napue* error nor *Brady* error.

### 1.    Background

a.    Defendants in private antitrust suits normally are subject to treble damages and joint-and-several liability. 15 U.S.C. § 15(a); *Marion Diagnostic Ctr., LLC v. Becton Dickinson & Co.*, 29 F.4th 337, 347 (7th Cir. 2022). But under the Antitrust Criminal Penalty Enhancement and Reform Act of 2004 (ACPERA), 15 U.S.C. §§ 7a-7a-2, if a successful leniency applicant is sued for conduct covered by a leniency agreement and satisfactorily cooperates in the civil action, the applicant is liable only for actual damages attributable to its own commerce. 15 U.S.C. § 7a-1(a), (b).

In July 2021, the Division issued Maxim a conditional leniency letter describing the terms of the government's agreement not to prosecute Maxim and its employees ("leniency agreement"). 13-ER-2429-34. The agreement's first paragraph incorporated by reference the Division's Corporate Leniency Policy and directed Maxim to

"Frequently Asked Questions About the Antitrust Division's Leniency Program and Model Leniency Letters (Jan. 26, 2017), https//:www.justice.gov/atr/leniency-program" ("2017 FAQs") "[f]or a further explanation of ... how the Division interprets the policy." 13-ER-2429 n.1.

The agreement required Maxim to provide "truthful, full, continuing, and complete cooperation," including—as described in Paragraph 2(g)—"making all reasonable efforts, to the satisfaction of the Antitrust Division, to pay restitution to any person or entity injured as a result of the anticompetitive activity being reported, in which Applicant was a participant." 13-ER-2430-31. The 2017 FAQs, in turn, explained that under Paragraph 2(g), "the applicant must demonstrate ... that it has satisfied its obligation to pay restitution" and that "[r]estitution is normally resolved through civil actions with private plaintiffs," in which "ACPERA[] limits the liability" of qualifying leniency applicants. 2017 FAQs at 18.

The agreement extended to "covered [Maxim] employees" who "provide[d] truthful, full, continuing, and complete cooperation," including "testifying in trial ... fully, truthfully, and under oath, subject

22

to the penalties of perjury." 13-ER-2433 ¶4(f). The agreement did not require covered employees to pay restitution. *Id.*

b. The government produced the leniency agreement in discovery, Dkt.743 at 5, and moved it into evidence through Lubinsky, 7-ER-1223:17-1224:13. The government asked Lubinsky only about his own obligations under the agreement, eliciting that he would not be prosecuted if he provided complete, truthful cooperation and that he had no agreement with the government except the leniency agreement. 7-ER-1226:22-1230:24. The government did not ask him (or any other witness) about Maxim's restitution obligation.

The government mentioned restitution only twice. In its opening statement, the government previewed that Lubinsky had "received immunity" and explained that, under the leniency program, "a company and its employees won't be prosecuted if they tell the Government what they did before they get caught and they pay the victims for the losses they caused." 7-ER-1076:18-23. In closing argument, the government stated that, under "DOJ's leniency program," "whistleblower[s]" do not get "a totally free pass": "They have to cooperate for years[ and] pay

23

back the victims of their crime, but ... they don't get prosecuted." 12-ER-2219:25-2220:7.

For his part, Lopez elicited from Lubinsky that neither Lubinsky nor Maxim had paid restitution, yet Lubinsky had avoided criminal charges and Lubinsky and Maxim had avoided debarment. 9-ER-1551:17-20, 9-ER-1600:7-24. In closing, Lopez referenced Maxim's "obligation to pay restitution" and asked, "Where is the restitution? When is it going to come?" 12-ER-2233:17-2234:2.

c.    Lopez obtained new counsel for sentencing. In a July 2025 meet-and-confer, the government stated that it would be seeking restitution from Lopez for the nurse victims, other than those employed by Maxim. Dkt.743 at 8. Counsel responded that Maxim's leniency agreement "doesn't seem to limit restitution to Maxim's victims. ... Am I missing something?" 1-SER-14. The government explained that Maxim's restitution was "limited under ACPERA," directing counsel to the 2017 FAQs. 1-SER-13. Counsel responded, "Thanks[]. The ACPE[R]A reference is very helpful." *Id.*

In October 2025, shortly before sentencing, Lopez moved for a new trial, arguing that the government had violated (1) *Napue*, by allowing

24

Lubinsky to testify that he had no other agreement with the government; and (2) *Brady*, by suppressing its "actual deal" with Maxim. 5-ER-728-29, 5-ER-732. In opposing, government counsel filed a sworn declaration that the leniency agreement was "the only agreement between the government and Maxim"; "[t]here is no other agreement regarding Maxim's restitution obligations"; and "[t]he government's understanding of Maxim's restitution obligations was that the conditional leniency agreement required restitution consistent with [ACPERA]." 1-SER-11.

d.     At the hearing on the new-trial motion, government counsel noted that Lopez had "presented no evidence whatsoever that trial counsel was unaware of the lack of joint and several liability," and that: "Trial counsel was an experienced antitrust attorney, and this joint[-]and[-]several[-]liability elimination through ACPERA is a well-known Antitrust Division policy." 2-ER-143:17-24. When the district court asked whether Lopez had evidence of "some secondary deal," such as "an affidavit from ... prior counsel," defense counsel said, "[W]e cannot get that. He's not responding to us." 2-ER-159:21-160:9.

The district court denied the motion. As to *Napue*, the court found that "there was no side agreement," 2-ER-149:10-13, and so Lubinsky's testimony "was accurate," 2-ER-156:18-20. The court also rejected any "suggestion that somehow the jury was misled," 2-ER-156:20-22, reasoning that the leniency agreement was in evidence, which "itself demonstrates it was not suppressed," 2-ER-157:2-3, and that "the scope of the agreement was clear" given that "the references to ACPERA were included as part of the agreement itself," 2-ER-157:21-24.

As to *Brady*, the district court held that there was no suppression, additionally noting that the amount of Maxim's restitution obligation "had not been decided" when the witnesses testified. 2-ER-168:20-24. And the court held that, anyway, Lopez failed to show materiality given the "overwhelming evidence ... regarding his involvement in ... the Sherman Act violation." 2-ER-170:3-9.

### 2. Legal Principles and Standard of Review

a. Upon the defendant's motion, the district court may grant a new trial "if the interest of justice so requires." Fed. R. Crim. P. 33. This Court generally reviews de novo the denial of a new-trial motion alleging *Napue* or *Brady* error. *United States v. Rodriguez*, 766 F.3d

26

970, 980 (9th Cir. 2014) (*Napue*); *United States v. Bruce*, 984 F.3d 884, 890 (9th Cir. 2021) (*Brady*). But this Court reviews for plain error "claims [that] were not presented to the district court." *United States v. Houston*, 648 F.3d 806, 813 (9th Cir. 2011).

b. Under *Napue*, "[a] defendant's due process rights are violated when a conviction is obtained through the knowing use of false testimony." *United States v. Renzi*, 769 F.3d 731, 751 (9th Cir. 2014). To establish a *Napue* violation, a defendant must show that: (1) "the testimony was actually false," (2) "the government knew or should have known that it was false," and (3) "the testimony was material, meaning there is a reasonable likelihood that the false testimony could have affected the judgment of the jury." *Id.* (quotation marks omitted).

Lopez's *Napue* claim is new. In his new-trial motion, he argued that the government allowed Lubinsky to testify that he had no agreement with the government other than Maxim's leniency agreement when, in fact, he was covered by an alleged "side agreement[]" limiting Maxim's restitution. 5-ER-728-29. The district court having found that "there was no side agreement," 2-ER-149:10-13, Lopez now claims (Br.39) that the leniency agreement *itself*, and the

27

government's "representations as to its terms," were false. He thus challenges not only different evidence but also non-evidence, so his claim is subject to plain-error review. *See United States v. Holmes*, 163 F.4th 547, 573 (9th Cir. 2025) (so holding where defendant did not object to "the aspects of [the evidence] he now argues are false").

To demonstrate plain error, a defendant must meet the "heavy burden" of showing (1) unwaived error; (2) that is "plain"—*i.e.*, "clear or obvious," rather than "subject to reasonable dispute"; and (3) that "affects substantial rights," *United States v. Olivas*, 150 F.4th 1107, 1113 (9th Cir. 2025) (quotation marks omitted)—*i.e.*, that there is "a reasonable probability" that, but for the claimed error, "the result of the proceeding would have been different," *United States v. Dominguez Benitez*, 542 U.S. 74, 81 (2004) (quotations omitted). "If those three requirements are met," this Court has "discretion to grant relief, but only if [the defendant] can show that the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Olivas*, 150 F.4th at 1113 (quotation marks omitted). "Meeting all four prongs is difficult, as it should be." *Puckett v. United States*, 556 U.S. 129, 135 (2009) (quotation marks omitted).

28

c.    Under *Brady*, "suppression by the prosecution of evidence favorable to an accused," including impeachment evidence, "violates due process where the evidence is material either to guilt or to punishment." *United States v. Cloud*, 102 F.4th 968, 975 (9th Cir. 2024) (quoting *Brady*, 373 U.S. at 87, and citing *Giglio v. United States*, 405 U.S. 150, 154 (1972)). To succeed on a *Brady* claim, a defendant must establish that: "(1) the evidence is favorable to the accused, (2) the prosecution suppressed the evidence, and (3) the evidence is material." *Hampton v. Shinn*, 143 F.4th 1047, 1063 (9th Cir. 2025) (quotation marks omitted).

"The last element, materiality, is a formidable barrier to relief." *Hampton*, 143 F.4th at 1063–64 (quotation marks omitted). The evidence must "reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley*, 514 U.S. 419, 435 (1995). Under that standard, "even if undisclosed evidence entirely discredits a prosecution witness, the failure to turn over the evidence is not material if considerable other evidence links the defendant to the crime and the record provides strong support that the defendant would have been convicted anyway." *Klein v. Martin*, 607 U.S. 213, 222 (2026) (cleaned up).

29

This Court reviews a district court's factual findings—such as "the existence and content of undisclosed evidence"—for clear error and its legal conclusions de novo. *Cloud*, 102 F.4th at 975-76. "[W]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *United States v. Brown*, 563 F.3d 410, 414 (9th Cir. 2009) (quotation marks omitted).

### 3. Discussion

#### a. *Napue*

Lopez's *Napue* claim fails on its face because he "makes no attempt to show that he has satisfied the plain error factors." *United States v. Saini*, 23 F.4th 1155, 1167 (9th Cir. 2022). Anyway, he could not show that the government presented false evidence, much less that it presented "clearly or obviously false" evidence. *Holmes*, 163 F.4th at 574. Given the district court's unchallenged factual finding that "there was no side agreement," 2-ER-149:10-13, the leniency agreement could not have falsely represented Maxim's obligation—it *defined* that obligation. And as the district court instructed the jury, government counsels' statements, including about restitution, were "not evidence." 1-ER-75. *See Napue*, 360 U.S. at 269 (forbidding knowing presentation

30

of material, "false evidence"); *Hampton*, 143 F.4th at 1068 (predicate for *Napue* violation is false "testimony (or evidence)").[3]

Nor could Lopez show a reasonable probability of a different outcome, much less a miscarriage of justice. Although Lopez claims (Br.40-42) the ostensibly "undisclosed restitution deal" would have provided "critical impeachment ammunition as to Lubinsky," Lopez thoroughly impeached Lubinsky on this subject, including suggesting (incorrectly) that Maxim's cooperation had allowed both Maxim and Lubinsky to avoid paying any restitution (*infra* 36-38). And the government adduced "overwhelming" evidence of Lopez's participation in the wage-fixing conspiracy, 1-SER-5, independent of Lubinsky's testimony. That evidence included Lopez's contemporaneous texts and emails, his recorded statements acknowledging the conspiracy, and his detailed confession to the FBI. *Supra* 5-14. *Cf. Holmes*, 163 F.4th at 574-75 (holding that "'actually false'" testimony "did not seriously affect [defendant's] substantial rights," where "the jury heard similar

---

[3] Nor were the statements false. Far from asserting that Maxim had "an unlimited restitution obligation" (Br.37), the statements did not even mention Maxim, much less purport to describe the exact contours of its restitution obligation. 7-ER-1076:18-23; 12-ER-2219:25-2220:7.

testimony from at least two other witnesses" and "there was ample evidence … to convict"); *Johnson v. United States*, 520 U.S. 461, 470 (1997) (affirming conviction on fourth prong of plain-error test, where there was "overwhelming" evidence of guilt: "[I]t would be the reversal of a conviction such as this which would have th[e] effect" of "seriously affect[ing] the fairness, integrity or public reputation of judicial proceedings") (quotation marks omitted).

### b. *Brady*

Lopez's claim (Br.37) that the government suppressed the "true substance" of Maxim's leniency agreement—*i.e.*, the Division's *interpretation* of the agreement (Br.39-40)—likewise fails.

First, the Division's interpretation of the leniency agreement as requiring restitution only to Maxim's nurses was not favorable evidence. Lopez claims (Br.35, 38, 41-42) that, had he been aware of that interpretation, he could have impeached Lubinsky with the fact that, by cooperating, Maxim ostensibly "sav[ed] ... over $5.3 million"[4] in restitution payments for nurse wages. But Lopez's counterfactual is

---

[4]    This figure represents the amount the government sought from Lopez as restitution to non-Maxim nurses. Dkt.726 at 36.

incorrect. Had Maxim been prosecuted, it might not have owed *any* such restitution, even if convicted, because restitution is not mandatory for antitrust crimes. *See* 18 U.S.C. §§ 3663A(a), (c)(1). Indeed, the district court here declined to order Lopez to pay restitution to the nurses. 4-ER-695:6-696:1. The only certainty is that, by cooperating, Maxim *assumed* a restitution obligation. Lopez thus fails to show that the allegedly undisclosed information would have been impeaching. *See United States v. Wilkes*, 662 F.3d 524, 535 (9th Cir. 2011) (rejecting *Brady* claim where defendant "failed to establish" that information "would have served to impeach [witness's] credibility").

Second, the Division's interpretation of the leniency agreement was not suppressed. Lopez bore "the initial burden of producing some evidence to support an inference" of suppression. *United States v. Price*, 566 F.3d 900, 910 (9th Cir. 2009). And a predicate of suppression is that the information was "unknown to the defense." *Martinez v. Ryan*, 926 F.3d 1215, 1228 (9th Cir. 2019) (quotation marks omitted). Yet Lopez provided no evidence that *trial* counsel had been unaware of the scope of Maxim's restitution obligation, Dkt.722 at 10—even when the government represented that "[t]rial counsel was an experienced

33

antitrust attorney, and this joint[-]and[-]several[-]liability elimination through ACPERA is a well-known Antitrust Division policy," 2-ER-143:17-24, and even when the court noted the lack of "an affidavit from ... prior counsel," 2-ER-159:21-160:6. Lopez thus failed to raise an inference of suppression. *See Rhoades v. Henry*, 638 F.3d 1027, 1040 (9th Cir. 2011) (statement "was not suppressed," where, *inter alia*, defendant "failed to show it was unknown to counsel").

Anyway, the government disclosed the Division's interpretation of the leniency agreement. The government produced the agreement in discovery and moved it into evidence, Dkt.743 at 5, 2-ER-157:2-3; the agreement expressly stated that the 2017 FAQs contained "a further explanation" of "how the Division interprets" its leniency policy, 13-ER-2429 n.1; and the FAQs, in turn, stated that restitution "is normally resolved through civil actions with private plaintiffs," in which "ACPERA limits the liability" of qualifying leniency applicants, 2017 FAQs at 18. Based on these facts and the record before it, the district court found that the scope of the restitution obligation "was clear." 2-ER-157:21. Specifically, "the references to ACPERA were included as part of the agreement itself as set forth in footnote 1 of the agreement."

34

2-ER-157:21-23. Lopez does not acknowledge this factual finding (Br.23), let alone argue that it was clearly erroneous (Br.37-40). For this reason, too, his suppression claim fails. *See, e.g., Albrecht v. Horn*, 485 F.3d 103, 130 (3d Cir. 2007) (discerning no clear error in district court's finding that statement "must have been disclosed at the time of trial").[5]

And even if the scope of the restitution obligation had not been clear to trial counsel, Lopez still could not show suppression. As this Court has explained, "if the defendant is aware of the essential facts enabling him to take advantage of any exculpatory evidence, the government's failure to bring the evidence to the direct attention of the defense does not constitute suppression." *Cunningham v. Wong*, 704 F.3d 1143, 1154 (9th Cir. 2013) (cleaned up); *see Milke v. Ryan*, 711 F.3d 998, 1017-18 (9th Cir. 2013) (citing cases). Here, the FAQs were publicly available, and trial counsel could have explored their meaning at trial—had he been in doubt. As the district court noted, Lopez had the "opportunity to [ask] Lubinsky and the other Maxim witnesses"

---

[5]     Lopez argues (Br.39-40), inappositely, that "anyone" would have interpreted Maxim's restitution obligation the way he does. The question is how his *trial* counsel—an "experienced antitrust attorney" who presumably was aware of the Division's "well-known" policy, 2-ER-143:17-24—would have interpreted the obligation.

about Maxim's understanding of the restitution requirement, "[b]ut that wasn't taken advantage of for whatever reason." 2-ER-157:13-20. That failure does not implicate *Brady*. *See, e.g.*, *Jones v. York*, 34 F.4th 550, 559 (7th Cir. 2022) (defendant's claim that "the '*meaning* of [a] column' [in her cell phone records] was not provided to her" did not support a *Brady* claim; the records were presented at trial, and "it was the defense's responsibility to understand, interpret, and use the records").

Third, even if the Division's interpretation of the leniency agreement had been both favorable and suppressed, Lopez could not show materiality. Lopez argues (Br.38, 40-42) that he could have used the scope of Maxim's restitution obligation to impeach Lubinsky. But the jury was already "fully informed that Maxim was subject to a leniency agreement [ and] that [it was] receiving significant benefits." 2-ER-169:11-16. Defense counsel also cross-examined Lubinsky at length about the benefits of his cooperation. 9-ER-1597:10-1601:8. And the district court instructed the jury to view Lubinsky's testimony "with greater caution" because he had received "benefits and favored treatment from the government." 1-ER-80. As the court concluded (2-ER-169:13-19), additional impeachment on restitution would have been,

36

at best, cumulative. *See Catlin v. Broomfield*, 124 F.4th 702, 744 (9th Cir. 2024) ("[e]vidence of additional benefits [the witness] may have received" was "insufficient to establish materiality").

Indeed, the defense made hay of Maxim's leniency agreement, arguing that cooperating had thus far allowed Maxim to avoid *all* restitution and suggesting that Maxim had a resulting incentive to encourage its employees to cooperate. 9-ER-1551:17-20; 9-ER-1600:22-24; 12-ER-2233:15-2234:2. The impeachment argument Lopez now says (Br.38) he was prevented from making—that Maxim "stood to save over $5.3 million" compared with an all-victims obligation—would have been less forceful than the stood-to-save-*all*-restitution argument he made. And that lesser argument would have gone nowhere: Counsel admitted that, had Lubinsky been asked how much restitution Maxim owed, Lubinsky likely would have said, "I have no clue." 2-ER-151:8-9.[6]

---

6       Lopez incorrectly claims that the government "repeated[ly] invo[ked]" the leniency agreement to bolster Lubinsky's credibility (Br.42), telling "Lopez, the jury, and the court ... unambiguously that Maxim, Lubinsky's employer, had agreed to pay restitution to 'any person or entity injured as a result of the anticompetitive activity being reported'" (Br.37 (quoting Paragraph 2(g) of GX174, 13-ER-2431); Br.38). The government's only use of GX174 was to elicit from Lubinsky his own obligations under the agreement; that he would not be prosecuted if he provided complete, truthful cooperation; and that he

Anyway, whatever the value of an impeachment attack of this type, it would not have "put the whole case in such a different light as to undermine confidence in the verdict," *Kyles*, 514 U.S. at 435, given the "overwhelming" evidence of Lopez's participation in the wage-fixing conspiracy, 1-SER-5, *supra* 5-14. *See United States v. Harmon*, 833 F.3d 1199, 1205 (9th Cir. 2016) (no prejudice where witness "was impeached by other evidence" and evidence against defendant was "extremely strong").

d.     Even if there had been plain *Napue* error or *Brady* error, any such error would not undermine confidence in the fraud convictions. *United States v. Golb*, 69 F.3d 1417, 1430 (9th Cir. 1995). Nor, for any *Napue* error, would failing to grant a new trial on the fraud convictions result in a "miscarriage of justice." *Johnson*, 520 U.S. at 470 (quotation marks omitted).

Both Maxim's leniency agreement and Lubinsky's testimony pertained only to the antitrust count. 13-ER-2429 (agreement concerns

---

had no agreement with the government except the leniency agreement. 7-ER-1226:22-1230:24. The government did not ask Lubinsky, or any other witness, about Maxim's restitution obligation, much less draw the jury's attention to Paragraph 2(g).

"a criminal violation of Section 1"); 7-ER-1224:16-1225:16 (Lubinsky in court to describe wage-fixing conspiracy). The fraud counts, by contrast, were based on Lopez's representations to Solace that CHH was not under criminal investigation, 1-ER-61, representations whose falsity Lopez did not contest. There is no reasonable probability, then, that any further impeachment of Lubinsky would have affected the jury's verdict on the fraud counts—particularly given the court's instruction that the jury must decide each count separately, 1-ER-100, an instruction the jury must be presumed to have followed, *Weeks v. Angelone*, 528 U.S. 225, 234 (2000).

Lopez is wrong to assert (Br.43-44 & n.14) that "the government's presentation" linked the strength of the fraud counts to that of the antitrust count. The government's argument that the fraud and antitrust counts were "logically related" was a written argument *to the court* about the propriety of joinder, Dkt.180 at 5, not a suggestion to the jury that the counts rose and fell on the same evidence. Nor did Lubinsky "support[] the wire-fraud counts" (Br.43) by recounting his October 2019 call with Lopez; in closing, the government did not mention that testimony—or any Lubinsky testimony—in summing up

39

the wire-fraud evidence. 12-ER-2183-2202. Nor would the scope of

Maxim's restitution obligation have impeached Agent Singh (Br.43),

who, in describing the leniency policy and Maxim's and Lubinsky's

cooperation, made no mention of restitution. 9-ER-1690:3-1693:1.

**B.     The District Court Did Not Plainly Err in Admitting Agent Singh's Lay Opinion Testimony; Lopez Waived His Challenge to the Court's Curative Instruction.**

Lopez argues (Br.44-46) that the district court admitted

"undisclosed expert testimony" by Agent Singh. Lopez did not timely

object on this ground, and he shows no plain error. He also argues

(Br.46-49), for the first time on appeal, that the court's instruction

striking Agent Singh's "breaking the law" statements was inadequate.

Lopez waived this argument by affirmatively accepting the instruction.

**1.     Background**

a.     Agent Singh testified that he organized the FBI's "knock-

and-talk" interviews with Lopez and others to take place roughly

simultaneously on the day the investigation became overt because, "[a]s

is common in conspiracies, once one conspirator is notified of the

investigation, they tend to communicate with the others, and then they

all usually get together and create the same lie." 9-ER-1694:12-1695:22.

40

And after mentioning that Lopez and Basilio texted each other during Lopez's interview, 9-ER-1703:1-1704:1, 10-SER-1993, Singh agreed that the texting was an example of why the FBI conducts simultaneous interviews, adding: "Coconspirators often communicate with each other once an investigation is known." 9-ER-1704:2-6. Lopez objected to both statements on the ground that they opined on the ultimate issue of guilt. 9-ER-1695:23-25 ("to the witness's going into the purview of the jury as to a conspiracy"); 9-ER-1704:7-8 ("to the term 'coconspirators'"). The district court overruled the objections but reminded the jury that "you are the individuals who decide the question of fact here." 9-ER-1696:1-4, 9-ER-1704:9.

b.      Agent Singh also testified—once on direct and once on redirect—that he remembered Lopez's admissions in the interview, despite the passage of time, because they were a "brazen admission of breaking the law." 10-ER-1785:10-12; 10-ER-1856:23-24. Lopez did not object to either statement. *Id.*

The next day, Lopez moved in writing for a mistrial based on (*inter alia*) the two breaking-the-law statements. Dkt.609 at 12-13. The district court heard argument six days later and denied the motion,

41

finding no manifest prejudice. 9-SER-1835:3-5.[7] The court explained that, had Lopez timely objected, "I could have addressed the issue at that time." 9-SER-1834:23-1834:2. Counsel then orally moved to strike the two statements. 9-SER-1837:9-18. The court said it would be willing to do so—either with or without an instruction, at counsel's option. 9-SER-1838:3-7. At counsel's request, the court gave him "overnight" to think about it, specifying: "If you elect an instruction, please have a proposed instruction for me to take a look at." 9-SER-1838:20-1839:10.

The next morning, counsel proposed an instruction. 9-SER-1852:24-1853:12. The court responded with a proposed "amended" instruction. 11-ER-1966:5-7. Having reviewed the amended version, counsel asked that the court "expand" the instruction to address Agent Singh's statements about "conspirators"—statements counsel acknowledged were not "exactly the same as breaking the law" but which he believed "ha[ve] the same import" and so "should also be stricken." 11-ER-1966:8-1967:13. Counsel concluded: "*Other than that, I accept the Court's instruction.*" 11-ER-1967:14 (emphasis added).

---

[7]   Lopez does not challenge, and therefore has abandoned any challenge, to the district court's denial of the mistrial motion. *United States v. Bellot*, 113 F.4th 1151, 1157 (9th Cir. 2024).

The district court denied the request to expand the instruction to address the "conspirators" statements, 11-ER-1967:15-1969:6, but gave the instruction counsel had accepted on the breaking-the-law statements. Specifically, the court instructed the jury that: Agent Singh "made several statements that could be considered opining on the guilt of the defendant, which is inappropriate"; "[a]ccordingly, I now strike all portions of his testimony where he specifically stated, 'breaking the law'"; and the jury was "not [to] consider that statement for any purpose"—"It should be as if it was never said." 11-ER-1975:10-1976:4.

### 2. Standards of Review

For preserved claims, the admission of lay opinion testimony "will be overturned only if it constitutes a clear abuse of discretion." *United States v. Jimenez-Chaidez*, 96 F.4th 1257, 1267 (9th Cir. 2024) (quotation marks omitted). A party preserves a claim of error in a ruling to admit evidence "only if" the party "timely objects" and "states the specific ground." Fed. R. Evid. 103(a)(1). Because Lopez did not timely object to Agent Singh's "conspirators" testimony on the ground that it was impermissible expert testimony, his claim may be reviewed for plain error only. Fed. R. Evid. 103(e).

43

When a party, "in spite of being aware of the applicable law, propose[s] *or accept[s]* a flawed instruction," the party "waive[s] any challenge" to the instruction. *United States v. Kaplan*, 836 F.3d 1199, 1216-17 (9th Cir. 2016) (emphasis added). Forfeited rights "are reviewable for plain error," but "waived rights are not." *Id.*

### 3. Discussion

a. The district court did not abuse its discretion, much less obviously do so, in admitting as lay testimony Agent Singh's opinion about the behavior of conspirators once they learn of an investigation. Under Rule 701, lay witnesses may testify to opinions that are rationally based on their perceptions, "helpful to clearly understanding the witness's testimony or to determining a fact in issue," and not based on "scientific, technical, or other specialized knowledge." Fed. R. Evid. 701. Agent Singh's opinion readily met these requirements.

It was based on his experience conducting FBI investigations and his perceptions while interviewing Lopez, 9-ER-1684:21-23, 9-ER-1686:3-19, 9-ER-1701:21-23; it was helpful to understand his testimony that he organized the knock-and-talks to occur roughly simultaneously and without notice, 9-ER-1695:15-1696:9, and also helpful to the jury's

44

assessment of the significance of Lopez's texting Basilio during the interview, 9-ER-1703:4-1704:6; and it was "common enough and require[d] such a limited amount of expertise, if any," as to "be deemed lay witness opinion," rather than specialized knowledge. *United States v. VonWillie*, 59 F.3d 922, 929 (9th Cir. 1995) (holding permissible officer's lay testimony, "based on his perceptions during the search at [defendant]'s residence and his perceptions during prior drug investigations," that "it was common for drug traffickers to possess and use weapons in order to protect their drugs and to intimidate buyers"); *see United States v. Pinillos-Prieto*, 419 F.3d 61, 71-72 (1st Cir. 2005) (undercover agent's testimony, "offered principally to explain [the agent's] own actions," that "places which sell drugs are often protected by people with weapons" and "that the moment when the drugs and money are handed over is the most dangerous part of the work of an undercover agent" was admissible under Rule 701 because it "require[d] no special expertise").

Lopez's authorities are far afield. *United States v. Perez*, 962 F.3d 420, 436 (9th Cir. 2020), suggested that "isolated aspects" of an officer's testimony about a gang's "Mayan roots" "arguably" were expert

45

testimony. In *United States v. Lloyd*, 807 F.3d 1128 (9th Cir. 2015), the witness was *not*, as Lopez argues (Br.45), a law enforcement officer, and his testimony was improper because it went "well beyond his own personal experience," *Lloyd*, 807 F.3d at 1155.

Even if the district court had obviously abused its discretion, Lopez could not show prejudice, much less a miscarriage of justice. When he testified, Agent Singh had been an FBI special agent for 15 years, including five as a Supervisory Special Agent; had received extensive training, including six months at Quantico; was a certified FBI instructor in "advanced investigation" techniques; and had participated in over 60 investigations. 9-ER-1680:11-1684:23. As in *United States v. Figueroa-Lopez*, 125 F.3d 1241, 1247 (9th Cir. 1997), "[g]iven this background," he would have been qualified to deliver the disputed opinions as an expert, so any "failure formally to go through the usual process" would have been "clearly harmless."

b.      Lopez waived his challenge to the curative instruction striking Agent Singh's comments about "breaking the law." After considering overnight whether he wished to receive an instruction, proposing his own, and reviewing the court's "amended" version,

46

counsel explicitly "accept[ed]" the instruction—requesting only that the instruction be expanded to address *other* comments of Agent Singh's. 11-ER-1966:19-1967:14. By knowingly and affirmatively approving the court's action addressing the specific comments he now challenges, he waived any challenge as to those comments. *See Kaplan*, 836 F.3d at 1217 (finding claim "waived" and "declin[ing] to reach the issue," where counsel "affirmatively approved" instructions in question); *United States v. Simon*, 12 F.4th 1, 61 (1st Cir. 2021) (counsel's "approval of the [curative] instructions as given" "constituted a waiver").[8]

### C. The District Court Did Not Abuse Its Discretion in Admitting Lopez's "Hookers" Comment.

Lopez argues (Br.49-53) that the district court violated Rule 403 "as a matter of law" by admitting Lopez's recorded statement comparing nurses who switch jobs for higher pay to "hookers." He is wrong.

---

[8]    Even if plain-error review were available, Lopez has abandoned any such claim. *United States v. Wahchumwah*, 710 F.3d 862, 868 n.2 (9th Cir. 2013). Nor, anyway, could he show plain error because the jury must be presumed to have followed the court's instruction, *Weeks*, 528 U.S. at 234, and so would not have "fill[ed] in the gap" (Br.48) with the stricken words. Lopez likewise could not show an effect on the fraud counts because the comments related only to the wage-fixing charge.

47

### 1. Background

The government moved in limine to admit various post-conspiracy communications as "inextricably intertwined with the charged wage-fixing conspiracy." Dkt.495 at 19. One was Lopez's statement, recorded at the September 2019 lunch with Lubinsky, Testa, and others, that if nurses are offered more money, "they're going to leave. They're like hookers." 11-SER-2351:4-5; Dkt.495 at 20.

The government argued that the statement tended to show (*inter alia*) Lopez's "motive for entering the conspiracy"—specifically, to prevent nurses from moving between agencies for higher wages—and that the statement's probative value was not substantially outweighed by any risk of unfair prejudice. Dkt.495 at 20-21. Specifically, the statement was not more inflammatory than the charged conduct, and any potential emotional impact was not unfair: "Defendant chose to describe the victims of his wage-fixing conspiracy as 'hookers' when speaking to his coconspirators, and should not be able to exclude this valuable motive evidence because he elected to use a charged metaphor with a negative connotation to do so." *Id.* at 21.

The district court granted the motion, 6-ER-917:16-22, 13-ER-2491-92, and reaffirmed the ruling at trial, 7-ER-1209:9-17, 8-ER-1449:4-15, where the government played several minutes of the recording, including the "hookers" statement, 8-ER-1450:5-1451:13.

## 2. Legal Principles and Standard of Review

Under Rule 403, a court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of," *inter alia*, "unfair prejudice," Fed. R. Evid. 403—*i.e.*, "an undue tendency to suggest decision on an improper basis," *United States v. Ruiz*, 167 F.4th 1024, 1036 (9th Cir. 2026) (quotation marks omitted). Like the Federal Rules of Evidence as a whole, *United States v. Carranco*, 551 F.2d 1197, 1200 (10th Cir. 1977), Rule 403 "favors admissibility" of relevant evidence, excluding only "matter of scant or cumulative probative force, dragged in by the heels for the sake of its [unfairly] prejudicial effect," *United States v. Hankey*, 203 F.3d 1160, 1172 (9th Cir. 2000) (quotation marks omitted). Rule 403 determinations are reviewed for abuse of discretion. *Ruiz*, 167 F.4th at 1031.

Lopez argues (Br.49) for de novo review, asserting incorrectly that the district court failed to conduct Rule 403 balancing. In overruling a

49

renewed objection at trial, the court explained that the statement was relevant to "knowledge" and "intent" and not "so prejudicial as to warrant exclusion." 7-ER-1209:9-17; 1-ER-56 n.18 ("the probative value outweighed any prejudice").

### 3.    Discussion

The district court did not abuse its discretion in admitting the statement. The statement was highly probative of the conspiracy's existence and of Lopez's having knowingly joined it. The statement corroborated, in Lopez's own words, his "motive for participating," *United States v. Serang*, 156 F.3d 910, 915 (9th Cir. 1998), in the wage-fixing conspiracy. Lubinsky had testified that he, Lopez, and Testa sought to "prevent nurses from being able to go to another agency and receive higher wages at that agency," 7-ER-1271:9-10, and the statement demonstrated that Lopez believed nurses would readily change agencies for "like two dollars more an hour," 11-SER-2350:19-20.

Nor was the statement *unfairly* prejudicial. Lopez's derogatory statement about nurses was no "more inflammatory than the charged crime," *e.g., United States v. Livoti*, 196 F.3d 322, 326 (2d Cir. 1999)—

50

*i.e.*, a conspiracy to fix nurses' pay to "prevent" them from "receiv[ing] higher wages," 7-ER-1271:9-10. Indeed, Lopez's statement was similar to statements by Jacobs and Testa in the same conversation, neither of which Lopez challenges. And given the context—a lunch mere months after the conspiracy ended, arranged by two of the three main conspirators in the (ostensible) hopes of reviving the conspiracy—the statement had a close, logical connection to the charged events. *Compare Hankey*, 203 F.3d at 1172. The district court's determination, then, that the statement's probative value was not substantially outweighed by the risk of unfair prejudice was neither "illogical," nor "implausible," nor "without support in the record." *See United States v. Robertson*, 895 F.3d 1206, 1213 (9th Cir. 2018) (internal quotation omitted).

*United States v. Hazelwood*, 979 F.3d 398 (6th Cir. 2020), on which Lopez relies, does not assist him. The comments there were not even relevant to the charged crimes, because "[b]eing a racist and a chauvinist did not make it more probable that [the defendant] would commit wire fraud." *Id.* at 409. And, also unlike here, the risk of unfair prejudice from the "absurdly offensive remarks," including seven uses of

51

the n-word, *id.* at 413, was "extraordinary," *id.* at 412. Granted, Lopez's single statement did not reflect well on him, but it did not carry an "*undue* tendency" to suggest decision on an improper basis, *Ruiz*, 167 F.4th at 1036 (emphasis added). The statement was highly probative, and the government was entitled to make its case with evidence that "tells a colorful story with descriptive richness," *Old Chief v. United States*, 519 U.S. 172, 187 (1997), rather than facts "sanitized for the occasion," *Hankey*, 203 F.3d at 1172.

Lopez is wrong to suggest (Br.51) that the statement lacked probative value because it was "made long after the conspiracy ended." In fact, it was made four months after the conspiracy, at a lunch involving several of the conspirators—one of whom sought to revive the conspiracy. Nor was the statement cumulative of Lubinsky's testimony. Lopez's own words proved *his* motive to conspire in a way Lubinsky's testimony could not have. Thus, the statement was "not redundant," *see United States v. Justus*, 162 F.4th 962, 970 (9th Cir. 2025) (upholding admission of 73 of defendant's social media posts)—particularly given

52

the government's "heavy burden of proof," *United States v. Gallo*, 543 F.2d 361, 365 (D.C. Cir. 1976).[9]

Lopez's remaining assertions misrepresent the record. Contrary to his claim (Br.52) that the government "chose to play" the tape with his "hookers" statement on it, that tape was the only recording from the lunch admitted into evidence. Nor (Br.52) did the government rely on the statement to make a "propensity-based" argument. The government argued in closing that the statement showed: (1) Lopez agreed "the nurses would try to get a higher wage from another company if the companies didn't all agree to pay the same rate," 12-ER-2208:22-24, and (2) the conspirators (including Testa) "didn't think twice about the harm they caused the nurses," 12-ER-2209:24-25. The arguments, to which Lopez did not object, went to motive and state of mind. And (Br.31) the jury did not "specifically ask[] to review" the "hookers" statement. The jury note did not mention the "hookers" recording—it sought "help with

---

[9]    The district court excluded (Br.52) expert testimony on nurse mobility in the Las Vegas market, 1-ER-109, because evidence of a lack of adverse effects is irrelevant to the illegality of per se illegal conduct like wage fixing. *See United States v. Joyce*, 895 F.3d 673, 677 (9th Cir. 2018). But Lopez's desire to prevent nurses from seeking greater pay was plainly relevant to whether he conspired to fix their wages.

accessing the audiovisual recordings," *plural*. 12-ER-2305:8-9. The term "audiovisual," of course, encompasses audio-only recordings, *see United States v. Williams*, No. 25-12357, 2026 WL 891936, at *2 (11th Cir. Apr. 1, 2026)—like Lopez's inculpatory calls to Lubinsky, 11-SER-2280-2329, 12-SER-2378-2397.

Finally, even if Rule 403 error *had* occurred, it would be "harmless based on the overwhelming evidence of guilt." *United States v. Lague*, 971 F.3d 1032, 1041 (9th Cir. 2020). The government proved Lopez's participation in the wage-fixing conspiracy through substantial evidence apart from the lunch recording. *Supra* 5-14.

**D.** **The District Court Did Not Abuse Its Discretion by Admitting an Excerpt from Lopez's Privilege Log, or by Denying a Related Mistrial Motion.**

Lopez argues (Br.53-54) that the admission of an excerpt from a privilege log he produced to the government violated the hearsay rule. He also argues (Br.54-56) that the district court should have granted a mistrial based on the government's use of the log. He is wrong.

**1.** **Background**

During direct examination of Agent Singh, the district court admitted over objection an excerpt of a privilege log ("log") (12-SER-

2398) Lopez's lead trial counsel, Mark Krotoski, had provided the government. 9-ER-1527, 9-ER-1725:22-1734:17, 9-ER-1736:13-1737:7. The government elicited from Agent Singh that the log had come from Lopez's "agent" and that it showed that, on April 9, 2021, Lopez sent an email to "someone with the suffix of an email address at Morgan Lewis,"[10] attaching a "search warrant" from the "U.S. District Court, Northern District of California." 9-ER-1736:16-22, 9-ER-1737:9-1738:7. The government also elicited that: April 9, 2021, was the same day Lopez received the search warrant for his Gmail account; the warrant was issued by the Northern District of California; and Google was based in that district. 9-ER-1725:4-21, 9-ER-1737:15-17, 9-ER-1738:8-13.

In closing argument, the government cited the log as the "third" of four indications that Lopez "knew about the Government's ongoing criminal investigation" when he sold CHH. 12-ER-2184:5-7, 12-ER-2185:21-23, 12-ER-2187:2-5. Specifically, the government noted that (1) according to the log, on April 9, 2021—the same day Lopez received

---

[10]    At the court's direction, the government had redacted Mr. Krotoski's name from the listed recipient's email address. 12-SER-2398; 9-ER-1726:24-1727:7. By the time of trial, Mr. Krotoski was employed by a different firm. 9-ER-1527, 9-ER-1733:19-1734:4.

the search warrant—"[a]n e-mail from the defendant goes to someone at Morgan Lewis and it attaches a search warrant," 12-ER-2185:23-2186:15; and (2) the note Lopez wrote himself in September 2021 showed that Morgan Lewis was "his antitrust lawyer," 12-ER-2186:16-17, 12-ER-2192:12-19. The government emphasized: "[I]t is a bedrock principle of our legal system that you have every right to consult an attorney and that you absolutely cannot infer that someone is guilty merely because they decided to consult with counsel." 12-ER-2186:18-21. Instead, the government explained, "All I want you to do is recognize that this evidence shows Eddie Lopez was very aware of the Government's ongoing criminal investigation at this time." 12-ER-2186:21-2187:1.

Lopez later moved for both a mistrial and a new trial, challenging (*inter alia*) the government's use of the log in closing. Dkt.654 at 10-14, Dkt.666 at 19-20. This district court denied those motions. 1-ER-53-54, 1-ER-62-63.

### 2. Standard of Review

This Court reviews evidentiary rulings for abuse of discretion, *United States v. Orm Hieng*, 679 F.3d 1131, 1135, 1141 (9th Cir. 2012),

and "may affirm an evidentiary ruling on any basis supported by the record, even if it differs from the district court's reasoning," *United States v. Shen Zhen New World I, LLC*, 115 F.4th 1167, 1185–86 (9th Cir. 2024); *United States v. Shuemake*, 124 F.4th 1174, 1179 (9th Cir. 2024) (grand-jury testimony admitted as recorded recollection; admission affirmed under Rule 801(d)(1)(A)). This Court reviews the denial of a mistrial motion for abuse of discretion. *United States v. Lemus*, 847 F.3d 1016, 1024 (9th Cir. 2016).

### 3.    Discussion

a.    The district court correctly admitted the log as nonhearsay.[11] Rule 801(d)(2) defines as "not hearsay" a statement, such as a written assertion, that is offered against an opposing party and, as relevant here, "was made by the party's agent … on a matter within the scope of that relationship and while it existed." Fed. R. Evid. 801(d)(2)(D). As the government argued below, 9-ER-1726:24-1727:12, the log met this definition. It was a written assertion (12-SER-2398) offered against Lopez, 9-ER-1736:23-1737:7, that was made by his "agent," 9-ER-

---

[11]    The court viewed the log as not being offered for its truth. 1-SER-7 & n.2.

1736:16-22—lead trial counsel Krotoski, 9-ER-1527—in representing

Lopez in this case, 9-ER-1726:24-1727:1, Dkt.521 at 32, 13-ER-2323, 13-

ER-2420.[12] It thus was an admission by a party opponent and properly

admitted as nonhearsay. *See Totten v. Merkle*, 137 F.3d 1172, 1176 (9th

Cir. 1998) ("a statement made by an attorney is generally admissible

against the client") (citing *Williams v. Union Carbide Corp.*, 790 F.2d

552, 556 (6th Cir. 1986)); *Williams*, 790 F.2d at 556 (holding that

statements in lawsuit, although made by plaintiff's attorney, were

admissible against plaintiff as "admissions").[13]

    b.    Nor did the district court abuse its discretion in denying

Lopez's mistrial motion, which rested on the false premises that: (1) the

log was attorney-client privileged; and (2) the government's use of the

log in closing (as he puts it here) "invit[ed] the jury to infer what Lopez

---

[12]    Krotoski provided the full log (13-ER-2415-2428) and another log (13-ER-2326-2414) to the government in an August 26, 2024, letter (13-ER-2323). A "Government Exhibit 204" sticker appears on the face of the letter, but the admitted exhibit (12-SER-2398) was only a redacted excerpt from a page of the full log (13-ER-2420).

[13]    *Biggs v. Chi. Bd. of Educ.*, 2022 WL 1591577 (N.D. Ill. May 19, 2022), on which Lopez relies, did not address whether a privilege log can be a party admission.

discussed with his lawyer" (Br.54) or his "motive for seeking representation" (Br.55).

First, neither the log nor the underlying information was attorney-client privileged. The privilege applies only to "confidential communications between attorneys and clients," made for the purpose of giving legal advice. *In re Grand Jury*, 23 F.4th 1088, 1091 (9th Cir. 2021). The log was a statement by Krotoski to the government, not a confidential communication between lawyer and client. *See United States v. Martin*, 278 F.3d 988, 1000 (9th Cir. 2002). The underlying information—*i.e.*, that, on April 9, 2021, Lopez emailed someone at Morgan Lewis, attaching a search warrant—likewise was not privileged because, "while the contents of attorney-client communication are ordinarily privileged, the bare fact that communication occurred is not." *Heckler & Koch, Inc. v. German Sport Guns GmbH*, 2014 WL 12756372, at *6 (S.D. Ind. 2014). And, anyway, Lopez waived any conceivable privilege in the underlying information when, acting through Krotoski, he "voluntarily furnished [the information] to the Government." *United States v. Grammer*, 513 F.2d 673, 676 (9th Cir. 1975); *see* Dkt.521 at 32 (acknowledging that log was "produced by Mr. Lopez in this case"); *cf.*

59

*Cage v. Harper*, No. 17-CV-7621, 2021 WL 3022316, at \*2 (N.D. Ill. July 16, 2021) (observing that "privilege logs can be admissible evidence"; "For example, an entry on a privilege log could be a statement by a party-opponent … that a privileged communication took place on a certain day. Sometimes the existence of an attorney-client communication, in and of itself, can have a bearing on the issues at trial."), *aff'd*, 42 F.4th 734 (7th Cir. 2022).

Second, far from inviting the jury to speculate about "what Lopez must have said to his lawyers" (Br.56), the government argued in closing only that Lopez had forwarded the search warrant to his antitrust attorney the same day in 2021 he received it from Google and that "this evidence shows Eddie Lopez was very aware of the Government's ongoing criminal investigation at this time." 12-ER-2186:23-2187:1. And in the same breath, the government emphasized that the jury could draw no inference of guilt from Lopez's decision to consult with counsel. 12-ER-2186:18-21. These comments in no way infringed Lopez's right to counsel, which is implicated only when the government "deliberately intrude[s] into [a defendant's] privileged relationship with his attorney," such as by "actively infiltrat[ing] the

60

defense" or "intercepting confidential communications." *Clutchette v. Rushen,* 770 F.2d 1469, 1472 (9th Cir. 1985). Nor did they lead to "self-incrimination obtained by a genuine compulsion of testimony," *United States v. Swacker*, 628 F.2d 1250, 1252 (9th Cir. 1980), given (*inter alia*) that Lopez did not testify.

## E. Lopez Shows No Plain Error in the Government's Rebuttal Argument.

Lopez challenges (Br.57-60) three lines of the government's rebuttal argument to which his three experienced trial attorneys failed to object. But he shows no error, much less prejudicial error, and he fails to address the second and fourth prongs of the plain-error test—a failure that itself forecloses his claim. *See Wahchumwah*, 710 F.3d at 868 n.2.

### 1. Lopez Shows No Error, Much Less Obvious Error.

As this Court has recognized, "[t]here is perhaps a fine line between a proper and improper 'do your duty' argument." *United States v. Sanchez*, 176 F.3d 1214, 1225 (9th Cir. 1999). "[I]t is proper to tell the jury that it is its duty to convict if it concludes that the defendant is guilty beyond a reasonable doubt." *United States v. Gomez*, 725 F.3d

61

1121, 1131 (9th Cir. 2013); *see also* Ninth Circuit Model Criminal Jury Instr. 6.5 ("[I]f after a careful and impartial consideration of all the evidence, you are convinced beyond a reasonable doubt that the defendant is guilty, it is your duty to find the defendant guilty."). It is improper to tell the jury, "*without qualification*, that it [is] the jury's duty to convict." *Gomez*, 725 F.3d at 1131 (emphasis added).

In *Gomez*, the prosecutor ended his closing by arguing, without objection: "'[T]he United States has the burden of proof beyond a reasonable doubt. Is the evidence that was presented in this case proof beyond a reasonable doubt? Absolutely. And now it's your duty to say the defendant is guilty of importing methamphetamine.'" 725 F.3d at 1131. This Court held the argument "clearly proper," reasoning that, "[r]ead in context, the prosecutor was arguing that, *if* the jury finds that the prosecution has met its burden of proving the elements beyond a reasonable doubt, *then* it is the jury's duty to convict." *Id.* By contrast, in *Sanchez*, the prosecutor capped a closing riddled with other errors—denigrating the defense as a "'sham'" and repeatedly vouching for witnesses—by arguing, over objection: "And I would ask your consideration, as every jury has done, and that is that after the

62

marshal's service has done their duty and the court has done its duty and lawyers on both sides have done their duty, that you as jurors do your duty and well consider this matter and find these defendants guilty." 176 F.3d at 1224-25. Because the prosecutor had not mentioned the need to prove every element of the crime beyond a reasonable doubt, this argument improperly implied that the jury's duty was simply "to find the defendants guilty." *Id.*

The government's argument here was permissible under *Gomez*—and thus *a fortiori* was not an error "clear on its face under current law." *United States v. Campos*, 217 F.3d 707, 712 (9th Cir. 2000). The government began its summation by saying that it would be "present[ing] ... the key evidence that proves the defendant guilty beyond a reasonable doubt," 12-ER-2181:25-2182:2, and the government continued that theme throughout. The government repeatedly tied the evidence to the elements of the crimes, e.g., 12-ER-2199:18-2200:13, 12-ER-2210:6-11, 12-ER-2280:10-24, and acknowledged—*eight* times—that it bore the burden of proof beyond a reasonable doubt, 12-ER-2181:25-2182:2, 12-ER-2183:3-5, 12-ER-2188:3-4, 12-ER-2194:22-25, 12-ER-2199:19-21, 12-ER-2202:7-9, 12-ER-2219:15-17, 12-ER-2227:20-22.

63

On rebuttal, the government responded to defense arguments by walking the jury through eight exhibits, 12-ER-2277:17-2278:9 (GX5), 12-ER-2278:16-22 (GX184), 12-ER-2278:23-24 (GX185), 12-ER-2285:24-25 (GX193), 12-ER-2289:2-10 (GX7), 12-ER-2289:11-2290:3 (GX73), 12-ER-2290:4-11 (GX19), 12-ER-2290:12-2291:1 (GX17), and then stated:

> Last thing, and then I'm going to sit down. All these exhibits—I'm not going to show them. The only way— the only way you can come back not guilty on everything is if you really don't consider any of this. ...
>
> If you look at any single document, if you listen to any of his tapes, he's guilty. We proved our case. I have a job. Judge has a job. You have a job. With all due respect, you took an oath, do your job. He's guilty on every single count.

12-ER-2293:4-16. None of Lopez's three experienced trial attorneys objected. 12-ER-2293:17-2294:13; Dkt.791 at 14.

The government's argument was proper. As in *Gomez*, read in context, the "do your job" comment argued that the jury had a duty to find guilt *because* the government had "proved [its] case" through the cited evidence. 12-ER-2293:4-15. And the jury knew—the government had said so eight times—that, to prove its case, the government had to prove the elements of the crimes beyond a reasonable doubt. Thus, the argument had precisely the logical structure of that approved in *Gomez*:

64

The government bears the burden of proof beyond a reasonable doubt; the government's evidence meets that burden; now, therefore, it is your duty to find guilt. 725 F.3d at 1131. And the import of the argument would have been especially clear given the government's earlier arguments to the same effect. *See, e.g.*, 12-ER-2199:19-21 ("To find the defendant guilty of wire fraud, you have to find that the Government proved the following things to you beyond a reasonable doubt."); 12-ER-2227:20-22 ("The Government has proven beyond a reasonable doubt that the defendant is guilty of wage fixing and wire fraud, and we ask you to return a verdict of guilty on all counts."). In short, as the district court concluded, the argument was proper under *Gomez* because it "was qualified with the argument that the government had met its burden of proof." 1-ER-59.

Lopez's arguments to the contrary are unavailing. He argues that it is improper for a prosecutor to refer to the jobs of "others involved in the proceeding," Br.58, but *Gomez* said no such thing—it simply noted the lack of such a reference as one reason among several that *Sanchez* was distinguishable. *Gomez*, 725 F.3d at 1132. Here, the reference to the jobs of others did not suggest an improper inference because the

65

government made clear that the jury's job arose only if the government met its burden. Lopez's suggestion (Br.58) that the government needed to mention its burden of proof immediately before its do-your-job argument is both wrong—*Gomez* did not so hold—and academic because the prosecutor's statement that "[w]e proved our case," 12-ER-2293:13, *was* a reference to the burden, as the district court found, 1-ER-59. In sum, Lopez shows no error, much less clear or obvious error.

### 2. Lopez Shows No Prejudice, Much Less a Serious Effect on the Fairness, Integrity, or Public Reputation of the Proceedings.

Even if there *had* been clear or obvious error, Lopez could not show prejudice or a need for this Court to exercise its discretion to notice such error. "When prosecutorial conduct is called in question, the issue is whether, considered in the context of the entire trial, that conduct appears likely to have affected the jury's discharge of its duty to judge the evidence fairly." *United States v. Simtob*, 901 F.2d 799, 806 (9th Cir. 1990). Key to that determination is the strength of the government's case. *See United States v. Weatherspoon*, 410 F.3d 1142, 1151 (9th Cir. 2005) ("When the case is particularly strong, the likelihood that prosecutorial

misconduct will affect the defendant's substantial rights is lessened because the jury's deliberations are less apt to be influenced.").

Here, as the district court found, the government adduced "overwhelming" evidence of Lopez's guilt. 1-SER-5. That evidence included his own text messages, emails, statements on recorded calls, and bank records, as well as supporting witness testimony. *Supra* 5-18. And contrary to his suggestion (Br.59), the case did not depend heavily on witness credibility given the contemporaneous documentary corroboration of both the wage-fixing conspiracy (*see, e.g.,* 10-SER-1992, 10-SER-1994, 10-SER-1996) and his many false representations to Solace about the pending antitrust investigation (10-SER-2071-2076, 10-SER-2077-2082, 10-SER-2083-2093, 11-SER-2095-2277). Indeed, Lopez has not challenged the sufficiency of the evidence, which confirms the lack of prejudice. *See United States v. Monaghan*, 741 F.2d 1434, 1443 (D.C. Cir. 1984) (improper prosecutorial comments confined to closing remarks caused "insubstantial or nonexistent" prejudice, given that "appellant raises no plea of insufficient evidence"). Considering the strength of the government's case and the context of the entire, weeks-long trial, Lopez cannot show that, absent the brief remark, "the

67

outcome of the proceeding would have been different." *Greer v. United States*, 593 U.S. 503, 508-09 (2021) (quotation marks omitted).

Lopez does not even argue that affirming his convictions would seriously affect the fairness, integrity, or public reputation of the proceedings. Nor could he. When the government adduced overwhelming evidence of guilt, and when his three experienced trial attorneys—who had objected to other parts of the closing—saw nothing objectionable in the brief rebuttal comment, "it would be the reversal of [Lopez's] conviction[s] ... which would have that effect." *Johnson*, 520 U.S. at 470; *see also Henderson v. United States*, 568 U.S. 266, 278-79 (2013) ("[T]hat a defendant did not object ... may well count against the grant of Rule 52(b) relief.").[14]

## II.    Lopez's Challenges To His Sentence Lack Merit.

### A.    Lopez Shows No Clear Error in the Loss Calculation.

Lopez argues (Br.60-64) that the district court erred in using the gain from his wire fraud to calculate his offense level. He is wrong.

---

[14]    Lopez summarily argues (Br.34, 60) that this Court should reverse for the "cumulative effect" of a supposed pattern of government "misconduct." But he has shown no unwaived error, preserved or plain, so there is nothing to cumulate. *United States v. Jeremiah*, 493 F.3d 1042, 1047 (9th Cir. 2007).

### 1. Background

Section 2B1.1 of the Sentencing Guidelines governed Lopez's offense level for his grouped wire-fraud convictions, as well as for his combined offense level. 3-ER-584:1-7; 3-ER-585:21-586:25. Under 2B1.1, the offense level depends on the "loss" from the crime, defined as "the greater of actual loss or intended loss." U.S.S.G. § 2B1.1(b)(1) n.(A). Alternatively, the court must use the "gain that resulted from the offense" "if there is a loss but it reasonably cannot be determined." *Id.* § 2B1.1(b)(1) n.(B); *see United States v. Zolp*, 479 F.3d 715, 719 (9th Cir. 2007) ("If the court is unable to determine either actual or intended loss with sufficient certainty, it may rely on ... gain.").

Finding that "the full amount," 1-ER-26, of "actual or intended loss" was "immeasurable," the district court used Lopez's gain—the $10.459 million he received from Solace—as the measure of loss, 1-ER-27-28. As the court explained, at the time Lopez fraudulently obtained Solace's $10.459 million payment, the undisclosed criminal investigation not only made CHH worthless to Solace but also threatened "Solace and its sister companies [with] losing required licensing," which would have caused further collateral harm, 1-ER-25,

69

1-ER-27; *see* 3-ER-581:6-582:8. The loss determination increased

Lopez's offense level from 7 to 27. *See* U.S.S.G. §§ 2B1.1(a)(1), (b)(1)(K).

### 2.     Standard of Review

This Court reviews "the district court's interpretation of the

sentencing guidelines de novo, its application of the guidelines to the

facts ... for abuse of discretion, and its factual findings for clear error."

*Zolp*, 479 F.3d at 718. Factual findings include "the determination of

the loss amount," *United States v. Thomsen*, 830 F.3d 1049, 1071 (9th

Cir. 2016), and whether "loss could not reasonably be determined,"

*United States v. Yafa*, No. 23-4108, 2025 WL 1408412, at *2 (9th Cir.

May 15, 2025).

### 3.     Discussion

Lopez argues (Br.60-63) that the district court erred in using his

(admitted) gain as a proxy for loss because the court allegedly (1) either

made no threshold finding, or erred in its threshold finding, that there

was an actual or intended loss; and (2) showed itself capable of

"ascertain[ing] the loss." The record refutes these arguments.

First, the district court made findings of both actual and intended

loss. After recognizing that "loss" means "'the greater of actual loss or

intended loss,'" that "actual loss" means reasonably foreseeable pecuniary harm that "'*resulted*'" from the offense, and that "intended loss" means pecuniary harm the defendant "*purposely sought* to inflict," 1-ER-23 (emphases added), the court found that Lopez had "[d]efraud[ed] [Solace] of millions of dollars," causing "'actual loss'" of $10.459 million—*i.e.*, the amount Solace wired Lopez on December 23, 2021, 1-ER-25, 1-ER-27 (quoting *United States v. Crandall*, 525 F.3d 907, 915 n.8 (9th Cir. 2008)), for a "worthless" company, 3-ER-581:6-11, 25. The court then found that the "potential collateral consequences of Lopez's fraud were also significant," 1-ER-25, but that because those consequences "never came to fruition" once the government declined to prosecute Solace, the "full amount" of "the actual or intended loss is immeasurable," 1-ER-26-27, 3-ER-581:25-582:8. Implicit is that the potential collateral consequences were "intended loss" within the meaning of the purposely-sought-to-inflict standard the court had just recited.

Nor were these findings faulty. The district court did not err, much less abuse its discretion, by assessing actual loss at the time of the fraud rather than at the time of sentencing. As the court observed,

71

Section 2B1.1 is silent as to the appropriate valuation date, but in *Crandall*, this Court instructed that, where the fraud involved the sale of apartment buildings that had been fraudulently converted to individual condominiums, "the actual loss to the victims at the time of the fraud, as opposed to the time of trial or sentencing, best captures Defendants' culpability." 525 F.3d at 910, 914 n.8. As this Court explained, "[t]he volatile nature of the real estate market is wholly independent of Defendants' actions and, for sentencing purposes, they should not benefit from the ultimate conversion of the units into condominiums." *Id.* at 914 n.8. Here, too, that CHH became valuable because the government declined to prosecute CHH's successor-in-interest (1-SER-17) was wholly independent of Lopez's actions.[15]

The district court likewise did not clearly err in finding that Lopez purposely sought to inflict the collateral consequences. "[I]ntended loss

---

[15] Contrary to Lopez's suggestion (Br.63), *Zolp* did not create a rule requiring valuation based on present value. To the contrary, this Court "express[ed] no opinion" on the district court's method of calculation— *i.e.*, comparing the average price of the stock during the scheme to the stock's value after the scheme became public. 479 F.3d at 720 & n.4. The Court only held clearly erroneous "the district court's factual finding that the involved stock was 'worthless' after the fraud came to light." *Id.* at 716; *see id.* at 719-21.

can be shown by looking to what loss was expected because a person is presumed to have intended the natural and probable consequences of his or her actions." *United States v. Killen*, 761 F.3d 945, 950 (8th Cir. 2014) (cleaned up). And as the witnesses the court cited explained, selling Solace a healthcare company saddled with criminal liability jeopardized Solace's licenses, 1-ER-27—a fact Lopez, with his industry experience, 9-ER-1601:10-21, would have known.[16]

Second, in suggesting (Br.63) that the district court "revealed its ability to ascertain the loss," Lopez simply misquotes the court. The court's full statement was that "*on the back end*, Solace didn't suffer any significant financial loss as a result of the wire fraud" because the government declined to prosecute it. 4-ER-631:8-12 (emphasis added). Lopez shows no clear error in the court's finding that the loss could not reasonably be determined.

---

[16] *Crandall*, on which Lopez relies (Br.61-62), is readily distinguishable. *Crandall* addressed actual loss only because, as the Court explained, the defendants' scheme "was intended to enhance the marketability and value of the apartments" in question, not cause the buyers to "suffer any loss." 525 F.3d at 914. Here, Lopez unloaded on Solace a worthless company he knew would jeopardize its licenses.

Finally, even if the district court had erred in using Lopez's gain as a proxy for the full amount of actual or intended loss, any such error would be harmless given the court's correct finding that Lopez caused actual loss of $10.459 million. *See* U.S.S.G. § 2B1.1(b)(1)(K)) (20-level increase for loss greater than $9.5 million).

## B. The District Court Correctly Ordered Forfeiture of Lopez's $10.459 Million Fraud Proceeds.

Lopez argues (Br.64-69) that the forfeiture of his wire-fraud proceeds lacked statutory authorization and violated the Excessive Fines Clause. He is wrong.

### 1. Background

Post-trial, the district court granted the government's motion for a preliminary forfeiture order of $10.459 million, Dkt.710, holding that that amount was forfeitable under 18 U.S.C. § 981(a)(1)(C) as "the proceeds traceable to the wire fraud scheme Lopez was convicted of at trial," 1-ER-32 (citing *United States v. Lo*, 839 F.3d 777, 791 (9th Cir. 2016)). As the court explained, the proceeds of "'supposedly legitimate transactions'" can be forfeited, and here, although "CHH was a legitimate business," "the sale was tainted by Lopez's fraudulent omission of the antitrust investigation." 1-ER-33 & n.8 (quoting *United*

74

*States v. Omidi*, 125 F.4th 1283, 1288-89 (9th Cir. 2025)). At sentencing, the court entered a final forfeiture order of $10.459 million. 1-ER-10.

### 2. Legal Principles and Standard of Review

a. 18 U.S.C. § 981(a)(1)(C) provides for civil forfeiture of "[a]ny property … which constitutes or is derived from proceeds traceable to … any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of this title)." Wire fraud is "specified unlawful activity." *United States v. Phillips*, 704 F.3d 754, 769 (9th Cir. 2012).

28 U.S.C. § 2461(c), in turn, "provides for *criminal* forfeiture whenever civil forfeiture is available *and* the defendant is found guilty of the offense." *Phillips*, 704 F.3d at 769 (quotation marks omitted). When a defendant is found guilty of wire fraud and the government "establish[es] the requisite nexus between the property and the offense," "such forfeiture is mandatory." *Omidi*, 125 F.4th at 1287 (quotation marks omitted).

18 U.S.C. § 981 contains three definitions of "proceeds." As relevant here, subsection (a)(2)(A) provides that "[i]n cases involving illegal goods, illegal services, [and] unlawful activities … the term

75

'proceeds' means property of any kind obtained directly or indirectly, as the result of the commission of the offense giving rise to forfeiture, and any property traceable thereto, and is not limited to the net gain or profit realized from the offense." 18 U.S.C. § 981(a)(2)(A).

b.  "[*I*]*n personam* forfeitures of criminal proceeds" are subject to the Eighth Amendment's Excessive Fines Clause. *United States v. Beecroft*, 825 F.3d 991, 1000 (9th Cir. 2016), *abrogated on other grounds by Honeycutt v. United States*, 581 U.S. 443, 454 (2017). Such a forfeiture violates the Clause "if it is grossly disproportional to the gravity of a defendant's offense." *United States v. Bajakajian*, 524 U.S. 321, 334 (1998).

c.  This Court "review[s] de novo a district court's interpretation of federal forfeiture law, and its calculation of the forfeitable amount for clear error." *Omidi*, 125 F.4th at 1287. This Court likewise reviews proportionality determinations de novo and the underlying factual findings for clear error. *Bajakajian*, 524 U.S. at 336 n.10.

### 3. Discussion

#### a. Lopez's fraud proceeds were forfeitable.

18 U.S.C. § 981(a)(1)(C) authorized forfeiture of the $10.459 million Lopez received from his fraud. This Court has held that Section 981 "broadly makes forfeitable any property," including "funds," "obtained by the defendant directly or indirectly, as a result of the commission of a mail fraud or wire fraud offense." *Lo*, 839 F.3d at 793 (citing 18 U.S.C. §§ 981(a)(1)(C), (a)(2)(A)). And here, the district court found that Lopez obtained $10.459 million from "the wire fraud scheme [he] was convicted of at trial," 1-ER-32—a factual finding Lopez does not challenge.

Lopez's suggestion that *Lo* applies only to cases of "outright theft" (Br.67 n.18) is wrong: *Lo* articulated no such limitation. Because *Lo* is the law of this circuit, Lopez's reliance (Br.66-67) on out-of-circuit cases is unavailing. *See also Omidi*, 125 F.4th at 1287 (under Subsection 981(a)(1)(C), "any property which constitutes or is derived from proceeds traceable to a mail or wire fraud scheme is subject to

77

forfeiture") (quotation marks omitted).[17] And even if Subsection

981(a)(2)(B) had applied, Lopez would not have been entitled to an

offset for "direct costs" under that provision, because the ostensible

"cost" on which he relied—CHH's value as a business, Dkt.713 at 10—

was not a "direct cost," *see Cost*, Black's Law Dictionary (12th ed. 2024)

("direct cost" is "[t]he amount of money for material, labor, and

overhead to produce a product"), and anyway was zero at the time of the

fraud, 3-ER-581:6-25.

### b.   Eighth Amendment

The forfeiture did not violate the Excessive Fines Clause. The

"touchstone" of excessiveness analysis "is [the] value of [a monetary]

fine in relation to the offense." *Austin v. United States*, 509 U.S. 602,

627 (1993) (Scalia, J., concurring in part and in the judgment). This

Court has observed that when, as here, "the district court orders that

the defendant forfeit the profits gained from illegal activity, it is hard to

imagine how such a forfeiture could constitute cruel and unusual

---

[17]   Contrary to Lopez's assertion (Br.65), the rule of lenity "applies only when" (*inter alia*) "a criminal statute contains a grievous ambiguity." *Ocasio v. United States*, 578 U.S. 282, 295 n.8 (2016) (quotation marks omitted).

punishment." *United States v. Feldman*, 853 F.2d 648, 663 (9th Cir. 1988). And courts have repeatedly rejected excessiveness challenges to forfeitures of the amount obtained through fraud. *See United States v. Johnson*, 956 F.3d 510, 518 (8th Cir. 2020); *United States v. Bikundi*, 926 F.3d 761, 795 (D.C. Cir. 2019). This Court should do the same here, since the forfeiture targeted "the precise amount of funds Lopez received." 1-ER-34.

Citing *Beecroft*, Lopez claims (Br.68-69) that, in this Circuit, forfeitures are automatically excessive if they exceed "three times the maximum fine" under the Sentencing Guidelines. But *Beecroft* adopted no such rule. *Beecroft* vacated a $107 million forfeiture that was more than 100 times the *statutory* maximum fine and lacked "apparent [justification] on the record." 825 F.3d at 1001-02. In citing another decision stating that, in that case, a forfeiture "between 3 and 20 times greater than [the] maximum fine" would have been excessive, *Beecroft* did not purport to adopt that ratio as a constitutional cap. *Id.* at 1001. Indeed, *Beecroft* also cited with approval a decision "upholding [a] forfeiture order ten times greater than [the] maximum [criminal] Guidelines fine." *Id.* (citing *United States v. Mackby*, 339 F.3d 1013,

1018 (9th Cir. 2003)). And this Court's subsequent decisions do not reflect the bright-line rule Lopez advocates. *See, e.g.*, *United States v. Singh*, 783 F. App'x 765, 766 (9th Cir. 2019) (affirming forfeiture nearly twenty times maximum Guidelines fine).[18]

## C. The District Court Did Not Abuse Its Discretion in Ordering Restitution.

Lopez argues (Br.69-72) that the district court abused its discretion by ordering restitution for Solace's criminal attorney's fees. He is wrong.

### 1. Background

At sentencing, the government sought restitution to Solace of nearly $2.5 million Solace had paid in criminal attorney's fees. Dkt.734 at 12 n.8. The government explained that, due to Lopez's fraud, "Solace was forced to defend itself from potential criminal charges" for over a year, Dkt.734 at 11—*i.e.*, from February 2022, when Lopez sent Solace the government's target letters, Dkt.726 at 11, to October 2023, when

---

[18]    Although *Beecroft* held excessive a forfeiture in the amount of the conspiracy's proceeds, 825 F.3d at 1002 n.9, there the entire conspiracy proceeds were ordered forfeited from a single conspirator whose personal profit from the scheme was relatively small, *id.* at 994, in addition to the facts *supra* at 79.

Solace received the government's declination letter, Dkt.734 at 11. And after the declination, the government explained, Solace incurred attorney's fees participating in the criminal case against Lopez. *Id.* at 12.

To substantiate the request, the government submitted Solace's invoices from Reed Smith and Boies Schiller, both of which represented Solace in the investigation and ensuing prosecution. Dkt.726 Ex.A. After Lopez claimed deficiencies in those invoices, Dkt.772 at 3, the government submitted a sworn declaration from a Reed Smith attorney that the invoices "reflect work performed by [Reed Smith and Boies Schiller] in their representation of Solace and Webster [Equity Partners, Solace's owner] in the Criminal Matter," 5-ER-712, including responding to government subpoenas; obtaining Solace's declination; responding to Lopez's subpoenas; and preparing witnesses from Solace and Webster Equity Partners to testify, 5-ER-711.

At sentencing, the district court ordered restitution for Solace's criminal attorney's fees, finding "the Government's burden" met. 4-ER-678:13-16. The court found this was not a case "where there is just a dump of [fee] information" "without clarity," 4-ER-679:1-3—criminal

81

counsel's fees were separate from those Solace paid a different firm to handle a civil case Solace had brought against Lopez, 4-ER-679:4-9, and the invoices, though redacted, substantiated the fee request, "especially when it's coupled with [counsel's] declaration" under "penalties of perjury," 4-ER-679:10-15. The court thus ordered $2.496 million restitution "pursuant to [18 U.S.C. §§] 3663 and 3663A." 4-ER-680:1-4.

### 2. Legal Principles and Standard of Review

The Mandatory Victims Restitution Act (MVRA), 18 U.S.C. § 3663A, requires restitution for a "victim's actual losses that are a direct and proximate result of the defendant's offense." *United States v. Eyraud*, 809 F.3d 462, 467 (9th Cir. 2015) (quotation marks omitted). As relevant here, under Subsection (b)(1), "in the case of an offense resulting in damage to or loss or destruction of property," the court must require the defendant to make restitution for the lost property. 18 U.S.C. § 3663A(b)(1). And under Subsection (b)(4), "in any case," the court must require restitution for "expenses incurred during participation in the investigation or prosecution of the offense," *id.* § 3663A(b)(4)—*i.e.*, in "government investigations and criminal proceedings," *Lagos v. United States*, 584 U.S. 577, 579 (2018).

82

Subsection (b)(4) covers attorney's fees if the government shows "it was reasonably necessary for the victim to incur [them] to participate in the investigation or prosecution." *United States v. Nosal*, 844 F.3d 1024, 1047 (9th Cir. 2016) (cleaned up), *overruled in part on other grounds by Lagos*, 584 U.S. at 579.

"Any dispute as to the proper amount or type of restitution [is] resolved by the [district] court by the preponderance of the evidence," with the government bearing the burden of proving loss. 18 U.S.C. § 3664(e). In determining the amount of restitution, the district court need only "rely on evidence that possesses sufficient indicia of reliability to support its probable accuracy." *United States v. Dadyan*, 76 F.4th 955, 960 (9th Cir. 2023).

"The legality of a restitution order is reviewed *de novo*." *United States v. Gagarin*, 950 F.3d 596, 607 (9th Cir. 2020). "If the order is within statutory bounds, then the restitution calculation is reviewed for abuse of discretion, with any underlying factual findings reviewed for clear error." *Id.* (quotation marks omitted).

83

### 3. Discussion

The district court's restitution order was proper. The court found that the government had proved, by a preponderance of the evidence, Solace's actual losses that were "the proximate result of the wire fraud conviction[s]." 4-ER-679:16-20. And that finding was supported by evidence of sufficient reliability, including Solace's invoices; criminal counsel's declaration; and criminal counsel's in-court statements (4-ER-645:15-646:8, 4-ER-676:7-677:12). *Cf. Eyraud*, 809 F.3d at 465-66 (upholding restitution order based on legal invoices filed *in camera* and attorney declaration).[19]

Lopez's arguments to the contrary are unavailing. On the assumption that attorney's fees are recoverable only under Subsection (b)(4), Lopez challenges (Br.69-70) the award to Solace of the fees it incurred defending itself against the criminal investigation. But attorney's fees also are recoverable under Subsection (b)(1) when "the

---

[19] Lopez wrongly claims (Br.69) that the district court misstated the "standard for recoverable fees." The court recited Section 3663A's requirement that Lopez's offense have directly and proximately caused Solace's losses. 4-ER-679:16-20; *see* 18 U.S.C. § 3663A(a)(2). And the court specifically acknowledged *Lagos*. 4-ER-678:13-16. Thus, as in *Eyraud*, "the court was manifestly aware of the law governing an award of attorneys' fees." 809 F.3d at 468.

84

fees were the direct and proximate result of the defendant's crime."
*United States v. Abdelbary*, 746 F.3d 570, 577 (4th Cir. 2014); *see also United States v. Avenatti*, 81 F.4th 171, 211 (2d Cir. 2023) (extortion victim's attorney's fees were "pecuniary losses at the core of the MVRA"). And, here, the district court found that Lopez's offense directly and proximately caused Solace to incur those fees. 4-ER-679:16-20. Indeed, as the government's proof at trial and sentencing showed, Lopez's fraud caused Solace to buy a company saddled with criminal exposure, which brought Solace under investigation and forced it to hire defense counsel. Solace's defense fees thus were compensable lost property under Subsection (b)(1). *See Abdelbary*, 746 F.3d at 579 (affirming restitution for creditor's attorney's fees directly and proximately resulting from defendant's bankruptcy fraud).[20]

Contrary to Lopez's suggestion (Br.70), Subsection (b)(4) authorized Reed Smith's fees for advising on "developments in the Civil Litigation where issues raised by Mr. Lopez in the Criminal Matter

---

[20] The court's statement that it was ordering "full restitution," 4-ER-678:11, under Section "3663A," 4-ER-680:3-4, shows that the order rests on subsections (b)(1) *and* (b)(4). Even if that were in doubt, this Court could "affirm on any basis supported by the record." *United States v. Pope*, 686 F.3d 1078, 1083 (9th Cir. 2012).

were involved." 5-ER-712. As the government explained, Reed Smith "ha[d] to converse with civil counsel in order to represent [Solace] in the criminal case." 4-ER-658:20-659:2. And Subsection (b)(4) also covered counsel's fees, paid by Solace, to represent Oakmark Advisors (which employed witnesses "affiliated with Solace," 4-ER-645:1-25; 7-ER-1450:9-17) in responding to Lopez's subpoenas "seeking communications about Solace." 4-ER-676:24-677:7; 4-ER-645:23-646:6. Lopez offers no reason to doubt that it was "reasonably necessary" for Solace to incur both categories of fees to participate in his prosecution. *Nosal*, 844 F.3d at 1047; *see, e.g.*, *United States v. Rankin*, 2023 WL 7403638, at *5 (D. Conn. Nov. 9, 2023) (ordering restitution under Subsection (b)(4) for victim's fees for counsel to "represent current and former employees and board members [of the victim]," which "served to protect [the victim's] interests"), *aff'd*, *United States v. Sullivan*, 118 F.4th 170, 233 (2d Cir. 2024).[21]

---

[21]    Lopez's claim (Br.71) that only $150,000 of Solace's fees were to "aid the government" conflates different inquiries. The government's statement related to the *Guidelines loss calculation*, not the restitution determination. "[T]he two measures serve different purposes and utilize different calculation methods." *Dadyan*, 76 F.4th at 959-60 (quotation marks omitted).

Finally, Lopez's failure to show that the restitution award included *any* improper fees defeats his argument (Br.70-72) that redactions in the invoices prevented the district court from limiting restitution to those fees compensable under Subsection (b)(4). As discussed, there was no need for the court to do so.

## CONCLUSION

This Court should affirm.

Respectfully submitted,

s/   *Matthew A. Waring*

STANLEY E. WOODWARD, JR.
  *Associate Attorney General*

DANIEL W. GLAD
  *Acting Deputy Assistant Attorney General for Criminal Enforcement*

LESLIE A. WULFF
MIKAL J. CONDON
JEFFREY CRAMER
ANDREW MAST
  *Attorneys*
U.S. DEPARTMENT OF JUSTICE
ANTITRUST DIVISION

DANIEL E. HAAR
STRATTON C. STRAND
MATTHEW A. WARING
  *Attorneys*
U.S. DEPARTMENT OF JUSTICE
ANTITRUST DIVISION
950 Pennsylvania Ave., N.W.
Room 3224
Washington, D.C. 20530-0001
(202) 532-4186
matthew.waring@usdoj.gov

*Counsel for the United States*

July 9, 2026

87

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 25-7652

I am the attorney or self-represented party.

**This brief contains** 15,955 **words, including** 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [              ].

◉ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/ Matthew A. Waring **Date** 7/9/2026

*(use "s/[typed name]" to sign electronically-filed documents)*

Feedback or questions about this form? Email us at forms@ca9.uscourts.gov

**Form 8** *Rev. 12/01/22*

**STATUTORY ADDENDUM**

**TABLE OF CONTENTS**

15 U.S.C. § 1 ................................................................................2

18 U.S.C. § 1343................................................................................3

18 U.S.C. § 3663................................................................................4

18 U.S.C. § 3664................................................................................9

## 15 U.S.C. § 1. Trusts, etc., in restraint of trade illegal; penalty

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $100,000,000 if a corporation, or, if any other person, $1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court.

CREDIT(S)
(July 2, 1890, c. 647, § 1, 26 Stat. 209; Aug. 17, 1937, c. 690, Title VIII, 50 Stat. 693; July 7, 1955, c. 281, 69 Stat. 282; Pub.L. 93-528, § 3, Dec. 21, 1974, 88 Stat. 1708; Pub.L. 94-145, § 2, Dec. 12, 1975, 89 Stat. 801; Pub.L. 101-588, § 4(a), Nov. 16, 1990, 104 Stat. 2880; Pub.L. 108-237, Title II, § 215(a), June 22, 2004, 118 Stat. 668.)

Add. 2

## 18 U.S.C. § 1343. Fraud by wire, radio, or television

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both. If the violation occurs in relation to, or involving any benefit authorized, transported, transmitted, transferred, disbursed, or paid in connection with, a presidentially declared major disaster or emergency (as those terms are defined in section 102 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5122)), or affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

CREDIT(S)
(Added July 16, 1952, c. 879, § 18(a), 66 Stat. 722; amended July 11, 1956, c. 561, 70 Stat. 523; Pub.L. 101-73, Title IX, § 961(j), Aug. 9, 1989, 103 Stat. 500; Pub.L. 101-647, Title XXV, § 2504(i), Nov. 29, 1990, 104 Stat. 4861; Pub.L. 103-322, Title XXXIII, § 330016(1)(H), Sept. 13, 1994, 108 Stat. 2147; Pub.L. 107-204, Title IX, § 903(b), July 30, 2002, 116 Stat. 805; Pub.L. 110-179, § 3, Jan. 7, 2008, 121 Stat. 2557.)

## 18 U.S.C. § 3663. Order of restitution

**(a)(1)(A)** The court, when sentencing a defendant convicted of an offense under this title, section 401, 408(a), 409, 416, 420, or 422(a) of the Controlled Substances Act (21 U.S.C. 841, 848(a), 849, 856, 861, 863) (but in no case shall a participant in an offense under such sections be considered a victim of such offense under this section), or section 5124, 46312, 46502, or 46504 of title 49, other than an offense described in section 3663A(c), may order, in addition to or, in the case of a misdemeanor, in lieu of any other penalty authorized by law, that the defendant make restitution to any victim of such offense, or if the victim is deceased, to the victim's estate. The court may also order, if agreed to by the parties in a plea agreement, restitution to persons other than the victim of the offense.

**(B)(i)** The court, in determining whether to order restitution under this section, shall consider--

> **(I)** the amount of the loss sustained by each victim as a result of the offense; and

> **(II)** the financial resources of the defendant, the financial needs and earning ability of the defendant and the defendant's dependents, and such other factors as the court deems appropriate.

**(ii)** To the extent that the court determines that the complication and prolongation of the sentencing process resulting from the fashioning of an order of restitution under this section outweighs the need to provide restitution to any victims, the court may decline to make such an order.

**(2)** For the purposes of this section, the term "victim" means a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern. In the case of a victim who is under 18 years of age, incompetent,

Add. 4

incapacitated, or deceased, the legal guardian of the victim or representative of the victim's estate, another family member, or any other person appointed as suitable by the court, may assume the victim's rights under this section, but in no event shall the defendant be named as such representative or guardian.

**(3)** The court may also order restitution in any criminal case to the extent agreed to by the parties in a plea agreement.

**(b)** The order may require that such defendant--

> **(1)** in the case of an offense resulting in damage to or loss or destruction of property of a victim of the offense--
>
> > **(A)** return the property to the owner of the property or someone designated by the owner; or
> >
> > **(B)** if return of the property under subparagraph (A) is impossible, impractical, or inadequate, pay an amount equal to the greater of--
> >
> > > **(i)** the value of the property on the date of the damage, loss, or destruction, or
> > >
> > > **(ii)** the value of the property on the date of sentencing,
> >
> > less the value (as of the date the property is returned) of any part of the property that is returned;
>
> **(2)** in the case of an offense resulting in bodily injury to a victim including an offense under chapter 109A or chapter 110--
>
> > **(A)** pay an amount equal to the cost of necessary medical and related professional services and devices relating to physical, psychiatric, and psychological care, including nonmedical care and treatment rendered in accordance with a method of healing recognized by the law of the place of treatment;
> >
> > **(B)** pay an amount equal to the cost of necessary physical and occupational therapy and rehabilitation; and

Add. 5

**(C)** reimburse the victim for income lost by such victim as a result of such offense;

**(3)** in the case of an offense resulting in bodily injury also results in the death of a victim, pay an amount equal to the cost of necessary funeral and related services;

**(4)** in any case, reimburse the victim for lost income and necessary child care, transportation, and other expenses related to participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense;

**(5)** in any case, if the victim (or if the victim is deceased, the victim's estate) consents, make restitution in services in lieu of money, or make restitution to a person or organization designated by the victim or the estate; and

**(6)** in the case of an offense under sections 1028(a)(7) or 1028A(a) of this title, pay an amount equal to the value of the time reasonably spent by the victim in an attempt to remediate the intended or actual harm incurred by the victim from the offense.

**(c)(1)** Notwithstanding any other provision of law (but subject to the provisions of subsections (a)(1)(B)(i)(II) and (ii),[1] when sentencing a defendant convicted of an offense described in section 401, 408(a), 409, 416, 420, or 422(a) of the Controlled Substances Act (21 U.S.C. 841, 848(a), 849, 856, 861, 863), in which there is no identifiable victim, the court may order that the defendant make restitution in accordance with this subsection.

**(2)(A)** An order of restitution under this subsection shall be based on the amount of public harm caused by the offense, as determined by the court in accordance with guidelines promulgated by the United States Sentencing Commission.

**(B)** In no case shall the amount of restitution ordered under this subsection exceed the amount of the fine which may be ordered for the offense charged in the case.

**(3)** Restitution under this subsection shall be distributed as follows:

Add. 6

**(A)** 65 percent of the total amount of restitution shall be paid to the State entity designated to administer crime victim assistance in the State in which the crime occurred.

**(B)** 35 percent of the total amount of restitution shall be paid to the State entity designated to receive Federal substance abuse block grant funds.

**(4)** The court shall not make an award under this subsection if it appears likely that such award would interfere with a forfeiture under chapter 46 or chapter 96 of this title or under the Controlled Substances Act (21 U.S.C. 801 et seq.).

**(5)** Notwithstanding section 3612(c) or any other provision of law, a penalty assessment under section 3013 or a fine under subchapter C of chapter 227 shall take precedence over an order of restitution under this subsection.

**(6)** Requests for community restitution under this subsection may be considered in all plea agreements negotiated by the United States.

**(7)(A)** The United States Sentencing Commission shall promulgate guidelines to assist courts in determining the amount of restitution that may be ordered under this subsection.

**(B)** No restitution shall be ordered under this subsection until such time as the Sentencing Commission promulgates guidelines pursuant to this paragraph.

**(d)** An order of restitution made pursuant to this section shall be issued and enforced in accordance with section 3664.

CREDIT(S)

(Added Pub.L. 97-291, § 5(a), Oct. 12, 1982, 96 Stat. 1253, § 3579; renumbered § 3663 and amended Pub.L. 98-473, Title II, § 212(a)(1), (3), Oct. 12, 1984, 98 Stat. 1987, 2010; Pub.L. 98-596, § 9, Oct. 30, 1984, 98 Stat. 3138; Pub.L. 99-646, §§ 8(b), 20(a), 77(a), 78(a), 79(a), Nov. 10, 1986, 100 Stat. 3593, 3596, 3618, 3619; Pub.L. 100-182, § 13, Dec. 7, 1987, 101 Stat. 1268; Pub.L. 100-185, § 12, Dec. 11, 1987, 101 Stat.

Add. 7

1285; Pub.L. 100-690, Title VII, § 7042, Nov. 18, 1988, 102 Stat. 4399; Pub.L. 101-647, Title XXV, § 2509, Title XXXV, § 3595, Nov. 29, 1990, 104 Stat. 4863, 4931; Pub.L. 103-272, § 5(e)(12), July 5, 1994, 108 Stat. 1374; Pub.L. 103-322, Title IV, §§ 40504, 40505, Sept. 13, 1994, 108 Stat. 1947; Pub.L. 104-132, Title II, § 205(a), Apr. 24, 1996, 110 Stat. 1229; Pub.L. 104-294, Title VI, §§ 601(r)(1), (2), 605(l), Oct. 11, 1996, 110 Stat. 3502, 3510; Pub.L. 106-310, Div. B, Title XXXVI, § 3613(c), Oct. 17, 2000, 114 Stat. 1230; Pub.L. 109-59, Title VII, § 7128(b), Aug. 10, 2005, 119 Stat. 1910; Pub.L. 110-326, Title II, § 202, Sept. 26, 2008, 122 Stat. 3561.)

## 18 U.S.C. § 3664. Procedure for issuance and enforcement of order of restitution

**(a)** For orders of restitution under this title, the court shall order the probation officer to obtain and include in its presentence report, or in a separate report, as the court may direct, information sufficient for the court to exercise its discretion in fashioning a restitution order. The report shall include, to the extent practicable, a complete accounting of the losses to each victim, any restitution owed pursuant to a plea agreement, and information relating to the economic circumstances of each defendant. If the number or identity of victims cannot be reasonably ascertained, or other circumstances exist that make this requirement clearly impracticable, the probation officer shall so inform the court.

**(b)** The court shall disclose to both the defendant and the attorney for the Government all portions of the presentence or other report pertaining to the matters described in subsection (a) of this section.

**(c)** The provisions of this chapter, chapter 227, and Rule 32(c) of the Federal Rules of Criminal Procedure shall be the only rules applicable to proceedings under this section.

**(d)(1)** Upon the request of the probation officer, but not later than 60 days prior to the date initially set for sentencing, the attorney for the Government, after consulting, to the extent practicable, with all identified victims, shall promptly provide the probation officer with a listing of the amounts subject to restitution.

**(2)** The probation officer shall, prior to submitting the presentence report under subsection (a), to the extent practicable--

    **(A)** provide notice to all identified victims of--

        **(i)** the offense or offenses of which the defendant was convicted;

        **(ii)** the amounts subject to restitution submitted to the probation officer;

**(iii)** the opportunity of the victim to submit information to the probation officer concerning the amount of the victim's losses;

**(iv)** the scheduled date, time, and place of the sentencing hearing;

**(v)** the availability of a lien in favor of the victim pursuant to subsection (m)(1)(B); and

**(vi)** the opportunity of the victim to file with the probation officer a separate affidavit relating to the amount of the victim's losses subject to restitution; and

**(B)** provide the victim with an affidavit form to submit pursuant to subparagraph (A)(vi).

**(3)** Each defendant shall prepare and file with the probation officer an affidavit fully describing the financial resources of the defendant, including a complete listing of all assets owned or controlled by the defendant as of the date on which the defendant was arrested, the financial needs and earning ability of the defendant and the defendant's dependents, and such other information that the court requires relating to such other factors as the court deems appropriate.

**(4)** After reviewing the report of the probation officer, the court may require additional documentation or hear testimony. The privacy of any records filed, or testimony heard, pursuant to this section shall be maintained to the greatest extent possible, and such records may be filed or testimony heard in camera.

**(5)** If the victim's losses are not ascertainable by the date that is 10 days prior to sentencing, the attorney for the Government or the probation officer shall so inform the court, and the court shall set a date for the final determination of the victim's losses, not to exceed 90 days after sentencing. If the victim subsequently discovers further losses, the victim shall have 60 days after discovery of those losses in which to petition the court for an amended restitution order. Such order may be

Add. 10

granted only upon a showing of good cause for the failure to include such losses in the initial claim for restitutionary relief.

**(6)** The court may refer any issue arising in connection with a proposed order of restitution to a magistrate judge or special master for proposed findings of fact and recommendations as to disposition, subject to a de novo determination of the issue by the court.

**(e)** Any dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence. The burden of demonstrating the amount of the loss sustained by a victim as a result of the offense shall be on the attorney for the Government. The burden of demonstrating the financial resources of the defendant and the financial needs of the defendant's dependents, shall be on the defendant. The burden of demonstrating such other matters as the court deems appropriate shall be upon the party designated by the court as justice requires.

**(f)(1)(A)** In each order of restitution, the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant.

**(B)** In no case shall the fact that a victim has received or is entitled to receive compensation with respect to a loss from insurance or any other source be considered in determining the amount of restitution.

**(2)** Upon determination of the amount of restitution owed to each victim, the court shall, pursuant to section 3572, specify in the restitution order the manner in which, and the schedule according to which, the restitution is to be paid, in consideration of--

> **(A)** the financial resources and other assets of the defendant, including whether any of these assets are jointly controlled;

> **(B)** projected earnings and other income of the defendant; and

> **(C)** any financial obligations of the defendant; including obligations to dependents.

Add. 11

**(3)(A)** A restitution order may direct the defendant to make a single, lump-sum payment, partial payments at specified intervals, in-kind payments, or a combination of payments at specified intervals and in-kind payments.

**(B)** A restitution order may direct the defendant to make nominal periodic payments if the court finds from facts on the record that the economic circumstances of the defendant do not allow the payment of any amount of a restitution order, and do not allow for the payment of the full amount of a restitution order in the foreseeable future under any reasonable schedule of payments.

**(4)** An in-kind payment described in paragraph (3) may be in the form of--

    **(A)** return of property;

    **(B)** replacement of property; or

    **(C)** if the victim agrees, services rendered to the victim or a person or organization other than the victim.

**(g)(1)** No victim shall be required to participate in any phase of a restitution order.

**(2)** A victim may at any time assign the victim's interest in restitution payments to the Crime Victims Fund in the Treasury without in any way impairing the obligation of the defendant to make such payments.

**(h)** If the court finds that more than 1 defendant has contributed to the loss of a victim, the court may make each defendant liable for payment of the full amount of restitution or may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant.

**(i)** If the court finds that more than 1 victim has sustained a loss requiring restitution by a defendant, the court may provide for a different payment schedule for each victim based on the type and amount of each victim's loss and accounting for the economic circumstances of each victim. In any case in which the United States is

Add. 12

a victim, the court shall ensure that all other victims receive full restitution before the United States receives any restitution.

**(j)(1)** If a victim has received compensation from insurance or any other source with respect to a loss, the court shall order that restitution be paid to the person who provided or is obligated to provide the compensation, but the restitution order shall provide that all restitution of victims required by the order be paid to the victims before any restitution is paid to such a provider of compensation.

**(2)** Any amount paid to a victim under an order of restitution shall be reduced by any amount later recovered as compensatory damages for the same loss by the victim in--

> **(A)** any Federal civil proceeding; and

> **(B)** any State civil proceeding, to the extent provided by the law of the State.

**(k)** A restitution order shall provide that the defendant shall notify the court and the Attorney General of any material change in the defendant's economic circumstances that might affect the defendant's ability to pay restitution. The court may also accept notification of a material change in the defendant's economic circumstances from the United States or from the victim. The Attorney General shall certify to the court that the victim or victims owed restitution by the defendant have been notified of the change in circumstances. Upon receipt of the notification, the court may, on its own motion, or the motion of any party, including the victim, adjust the payment schedule, or require immediate payment in full, as the interests of justice require.

**(l)** A conviction of a defendant for an offense involving the act giving rise to an order of restitution shall estop the defendant from denying the essential allegations of that offense in any subsequent Federal civil proceeding or State civil proceeding, to the extent consistent with State law, brought by the victim.

**(m)(1)(A)(i)** An order of restitution may be enforced by the United States in the manner provided for in subchapter C of chapter 227 and subchapter B of chapter 229 of this title; or

**(ii)** by all other available and reasonable means.

**(B)** At the request of a victim named in a restitution order, the clerk of the court shall issue an abstract of judgment certifying that a judgment has been entered in favor of such victim in the amount specified in the restitution order. Upon registering, recording, docketing, or indexing such abstract in accordance with the rules and requirements relating to judgments of the court of the State where the district court is located, the abstract of judgment shall be a lien on the property of the defendant located in such State in the same manner and to the same extent and under the same conditions as a judgment of a court of general jurisdiction in that State.

**(2)** An order of in-kind restitution in the form of services shall be enforced by the probation officer.

**(n)** If a person obligated to provide restitution, or pay a fine, receives substantial resources from any source, including inheritance, settlement, or other judgment, during a period of incarceration, such person shall be required to apply the value of such resources to any restitution or fine still owed.

**(o)** A sentence that imposes an order of restitution is a final judgment notwithstanding the fact that--

> **(1)** such a sentence can subsequently be--

>> **(A)** corrected under Rule 35 of the Federal Rules of Criminal Procedure and section 3742 of chapter 235 of this title;

>> **(B)** appealed and modified under section 3742;

>> **(C)** amended under subsection (d)(5); or

>> **(D)** adjusted under section 3664(k), 3572, or 3613A; or

> **(2)** the defendant may be resentenced under section 3565 or 3614.

Add. 14

**(p)** Nothing in this section or sections 2248, 2259, 2264, 2327, 3663, and 3663A and arising out of the application of such sections, shall be construed to create a cause of action not otherwise authorized in favor of any person against the United States or any officer or employee of the United States.

CREDIT(S)

(Added Pub.L. 97-291, § 5(a), Oct. 12, 1982, 96 Stat. 1255, § 3580; renumbered § 3664, Pub.L. 98-473, Title II, § 212(a)(1), Oct. 12, 1984, 98 Stat. 1987; amended Pub.L. 101-647, Title XXXV, § 3596, Nov. 29, 1990, 104 Stat. 4931; Pub.L. 104-132, Title II, § 206(a), Apr. 24, 1996, 110 Stat. 1232; Pub.L. 107-273, Div. B, Title IV, § 4002(e)(1), Nov. 2, 2002, 116 Stat. 1810.)